**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO**

| | |
|---|---|
| ANDREA GOLDBLUM<br>4108 Langland St., Unit 301<br>Cincinnati, OH 45223, | Case No. 1:19-cv-398 |
| | Judge: |
| Plaintiff, | |
| v. | COMPLAINT |
| | AND |
| THE UNIVERSITY OF CINCINNATI,<br>2600 Clifton Avenue<br>Cincinnati, OH 45220, | JURY DEMAND |
| Defendant | |

## INTRODUCTION

1. Plaintiff Andrea Goldblum ("Goldblum") brings this action for violation of the anti-retaliation provisions of Title IX and Title VII.

2. This case arises out of the decision of the University of Cincinnati ("UC") to effectively terminate Goldblum's employment as the school's Title IX Coordinator after she raised concerns about the school of Arts and Sciences publishing and promoting an online article that highlighted the accomplishments of a registered sex offender.

## PARTIES

3. Goldblum was the former Title IX Coordinator at the University of Cincinnati.

   a. Goldblum is an Ohio resident with a residence at 4108 Langland St., Unit 301, Cincinnati, OH 45223.

   b. As the Title IX Coordinator at UC, Goldblum was responsible for overseeing an office that fields and investigates complaints and provides interim measures for those impacted

by sexual violence and sexual harassment. Her job duties also included raising awareness about the issues of sexual assault and sexual misconduct on the UC campus.

    c. The UC Title IX Office works closely with the UC Office of Equal Opportunity & Access.

4. Defendant UC is a public university created by the Ohio Legislature.

    a. UC has a principal place of business at 2600 Clifton Avenue, Cincinnati, OH 45220. Under Ohio Revised Code 3361.01, the University of Cincinnati's Board of Trustees is the governing body of the University of Cincinnati.

    b. UC voluntarily participates in federal spending programs.

## JURISDICTION AND VENUE

5. This case arises under the laws of the United States, specifically Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. § 1681 *et seq.*, and Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e *et seq.* Accordingly, this Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1331 and 1343.

6. This Court is an appropriate venue for this cause of action pursuant to 28 U.S.C. § 1391. The defendant is a resident of the State in which this district is located and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## FACTS

7. This case occurs in the midst of the national #MeToo movement.

    a. The #MeToo movement is a national campaign to force institutions and businesses to confront widespread sexual harassment and assault. Propelled by admiration for those who have spoken out, fear that what happened to them could happen to others, and anger at how long abusers have gone unpunished, women and men have come forward to report instances of sexual harassment, often posting their accounts online using the popular hashtag.

2

b. In late 2017, #MeToo emerged as a trending hashtag on Twitter in the wake of movie producer Harvey Weinstein's exposure as a serial sexual predator. Since then, victims of sexual harassment have spoken out in droves, sharing their stories about sexual harassment. This national conversation has only grown, implicating many men in positions of power, across industries.

8. The #MeToo movement has been prevalent on college and university campuses.

a. The Chronicle of Higher Education in November 2017 wrote:

> Higher education had already had moments of confrontation with harassment, assault, and the cultural and structural forces that underlie them. . . .  Campus officials have struggled to determine how to punish abusive employees — and how to avoid simply passing them on to other universities. Scholarly societies have taken a more vigilant approach to conferences that have long been seen as incubators for misconduct.  But the new wave of revelations and accusations has raised the stakes, and the fury the #MeToo movement has tapped into could have a longstanding impact on higher education.

b. USA Today in January 2018 wrote:

> Since August, allegations against a small group of high-profile academics and education officials have forced them to step down, in some cases reversing long-standing customs in which universities downplayed such misbehavior, victims' advocates say.

9. The #MeToo movement has been prevalent on the UC Campus.

a. In February 2018, the UC President stated, in a letter to the "UC Community" that he was aware of the impact of the #MeToo movement at UC and called upon "each of us to speak up and step up to make our campus safer and treat all members of our community with dignity and respect."  He wrote:

> In recent months, the #MeToo movement has grimly and justifiably reminded us that no workplace, no professional field, no learning environment and no community is immune to sexual assault, sexual harassment and sexual misconduct. That includes the University of Cincinnati.

b. In August 2108, an opinion piece in the school newspaper lauded the hiring of Goldblum because of her experience in supporting victims of sexual harassment and sexual assault.

3

The article noted the importance of this experience in the #MeToo era. The author wrote, "Considering recent events surrounding the #MeToo movement, I think now is a good time to evaluate UC's track record of handling Title IX situations."

10. UC has various policies that prohibit sexual harassment and other sexual misconduct on campus. These policies were adopted and implemented as part of UC's efforts to comply with its obligations under Title IX.

11. UC policies prohibit, *inter alia*, sexual harassment and retaliation.

12. In particular, UC has pledged to take immediate action to end a hostile environment if one has been created, prevent its recurrence, and remedy the effects of any hostile environment on affected members of the campus community.

   a. The UC Policy on Discriminatory Harassment (Policy 11-02) recognizes a responsibility on the part of UC employees "to provide a non-discriminatory and non-hostile environment for employees, for students, and for others it serves…" The policy further defines Discriminatory Harassment as "conduct that has the purpose or foreseeable effect of unreasonably interfering with an identifiable individual's work or academic performance or of creating an intimidating, hostile, or offensive work or learning environment for that individual."

   b. The UC Policy on Sexual Harassment (Policy 11-03) prohibits both sexual harassment and retaliation "against anyone making a complaint of discrimination, including a complaint of sexual harassment…"

   c. As Title IX coordinator, Goldblum was responsible for the day-to-day application and review of university policies and practices as it relates to Title IX, Title VII and other Equal Opportunity laws at both the state and federal levels. Goldblum was also responsible to

4

for coordination of response, prevention and education initiatives pursuant to Title IX and related statutes.

13. Goldblum had over 30 years of experience in higher education. previously served as the Title IX coordinator at Kenyon College, University of the Pacific and The Ohio State University.

14. Goldblum was hired by UC as the UC Title IX Coordinator in June 2018. Her official title was Executive Director, Gender Equity & Inclusion.

    a. The initial term of employment to was through the end of the 2018-2019 school term. Goldblum expected that the term would be renewed for additional school years.

    b. Prior to hiring Goldblum, UC had conducted a long and extensive search for a Title IX Coordinator. Previous Title IX coordinators had been named in Federal Civil Rights lawsuits in this Court and in other federal courts. For example, in *Doe v. University of Cincinnati,* 223 F. Supp. 3d 704 (S.D. Ohio 2016), aff'd 873 F.3d 393 (6th Cir. 2017), this Court granted a preliminary injunction prohibiting the UC Title IX coordinator and other administrators from suspending a student who had alleged that the school had acted in violation of his constitutional due process right to confront adverse witnesses. Another former Title IX Director was named as a defendant in a federal lawsuit in the District of Montana, *Powell v. Montana State Univ., et al.*, D. Montana No. CV17-15.

15. Goldblum was responsible for day to day applications and review of UC's policies and practices related to Title IX, Title VII, and other equal opportunity initiatives pursuant to Title IX. She was also responsible for oversight of compliance with Title IX by UC and for providing support and resources to students who were affected by potential violations of Title IX.

    a. As part of her duties regarding Title IX, Goldblum was charged with coordinating responses to Title IX issues and laws including response to reported incidents and to investigate complaints regarding Title IX incidents.

5

b. As part of her duties, Goldblum was tasked with providing recommendations to ensure the safety of those reporting violations as well as the school community.

c. As part of her duties, Goldblum was required to provide consultation strategy, and communications to senior management, including her direct supervisor, Dr. Bleuzette Marshall, ("Dr. Marshall"), as to issues and responses to them falling within her job description.

d. As part of her duties, Goldblum also was charged with collaborating with university divisions to develop and facilitate safety and advocacy programs for the students at the university related to her position.

16. When she was hired, Goldblum told the student newspaper that she was committed to raising awareness about the issues within the Title IX office.  Goldblum said, "We share everything from what the policies are and how to report, to how to work with people who have been traumatized and how to support respondents or those who have been accused of something."

**THE WILLIAM HOUSTON MATTER**

17. William Houston was a student at UC.

a. Houston was a former Bowling Green State University football player who was convicted of gross sexual imposition in an Ohio court.

b. Houston had originally been indicted on one count of attempted rape.  He was convicted after he entered a no contest plea as part of a plea bargain.  The charges against Houston arose from a July 20, 2014, incident.  Houston, a sophomore at the time, allegedly got on top of his female victim in her bed, touched her inappropriately, took her hand to touch his genitals, and kissed her.

6

      c.   Houston was suspended by Bowling Green State University following an investigation and hearing under the university's code of student conduct. He was found responsible for "sexual contact without permission."

18. In January 2019, the UC College of Arts and Sciences published on online article highlighting UC "students who show the passion and drive to complete their degree despite facing… roller-coaster challenges."

      a.   Houston was profiled in the article as one of the students honored with a "triumph cord" at graduation. According to the article,

> These slender purple cords showcase the level of adversity the students have gone through and signal that they have overcome it. [UC] celebrates all of its graduates but reserves this distinction for students whose stories show how overcoming major challenges can lead to triumph.

      b.   The article is currently available at https://www.uc.edu/news/articles/2019/01/n2060727.html, but the references to Houston have been delated. Instead, an editorial note from the Dean states, "Out of sensitivity to members of our community, the original information in this article has been modified."

      c.   The Article did not indicate the specifics of the "immaturity" or "challenges" faced by Houston. However, students at UC soon discovered that Houston was a convicted sex offender and that he had been suspended from Bowling Green State University for sexual misconduct.

19. Many students at UC, including survivors of sexual assault, responded negatively to the article. These students indicated that they did not feel safe on campus and were traumatized to learn that a sex offender had been living and studying amongst them without their knowledge.

20. Houston, and the article in which he was featured, was promoted on the UC Arts and Sciences Twitter page: https://twitter.com/UC_ArtSci/status/1092806055996911616. The Tweet is set forth here:



a. Replies to the tweet were very critical of UC, including:

- "#NextLivesHere #RapeCultureLivesHere #RapistsAreSafeHere

- "No offense but what the fuck"

b. Some of the replies suggested that UC did not take the issue of sexual assault on campus seriously. These replies included,

- "You have tweeted multiple times since this event. Just admit UC as a whole hates women and GO

- @UC_ArtSci_Dean soooo are you going to delete this yet or are you going to continue to support rapists?

- Good to know our local college is out here supporting rapists. #boycottUC… And this is NOT THE FIRST TIME UC HAS DONE THIS

21. Houston, and the article in which he was featured, was promoted on the UC Arts and Sciences Facebook page: https://www.facebook.com/UCArtSci/photos/a.478281874499/10156947490844500. The Facebook Post included a picture of Houston.  It is set forth here:



a.   Replies to the post were very critical of UC, including:

- Celebrating someone who caused harm to someone else for the rest of that person's life is pretty disgusting UC. How about this, give his victim free tuition since you want to highlight a sexual offender's successes.

- I am genuinely astonished and disappointed in UC, A&S, and the Comm Dept for not removing this post, rescinding the award, and issuing a public apology

- absolutely disappointed to be a part of this university that would support a man like this. BARF

9

b.  Some of the replies suggested that UC did not take the issue of sexual assault on campus

seriously.  These replies included:

- Here we have rape culture where perps aren't ashamed while survivors are CONSTANTLY victim blamed and shamed for being assaulted.

- Somebody in Arts and Sciences is getting fired. UC already has a horrible reputation in this area.

- Confidential Resources for Survivors at UC are available from Women Helping Women… Please reach out for support. There are people in our community who want to help you. You are not alone.  College of Arts & Sciences, University of Cincinnati PLEASE pin this comment so these resources can be immediately available to those who view this post.

- Applauding sexual predators is a slap in the face to student survivors. This post should be removed.

- The whole city already jokes about UC parties being where girls go to get raped. At least y'all at the administration are admitting you know this is happening. Thank you for publicly taking a side.

- how many people would I have to rape, theoretically, to get an award from you University of Cincinnati??

- Why the hell are you honoring a registered sex offender? UC is huge into rape culture it seems...

c.  The UC Director of Public Relations commented on the Facebook page that the materials

would remain available "for transparency."  He wrote:

> As an educational institution, we are currently leaving the item in place as it provides transparency around events and what has occurred here. The sum total of online materials -- the old 2015 materials up in northern Ohio that brought these issues to light and the new -- provides important transparency and as complete an account as is now available.

**GOLDBLUM FACES RETALIATION FOR ATTEMPTING TO RESPOND TO THE HOUSTON MATTER**

22. On or about February 5, 2019, Goldblum became aware of the complaints and comments about

the Houston article.  Goldblum heard from a number of students who suggested that UC

promoting Houston and giving him an award contributed to a hostile learning environment and atmosphere.

    a. Goldblum believed she was obligated to respond to those who were unidentified by posting a letter in the school newspaper listing resources and offering help for the students. She believed that UC had an obligation under Title IX to acknowledge that the students who were traumatized by the Houston article and awards had been heard by the UC Administration.

    b. Goldblum, in her role as Title IX coordinator, was concerned that the promotion of Houston was a practice that fostered the creation of a sexually hostile environment and made female UC students vulnerable to sexual assault.

    c. Goldblum, in her role as the Title X Coordinator, reviewed the available information from Bowling Green and police reports. Goldblum became concerned for the disregard by UC administrators for the safety of the UC community when she learned that there may have been as many as eleven victims.

    d. Goldblum, in her role as Title IX Coordinator, was concerned that the publication and promotion of the Article violated the UC Policy against Discriminatory Harassment because it had the foreseeable effect of unreasonably interfering with students' work or academic performance or of creating an intimidating, hostile, or offensive work or learning environment. Goldblum, in forming these concerns, was aware that the UC Policy on Discriminatory Harassment did not require the consequences actually occur, but only the consequences were foreseeable.

23. On or about February 5, 2019, Goldblum spoke with Dr. Marshall and the UC Director of Communications. Goldblum told Dr. Marshall and the Director of Communications that UC

could be in violation of Title IX if resources were not specifically offered to students who may have negative responses to UC giving an award to a convicted sex offender.

   a. Goldblum shared he belief that UC may have created a hostile environment in violation of Title IX because giving an award to a convicted sex offender could deny or limit the ability of some students to participate in or benefit from UC's programs or activities.

   b. In particular, Goldblum communicated that she was concerned that UC's actions could create a hostile environment in violation of Title IX if students who are survivors of sexual assault were triggered by UC giving an award to a convicted sex offender.  UC, in her view, was required to provide adequate resources to these students and was failing to do so.

24. Goldblum was advised by Dr. Marshall, that the matter "was being considered" and that "a response would be forthcoming."  Goldblum was also advised that she would be contacted by a dean of the university regarding how to handle the matter.

25. No further response was provided.  Goldblum was not provided with guidance about how to respond to students expressing concerns or seeking resources.

26. Goldblum attempted to speak to UC's legal department about the Houston Matter and potential obligations of the school under Title IX.  She received no response.

27. Goldblum, in order to fulfill her obligations as part of her job description and to comply with legal obligations, drafted a letter addressing the students who had complained and listing possible resources.

28. A draft of this letter was provided to Dr. Marshall.  Dr. Marshall advised that the letter was deemed to be unsatisfactory and not to send the letter.  Goldblum later revised the letter.

29. Despite repeated requests, Dr. Marshall provided no further response on the Houston matter.

30. On February 11, 2019, the student newspaper ran an article stating UC "is facing backlash for not removing an article on its website that highlights a recent graduate who was charged with a sex crime in 2014." The article noted that many students expressed concern about UC actions:

> Several commenters voiced contempt for the article and questioned the post's suggestion that sexual assault equates to immaturity. One student said she planned to discuss the matter with A&S department heads and the dean.

31. On February 12, 2019, Goldblum advised Dr. Marshall that she was going to send the letter to the student newspaper. Goldblum believed that, despite the previous instruction not to send the letter, she was required to do so in order to fulfill her role as Title IX Coordinator and to assure that UC provided adequate resources to those possibly affected by the Houston Matter.

32. Goldblum waited for a response from Dr. Marshall until after 5:00 p.m. When no objection was received, Goldblum sent the letter via email to the student newspaper.

33. The letter was never published.

34. Dr. Marshall subsequently contacted Goldblum. Dr. Marshall was angry that Goldblum had sent the letter and advised that she was "getting blamed" for Goldblum's actions. However, Dr. Marshall did not state that the letter was an appropriate response to the obligations of UC under Title IX.

35. Goldblum was advised not to "ever do anything like that again." Goldblum agreed and believed that the matter concerning the letter had been resolved.

36. Goldblum's letter was never published, either online or in print by the student newspaper. No explanation has been given about why the letter was not published.

37. On February 15, 2109, the UC student newspaper ran another article about the Houston controversy.

   a. The article noted that a portion of the original article had been redacted by UC "After facing backlash on social media…" The article included claims by UC that "faculty

13

nominators, student writer and editor were all unaware of Houston's criminal history before the piece was published,"

    b.   The article states that UC had changed in position about the article:

> Despite facing backlash on Facebook and Twitter, the university initially declined to alter the article. University spokesperson M.B. Reilly said Monday that the article would not be changed, citing transparency. Days later, Houston's profile was removed from the story, and an editor's note was issued.

38. Goldblum, in her role as a Title IX Coordinator, started an informal investigation into the admission of Houston.  Goldblum was particularly interested in determining whether any UC personnel had knowledge that Houston was a convicted sex offender either prior to his admission or prior to his receipt of an award.  Goldblum was conducting an initial inquiry into whether his admission or presence on campus with minimal restrictions and without informing the student body violated any of the UC Title IX policies.

39. On or about March 15, 2019, Goldblum was called into a meeting in Dr. Marshall's office.  A representative from HR and a police officer were present.

40. Goldblum was told that since she had sent the letter to student newspaper, she was insubordinate and would be terminated.

41. As a result of her initial inquiries, Goldblum learned that admissions staff and the Assistant Dean of Students, Daniel Cummins, were aware of Houston's background prior to his admission. Goldblum also learned that the UC Police were aware of Houston's background shortly after his admission.

42. The claim of insubordination was pre-textual.

    a.   The UC Office of Equity & Inclusion is required by the UC Discriminatory Harassment Policy to conduct an investigation.  The policy states that the Office "shall conduct a thorough investigation."

b. Goldblum's investigation, at a minimum, threatened to cause significant embarrassment to UC and various UC administrators.

c. Goldblum's investigation threatened to expose misconduct by UC personnel. For example, Goldblum was considering whether the Assistant Dean of Students or Admissions officials did not make the mandatory reports of potential sexual misconduct required by various UC policies.

43. In other circumstances, UC claims that it is committed to upholding free speech and First Amendment principles. For example, the University Policy on Discriminatory Harassment (Policy 11-02) provides:

> Because the university is committed to free speech and academic freedom, it believes the best remedy for racist, sexist, and other forms of destructive speech is its justifiable condemnation by the entire university community. The university is dedicated to using its full resources as an educational institution to combat intolerance, and urges each member of the community to assist in the struggle to achieve an institutional environment that is free of all vestiges of discrimination.

Expressing views on matters of sexual assault on campus and offering support through media and the student newspaper is precisely within the expectations of Goldblum's job as Title IX coordinator and also consistent with the UC policies promoting free speech and First Amendment principles.

44. Goldblum chose to resign.

45. Goldblum's resignation was the equivalent of a termination or a constructive discharge.

a. Goldblum's only alternative to resigning was termination. Although resignation spared Goldblum some professional embarrassment, the decision was not voluntary. Goldblum was advised that if she resigned, UC would not provide a negative job reference and would list her as having resigned. She was told that if she refused, she would be fired.

b. Goldblum was not provided with an alternative to resignation that would have allowed her to remain in her position. Dr. Marshall said, "you broke trust and I can't work with you… resign or be terminated."

c. Goldblum understood the nature of the choice she was given; the presence of an HR official and a police officer led Goldblum to conclude that the decision had been made and was not going to be changed. She also recognized that, given the high-profile nature of her position on campus, her termination would likely be imminent and receive media attention.

d. Goldblum was not given a reasonable time in which to choose; Dr. Marshall expected an immediate response and Goldblum did not have the opportunity to consult with counsel prior to making a decision.

e. Goldblum was not permitted to select the effective date of resignation. Instead, she was immediately denied access to her computer, email, and other resources.

46. Goldblum was escorted to her vehicle and then directly off campus. She had to surrender her ID card, keys, parking pass, and university credit card to the officer. Goldblum had to make two special trips after hours with police escort to obtain her personal items from her office.

47. Goldblum was not allowed access to the computer, despite having personal items stored on it. Goldblum was also not provided with access to emails and other correspondence concerning the Houston Matter.

48. Goldblum, in her role as Title IX Coordinator, had a reasonable good faith belief that the actions of UC in promoting Houston violated Title IX and UC policies by fostering the creation of a hostile environment that made female UC students vulnerable to sexual assault. Goldblum was terminated, on information and belief, to prevent her from conducting an adequate investigation to determine the merits or validity of her belief.

16

49. As a direct and foreseeable result of the UC's conduct, Goldblum has sustained, and will continue to sustain, substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; and loss of future career prospects.

## COUNT I
## (VIOLATION OF TITLE IX – RETALIATION)

50. Plaintiff repeats and incorporates all the allegations of this Complaint, as if fully set forth herein.

51. Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

52. Retaliation against a person because that person has complained of sex discrimination is a form of intentional sex discrimination encompassed by Title IX's private cause of action. When a funding recipient retaliates against a person because the person complains of sexual discrimination, this constitutes intentional discrimination on the basis of sex in violation of Title IX.

53. Goldblum engaged in protected activity by complaining about, investigating, and reporting potential violations of Title IX by UC in connection with the Houston matter.

    a. Goldblum told her supervisor and a responsible administrator at UC that UC could be in violation of Title IX if resources were not specifically offered to students who may have negative responses to UC giving an award to a convicted sex offender.

    b. Goldblum sent a letter to the student newspaper addressing the matter.

    c. Goldblum, in her role as a Title IX Coordinator, started an informal investigation into the Houston matter.

54. Goldblum's exercise of that protected activity was known to UC administrators.

55. Goldblum was subjected to an adverse employment action subsequent to or contemporaneous with the protected activity.  In particular, Goldblum was forced to resign immediately under threat of termination.

56. The adverse action against Goldblum was directly related to her in investigation and reporting of possible violations of Title IX by UC and was deigned to punish and intimidate Goldblum from publicly disclosing potential misconduct by UC officials.

57. As a direct and proximate result of UC's violations of Goldblum's rights under Title IX, Goldblum has suffered severe and substantial damages. These damages include diminished earnings capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages, in an amount to be determined by a jury and the Court.

58. UC is liable to Goldblum for her damages.

59. Pursuant to 42 U.S.C. §1988, Goldblum is entitled to her attorney's fees incurred in bringing this action.

## COUNT II
## (VIOLATION OF TITLE VII – RETALIATION)

60. Plaintiff repeats and incorporates all the allegations of this Complaint, as if fully set forth herein.

61. Title VII makes it unlawful for an employer to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin.   42 U.S.C. 2000e-2(a)(1).

62. Title VII prohibits an employer from retaliating against an employee for opposing "any practice made an unlawful employment practice by [Title VII], or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a).

18

63. Goldblum engaged in protected activity by complaining about, investigating and reporting potential violations of UC's non-discrimination policies in connection with the Houston matter.

    a. Goldblum told her supervisor and a responsible administrator at UC that UC could be in violation of UC's non-discrimination policies if resources were not specifically offered to students who may have negative responses to UC giving an award to a convicted sex offender.

    b. Goldblum sent a letter to the student newspaper addressing the matter.

    c. Goldblum, in her role as a Title IX Coordinator, started an informal investigation into the Houston matter.

64. Goldblum's exercise of that protected activity was known to UC administrators.

65. Goldblum was subjected to an adverse employment action subsequent to or contemporaneous with the protected activity.  In particular, Goldblum was forced to resign immediately under threat of termination.

66. The adverse action against Goldblum was directly related to her in investigation and reporting of possible violations of UC's non-discrimination policies and was deigned to punish and intimidate Goldblum from publicly disclosing potential misconduct by UC officials.

67. Goldblum reported the alleged violations by UC outlined in the Complaint to the EEOC.  On May 8, 2019, the EEOC closed its filed and issued a "Right to Sue" letter to Goldblum.

68. As a direct and proximate result of UC's violations of Goldblum's rights under Title VII, Goldblum has suffered severe and substantial damages. These damages include diminished earnings capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages, in an amount to be determined by a jury and the Court.

69. UC is liable to Goldblum for her damages.

70. Pursuant to 42 U.S.C. §1988, Goldblum is entitled to her attorney's fees incurred in bringing this action.

**Wherefore**, Plaintiff seeks the following relief from the Court:

- Judgment in favor of Goldblum awarding damages in an amount to be determined at trial;
- Court costs and other reasonable expenses incurred in maintaining this action, including reasonable attorney's fees as authorized by 42 U.S.C. §1988.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues so triable.

Respectfully submitted,

        /s/ Joshua A. Engel
Joshua Adam Engel (0075769)
Jim Hardin (0056247)
ENGEL AND MARTIN, LLC
4660 Duke Dr., Suite 101
Mason, OH 45040
(513) 445-9600
engel@engelandmartin.com