**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | |
|---|---|
| ANDREA GOLDBLUM, | Case No: 1:19-cv-398 |
| Plaintiff, | Dlott, J. |
| v. | Bowman, M.J. |
| THE UNIVERSITY OF CINCINNATI, | |
| Defendant. | |

**REPORT AND RECOMMENDATION**

Plaintiff Andrea Goldblum filed suit against her former employer, the University of Cincinnati, alleging that Defendant violated Title VII and Title IX by forcing her to resign and/or constructively discharging her based upon her engagement in protected activity. In lieu of an answer, Defendant filed a motion to dismiss for failure to state a claim. (Doc. 7). Plaintiff filed a response in opposition to that motion, (Doc. 9), to which Defendant has filed a reply. (Doc. 10). I now recommend that UC's motion be DENIED as to Plaintiff's Title IX claim but GRANTED as to her Title VII claim.

**I.  Standard of Review**

Unlike a motion for summary judgment, a motion to dismiss is directed to the sufficiency of the pleadings, with the Court's review limited accordingly. Thus, in evaluating the pending motion under Rule 12(b)(6), the Court is required to "accept all well-pleaded factual allegations of the complaint as true and construe the complaint in the light most favorable to the plaintiff." *Dubay v. Wells,* 506 F.3d 422, 426 (6th Cir. 2007) (internal quotation marks and additional citation omitted). A complaint must contain more

than "labels and conclusions" under the standards established in *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S. Ct. 1955 (2007) and *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937 (2009). At the same time, Rule 8(a) of the Federal Rules of Civil Procedure sets forth only a "notice pleading" standard and does not require detailed factual allegations. For that reason, all reasonable inferences are to be construed in favor of the plaintiffs, and a complaint generally will survive under Rule 12(b)(6) standards if it contains sufficient factual content "that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Hensley Mfg. v. ProPride*, *Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (quoting *Iqbal,* 129 S.Ct. at 1949).

## II. Factual Allegations of Complaint

Because Defendant's motion asserts that the complaint fails to state a claim, the Court first reviews the factual allegations alleged in the complaint, all of which are assumed to be true at this early stage of the proceedings.

Plaintiff served as UC's Title IX Coordinator from June 2018 until March 15, 2019, when she was informed she would be terminated for insubordination and chose to resign in lieu of termination. (Complaint at ¶¶2, 39-40, 44-45). As part of her duties at UC, Plaintiff was required "to provide consultation strategy, and communications to senior management, including her direct supervisor, Dr. Bleuzette Marshall… as to issues and responses to them falling within her job description." (*Id*. at ¶15).

In January 2019, the UC College of Arts and Sciences published an online article highlighting UC "students who show the passion and drive to complete their degree despite facing… roller-coaster challenges." The highlighted students were honored with a "triumph cord" at graduation. One of the profiled students was William Houston. (*Id*. at ¶¶17-18). Houston was a former Bowling Green State University football player who had

been indicted on one count of attempted rape following a July 2014 incident that occurred during his sophomore year at Bowling Green. He was suspended by Bowling Green State University after an investigation and full hearing, and ultimately was convicted of the lesser charge of gross sexual imposition after entering into a plea agreement in state court. (*Id.* at ¶17).

Following publication of the on-line article profiling Houston on various social media accounts including UC's Twitter and Facebook accounts, many students, including survivors of sexual assault, responded very negatively. (*Id.* at ¶¶19-21). Some of the students felt that the article showed that UC did not take the issue of sexual assault on campus seriously. (*Id.* at ¶¶20-21). Plaintiff became aware of the student complaints about the Houston article on or about February 5, 2019, and believed she was obligated to respond "by posting a letter in the school newspaper listing resources [for victims of sexual assault] and offering help for the students." (*Id.* at ¶22). On the same date, Plaintiff told Dr. Marshall and UC's Director of Communications that UC could be violating Title IX "if resources were not specifically offered to students who may have negative responses to UC giving an award to a convicted sex offender." (*Id.* at ¶23). Plaintiff also shared her belief that "UC may have created a hostile environment" by giving an award to Houston, and her concern that UC's actions "could create a hostile environment in violation of Title IX…." (*Id.*) Dr. Marshall advised Plaintiff that the matter "was being considered" and that "a response would be forthcoming"; he also told Plaintiff that she would be contacted by a university dean on how to handle the matter. (*Id.* at ¶24). Plaintiff attempted to speak to UC's legal department about the matter and potential obligations of the school under Title IX but received no response. (*Id.* at ¶26).

After waiting some period of time without receiving any response, Plaintiff drafted a letter addressed to students who had complained about the award and recognition given to Houston, which letter listed possible resources for victims of sexual assault. Plaintiff provided a copy to Dr. Marshall, who advised Plaintiff that the letter was not satisfactory and directed her not to send it. (*Id.* at ¶¶27-28). Plaintiff revised the letter but Dr. Marshall provided no further response despite repeated requests. (*Id.* at ¶29).

On February 11, 2019, the student newspaper ran an article stating that UC "is facing backlash for not removing an article on its website that highlights a recent graduate who was charged with a sex crime in 2014." (*Id.* at ¶30). On February 12, 2019, Plaintiff advised Dr. Marshall that she intended to send the revised letter to the student newspaper, despite the prior instruction not to do so, because Plaintiff believed she was "required to do so in order to fulfill her role as Title IX Coordinator…." (*Id.* at ¶31). Having waited for a further response from Dr. Marshall until after 5:00 p.m. but receiving none, Plaintiff emailed the letter to the student newspaper. (*Id.* at ¶32)

The letter was never published. (*Id.* at ¶33). Instead, Dr. Marshall subsequently contacted Goldblum and expressed her dissatisfaction with Plaintiff's actions. Dr. Marshall advised Plaintiff never to "do anything like that again," and Plaintiff agreed she would not. (*Id.* at ¶¶34-35).

On February 15, 2019, the UC student newspaper ran another article about the Houston controversy, noting that a portion of the original article promoting Houston had been redacted by UC "[a]fter facing backlash on social media…." (*Id.* at ¶37). The article included a statement attributed to UC that "faculty nominators, [the] student writer and editor were all unaware of Houston's criminal history before the [original] piece was published." (*Id.* at ¶37). Plaintiff started an "informal investigation into the admission of

4

Houston," in part to determine whether UC personnel had knowledge that Houston was a convicted sex offender either prior to his admission or prior to his receipt of an award." (*Id.* at ¶38). As a result of her initial inquiries, Plaintiff learned that admissions staff and the Assistant Dean of Students were all aware of Houston's background prior to his admission, as were UC Police, shortly after his admission. (*Id.* at ¶41).

On or about March 15, 2019, Plaintiff was called into a meeting in Dr. Marshall's office and informed that since she had sent the letter to the student newspaper a month earlier, she was insubordinate and would be terminated. (*Id.* at ¶40). Plaintiff alleges that the charge of "insubordination" was pretextual. (*Id.* at ¶42). She alleges that she was fired based upon her investigation, which "threatened to cause significant embarrassment to UC and various UC administrators," and "threatened to expose misconduct by UC personnel." (*Id.* at ¶42). Plaintiff further alleges that she was subjected to an adverse employment action – the forced resignation in lieu of termination – "subsequent to or contemporaneous with" her exercise of "protected activity" in violation of both Title IX and Title VII. (*Id.* at ¶¶55, 65).

### III. Defendant's Motion to Dismiss

In order to make out a retaliation claim under either Title IX or Title VII, a plaintiff generally must show that: (1) she engaged in a protected activity; (2) the exercise of protected rights was known to the defendant; (3) the defendant thereafter took an action that was materially adverse to the plaintiff; and (4) there was a causal connection between the protected activity and the adverse action. *Hubbell v. FedEx SmartPost, Inc.*, 933 F.3d 558, 568 (6th Cir. 2019) (Title VII); *Doe v. University of Tenn.*, 186 F. Supp.3d 788, 809 (M.D. Tenn. 2016) (Title IX). UC first argues in its motion to dismiss that the complaint fails to contain sufficient factual allegations to show that Plaintiff engaged in any qualifying

5

"protected activity" prior to her resignation in lieu of termination. As a second basis for dismissal, UC argues that Plaintiff has failed to sufficiently allege any causal connection between her alleged "protected activity" and her constructive discharge. For the reasons that follow, the undersigned finds UC's arguments to be unpersuasive as to the Title IX claim, but persuasive as to the Title VII claim.

### A. Protected Activity

#### 1. The Manager Rule

UC argues that when an employee is also a manager, as Plaintiff was in this case, federal courts apply a "manager rule" that holds that "in order to state a retaliation claim, complaints made within the scope of an employee's job cannot constitute protected conduct." *Atkinson v. Lafayette College*, 653 F. Supp.2d 581, 596 (E.D. Pa. 2009); *see also Kelley v. Iowa State Univ. of Science & Technology*, 311 F. Supp.3d 1051 (S.D. Iowa 2018). Defendant insists that because Plaintiff engaged in her activities within the scope of her employment as UC's Title IX Coordinator, none of those activities can be considered as "protected conduct" for the purposes of establishing either a Title IX or Title VII retaliation claim.

The undersigned disagrees. Although *Atkinson* and *Kelley* both involved retaliation claims filed under Title IX, the manager rule was first recognized by courts and was developed in the context of the Fair Labor Standards Act. As Plaintiff points out in her response, the Sixth Circuit has soundly rejected the substance of the manager rule in the anti-discrimination context, signaling that it should be limited to claims brought under the FLSA. *See Johnson v. Univ. of Cincinnati*, 215 F.3d 561 (6th Cir. 2000), *cert. denied*, 531 U.S. 1052 (2000); *Warren v. Ohio Dept. of Pub. Safety*, 24 Fed. Appx. 259 (6th Cir. 2001). In *Johnson*, UC sought to apply the manager rule to a retaliation claim presented

6

under Title VII, because the plaintiff in that case had held the position of Vice President of Human Resources and Human Relations and had alleged termination as a result of his "advocacy on behalf of minorities and his filing of an EEOC claim against the university." *Id.*, 215 F.3d at 566. The Sixth Circuit rejected the application of the judicially crafted doctrine, explaining that it "runs counter to the broad approach used when considering a claim for retaliation…, as well as the spirit and purpose behind Title VII as a broad remedial scheme." *Id.*, 215 F.3d at 580. Thus, the court held that the plaintiff's high-level official duties were "of no consequence" to his ability to prosecute a retaliation claim. In *Warren*, the appellate court similarly observed: "There is no qualification on who the individual doing the complaining may be…." *Warren*, 24 Fed. Appx. at 265 (holding that "the fact that the plaintiff is a human resource director who may have a 'contractual duty to voice such concerns' does not defeat a claim of retaliation; and the complaint may be made to a co-worker, a newspaper reporter, or anyone else.").

It must be noted that following the Supreme Court's decision in *Crawford v. Metro Gov't of Nashville & Davidson Cty.*, 555 U.S. 271, 276, 129 S. Ct. 846 (2009), some courts have questioned the continuing viability of the manager rule. *See generally Furr v. Ridgewood Surgery and Endoscopy Center, LLC*, 192 F. Supp.3d 1230, 1248 (D. Kan. 2016) (discussing cases). In any event, multiple courts have rejected the application of the manager rule to claims filed under Title VII and similar anti-discrimination statutes, using reasoning that applies equally to Title IX. "Nothing in the language of Title VII indicates that the statutory protection accorded an employee's oppositional conduct turns on the employee's job description or that Congress intended to excise a large category of workers from its anti-retaliation protections." *DeMasters v. Carilion Clinic*, 796 F.3d 409, 422 (4th Cir. 2015); *see also id.* at 424, holding that "the 'manager rule' has no place in

7

Title VII enforcement"); *Littlejohn v. City of New York*, 795 F.3d 297, 317 at n.16 (2d Cir. 2015) (declining to adopt the manager rule and holding that a "focus on an employee's job duties, rather than the oppositional nature of the employee's complaints or criticisms, is inapposite…"); *Armour v. Homer Tree Servs., Inc.*, 2017 WL 4785800 at **10-11, 2017 U.S. Dist. LEXIS 175476 at **29-30 (N.D. Ill. Oct. 24, 2017) ("the manager rule… would be inordinately difficult to apply in practice in cases involving claims under" anti-discrimination statutes, extending rejection of rule in Title VII context to §1981 retaliation claim); *Chapman v. Milwaukee Cty.*, 151 F. Supp.3d 892, 900 (E.D. Wis. 2015) (adopting the manager rule "would undermine the overall purpose of deterring and preventing discrimination").

In its reply memorandum, Defendant UC concedes that *Johnson* appears to reject the application of the manager rule in the Title VII context. However, UC argues that the rule still should be applied to bar Plaintiff's Title IX claim, because "the entirety of Title VII jurisprudence is not *necessarily* applicable" to Title IX. (Doc. 10 at 4, emphasis added). While true as a general proposition, UC also acknowledges, as it must, that "courts generally look to Title VII standards as an analog for the legal standards to apply to Title IX claims." *Id.* In fact, even in *Kelley*, a case relied upon by Defendant, the court pointed out that "[t]he language of Title IX suggests broader protections than Title VII." *Kelley*, 311 F. Supp.3d at 1065 (citing *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175, 125 S. Ct. 1497 (2005)). The broader protections offered by Title IX in the educational context make it even less likely that the Sixth Circuit would apply the manager rule to Title IX retaliation claims.

In addition to pointing out that the Sixth Circuit has already rejected the application of the manager rule in the Title VII context, and that no court within the Sixth Circuit has

8

followed *Atkinson* or applied the manager rule to *any* Title IX claims, Plaintiff points to cases that have declined to extend the rule to Title IX claims. *See, e.g., Kailikole v. Palomar Community College Dist.*, 384 F.Supp.3d 1185, 1191-92 (S.D. Ca. 2019) ("applying the 'manager rule' to …Title IX… would potentially eliminate a large category of workers from its anti-retaliation protections"). The undersigned finds the reasoning of *Kailikole* to be persuasive and consistent with the Sixth Circuit's analysis in *Johnson*.

Even if a reviewing court were to conclude, contrary to the undersigned, that the Sixth Circuit would apply the manager rule, the undersigned finds the primary case cited by Defendant, *Atkinson*, to be distinguishable. In denying a motion to dismiss filed on similar grounds, a Kansas district court accepted the premise that the manager rule applied to Title IX claims, but still denied the university's motion to dismiss. The court wrote:

> WSU relies on *Atkinson*. In that case, the district court granted summary judgment to the employer on a Title IX retaliation claim because, in part, plaintiff could come forward with no evidence permitting a jury to find that she had engaged in protected activity. *Id.* at 602. The summary judgment facts established that plaintiff had done nothing more than advocate Title IX compliance. *Id.* at 599. The record showed that plaintiff and her employer quarreled only about the source of funding used to implement changes plaintiff deemed necessary to comply with Title IX and whether the employer should become a Division I or III school. *Id.* at 602. Because these disputes "only tangentially involved Title IX," plaintiff had failed to demonstrate a genuine dispute whether she had engaged in protected activity. *Id.* Here, the Complaint is quite different. It alleges that plaintiff and WSU disagreed about plaintiff's handling of Title IX investigations into alleged sexual assaults—a central component of Title IX compliance. *See Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 633 (1999) (holding that schools cannot be deliberately indifferent to known acts of sexual harassment that interfere with a victim's ability to receive an education and comply with Title IX's mandate). This Complaint, unlike the summary judgment record in *Atkinson*, sufficiently alleges that plaintiff engaged in protected activity to prevent the court from entering judgment as a matter of law.

9

*Robinson v. Wichita State Univ.*, 2018 WL 836294 at *4, 2018 U.S. Dist. LEXIS 22983 at *14 (D. Kan. Feb. 13, 2018).

As in *Robinson*, the instant case requires the court to evaluate the complaint under Rule 12 standards, a procedural posture quite different than the evaluation of a claim under Rule 56 following discovery and full development of the record. Although the undersigned disagrees with *Robinson*'s conclusion that the manager rule applies to Title IX retaliation claims, it is worth noting that in the case presented as in *Robinson*, Plaintiff has alleged a significant disagreement with UC concerning UC's actions (and inactions) concerning the Houston incident, and whether or not UC was abiding by its obligations under Title IX. Thus, like *Robinson*, the claim presented by Plaintiff here is easily distinguished from *Atkinson*, which "only tangentially involved Title IX."

The second case on which Defendant heavily relies, *Kelley*, is even less persuasive. Remarkably, the plaintiff in that case did not contest "that the manager rule extends to Title IX retaliation claims." *Id.*, 311 F.Supp.3d at 1069. Quite understandably given that premise, the Iowa district court's reasoning for extending the manager rule to Title IX claims was relatively brief, with no acknowledgment of contrary authority. Yet even under the manager rule, based upon "the facts of this case and …[the] stage of the proceedings" under Rule 12, the *Kelley* court denied dismissal of the retaliation claim. *Id.* at 1070. The court pointed out that Kelley had alleged that "by circumventing her authority as Title IX coordinator, 'male perpetrators of sexual and domestic violence were given disproportionate protections in the Title IX investigation process and given *more than* equal benefits and opportunities in educational programs and activities while female victims were given *less than* equal benefits and opportunities.'" *Id.* (emphasis original). In addition, Kelley had alleged that the university "did not support her efforts as [its] Title

10

IX compliance officer," and that she had "complained to an OCR investigator and [university] administrators about ISU's failure to comply with Title IX." *Id.* According to Kelley, the university directed her to "remain silent" and to "implement policies that would have rendered ISU *non-compliant* with Title IX." *Id.* at 1071 (emphasis original). The court reasoned that the plaintiff's "alleged refusal to obey these directives suggest that she stepped outside her employment role – as that role was narrowly construed by ISU – and engaged in protected activity under Title IX. *Id.*

### 2. Protected Activity Under Title IX

For the reasons stated, both *Atkinson* and *Kelley* fail to persuade. Defendant further argues that Plaintiff has not alleged sufficient "protected conduct" because she did not put UC on notice that she was engaging in conduct that would be entitled to protection from retaliation, but instead, acted solely within the scope of her job duties as Title IX Coordinator. The rejection of the manager rule forecloses most if not the totality of this argument. However, even if a reviewing court were to conclude that the manager rule should apply, *Kelley* still supports the denial of UC's motion given the similar procedural posture and facts alleged.

Here, Plaintiff has alleged that she shared her concerns that UC might be violating Title IX and began informally investigating what she believed could be a Title IX violation, and that UC responded with what amounted to tactics of silence and stalling behaviors, followed by directives to keep silent by not sending her letter to the student newspaper or taking further steps to address what she perceived to be potential Title IX violations. In other words, much like the plaintiff in *Kelley*, Plaintiff alleges that she persisted in attempting to address perceived Title IX violations in the face of her employer's contrary directives to more narrowly define her Title IX role. Plaintiff's allegations that she related

11

concerns that UC may have created a hostile environment in violation of Title IX by giving an award to a convicted sex offender, and/or that UC might be failing to provide sexual assault survivors with adequate resources as legally required, as well as her "initial inquiry into whether [Houston's] admission or presence on campus with minimal restrictions and without informing the student body violated ….Title IX" all arguably constitute protected activities sufficient to put UC "on notice" about Plaintiff's Title IX concerns. (*See* Complaint at ¶¶ 22, 35). *See generally, Yazdian v. ConMed Endoscopic Technologies, Inc.*, 793 F.3d 634, 646 (6th Cir. 2015).

Although the undersigned concludes that Plaintiff has sufficiently alleged several activities that could constitute protected activities under Title IX, either alone or in combination, for the sake of completeness the undersigned also will address the Defendant's argument that the February 12, 2019 letter addressed to the student newspaper does not constitute protected activity. UC argues that the content of the subject letter is too generic and does not specifically oppose or complain about the University engaging in any unlawful discriminatory act. *See generally Soehner v. Time Warner Cable, Inc.*, 2009 U.S. Dist. LEXIS 106619 at *9 (S.D. Ohio Nov. 16, 2009) (holding that "a vague complaint that does not reference conduct made unlawful under [Title IX] is not protected activity.").

Defendant's argument would require this Court to examine the contents of the letter, which is discussed within the complaint but is not attached to the pleading. (Complaint at ¶¶27-36). The undersigned declines to consider the letter submitted by the Defendant in the context of the pending motion to dismiss. Ordinarily, consideration of a motion to dismiss under Rule 12 is limited to the pleadings. Here, Plaintiff states that she did not attach the letter in part because she did not have access to her computer, and

12

"cannot confirm that this is a true and accurate copy of the letter actually sent to the student newspaper." (Doc. 9 at 10, n. 7). In addition, Plaintiff alleges that she sent a prior draft to Dr. Marshall, which she later revised based upon Dr. Marshall's opposition; the original (unrevised) letter has not been submitted by Defendants.

At this stage of the proceedings, all reasonable inferences are to be construed in Plaintiff's favor. Applying that standard, Plaintiff has sufficiently alleged protected activities to support her retaliation claim under Title IX.

### 3. A Lack of Protected Activity Under Title VII

In contrast to the assessment of Plaintiff's allegations under Title IX, Defendant's argument that Plaintiff has failed to sufficiently allege that she engaged in protected activities under Title VII finds more purchase. Plaintiff states that she included that claim "as an alternative in the event that UC argued that Plaintiff's Title IX claims are preempted by Title VII." (Doc. 9 at 13). Although that particular issue remains unsettled in the Sixth Circuit, it is irrelevant here because UC has not raised a preemption argument.[1]  *See Arceneaux v. Vanderbilt University*, 25 Fed. Appx. 345, 346-347 and 349 (6th Cir. 2001) (discussing disagreement as to whether Title VII preempts Title IX employment discrimination claim); *Whitson v. Tennessee*, 2017 WL 3261771 at n.19 (E.D. Tenn. July 31, 2017); *see also Kelley*, 311 F. Supp.3d at 1063 (discussing circuit split on issue).

The undersigned's rejection of the manager rule does not save Plaintiff's claim under Title VII, for the simple reason that the complaint is devoid of any allegations that Plaintiff engaged in any activity protected by Title VII, as opposed to activities protected

---

[1] In fact, UC implies that it would not object to a plaintiff pursuing "both a Title VII and a Title IX claim in an appropriate case." (Doc. 10 at 9). The undersigned's review of the case law suggests such dual claims are more likely to arise when the plaintiff is asserting a gender-based Title VII *employment* discrimination claim in an educational setting, rather than in cases in which the Title IX claim is primary.

by Title IX. Despite having some overlap, the two statutory schemes remain analytically distinct, with Title IX focused exclusively on sex discrimination in federally funded education programs, and Title VII focused on numerous forms of employment discrimination. Thus, Section 901(a) of Title IX of the Education Amendments of 1972 states:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance ....

20 U.S.C. § 1681(a). Although Title IX does not contain an express provision against "retaliation," it supports retaliation claims "where the funding recipient retaliates against an individual because [she] has complained about sex discrimination." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. at 171, 125 S. Ct. at 1502.

By contrast, Title VII focuses on <u>employment</u> discrimination "because of" individual characteristics, including sex. *See* 42 U.S.C. § 2000e-2(a)(1). Unlike Title IX, Title VII does contain an express anti-retaliation provision, which prohibits retaliation against an employee who has "opposed any…unlawful employment practice" <u>under Title VII</u> or who has "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." *See* 42 U.S.C. §2000e-3.

Nowhere does Plaintiff allege that she opposed a discriminatory *employment* practice or participated in a charge or investigation of an *employment* practice under Title VII. Instead, Defendant maintains that "[a]t its essence, Ms. Goldblum's Complaint alleges that she was retaliated against in response to actions that she purportedly took under Title IX." (Doc. 10 at 10). The undersigned agrees. (*See* Complaint at ¶¶53, 63-67). While Plaintiff's allegations are sufficient to state a claim under Title IX, a claim of

14

retaliation for conduct that is protected under Title IX (but that is not *also* protected activity under Title VII) "is not cognizable under Title VII." *Patterson v. W. Carolina Univ.*, 2012 WL 6851306 at *5 (R&R filed Nov. 26, 2012), adopted at 2013 WL 145810 (W.D.N.C. Jan 14, 2013); *see also Lowrey v. Texas A&M Univ. Sys.*, 117 F.3d 242, 249 (5 th Cir. 1997) ("title VII provides no remedy for retaliation against individuals who raise charges of noncompliance with the substantive provisions of title IX."); *Litman v. George Mason University*, 156 F. Supp.2d 579, 584 (E.D. Va. 2001) (citing *Lowrey* and noting that "Title VII's anti-retaliation provision is worded very narrowly").

### B. Causation

In addition to its challenge to the "protected activities" element of Plaintiff's retaliation claims, Defendant UC asserts that Plaintiff also has failed to sufficiently allege the causation element - that UC retaliated against her "because of" her protected activities. *See Jackson*, 544 U.S. at 184. UC asserts that Plaintiff's allegations amount to "conclusory statements of a retaliatory motive" that are devoid of sufficient factual support. UC argues that "there is no allegation that anyone at the University, let alone any decision-maker, knew about the investigation" that Plaintiff had initiated into the Houston matter. (Doc. 10 at 9).

However, Plaintiff does allege that she was fired because of her complaints about the "William Houston Matter," which she alleges that she related both to her direct supervisor, Dr. Marshall, and to UC's Director of Communications. (Complaint at ¶¶23, 53-55, 63). She alleges that her protected activities were "known to UC administrators." (*Id.* at ¶54). Plaintiff further alleges that she was terminated "to prevent her from conducting an adequate investigation…" into the Houston matter. (*Id.* at ¶¶42, 48, 56). She alleges that her forced resignation was "directly related to her …investigation and

15

reporting of possible violations of Title IX by UC and was de[s]igned to punish and intimate [Plaintiff] from publicly disclosing potential misconduct by UC officials." (*Id.* at ¶56). In addition to alleging knowledge of her activities by decisionmakers and administrators, Plaintiff includes allegations of close temporal proximity between those activities and forced resignation.

Considering the relevant standard of review and again drawing all reasonable inferences in Plaintiff's favor, the undersigned finds that Plaintiff has included sufficient allegations through which a factfinder could infer a causal connection between her alleged protected activities and her forced resignation.

### IV.   Conclusion and Recommendations

For the reasons explained above, **IT IS RECOMMENDED THAT** UC's motion to dismiss Plaintiffs' claims (Doc. 7) be **DENIED** on Count I (Plaintiff's Title IX Retaliation Claim) but **GRANTED** on Count II (Plaintiff's Title VII Retaliation Claim).


*s/ Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

ANDREA GOLDBLUM,

        Plaintiff,

v.

THE UNIVERSITY OF CINCINNATI,

        Defendant.

Case No: 1:19-cv-398

Dlott, J.
Bowman, M.J.

**NOTICE**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).