IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| ANDREA GOLDBLUM, | : | Case No. 1:19-cv-398 |
| Plaintiff, | : | Judge Susan J. Dlott |
| v. | : | **ORDER ADOPTING REPORT AND RECOMMENDATION AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS** |
| THE UNIFORM OF CINCINNATI, | : | |
| Defendant. | : | |

This matter is before the Court on the Magistrate Judge's Report and Recommendation (Doc. 17) that Defendant's Motion to Dismiss (Doc. 7) be denied as to Count 1 (Plaintiff's Title IX retaliation claim) but granted as to Count 2 (Plaintiff's Title VII retaliation claim). Both parties filed objections (Docs. 18 and 21) and responded to the other party's objections (Docs. 22 and 23). For the reasons set forth below, the Court will adopt the Report and Recommendation (Doc. 17) and grant in part and deny in part Defendant's Motion to Dismiss (Doc. 7).

I.  BACKGROUND

A.  Facts Alleged

From June 2018 until March 15, 2019, Plaintiff Andrea Goldblum served as the Title IX Coordinator for Defendant University of Cincinnati ("UC"). According to her Complaint, the events ultimately leading to her discharge began at another university years before she arrived at UC.[1]

---

[1] In evaluating a motion to dismiss for failure to state a claim, the Court must accept as true the allegations made in Plaintiff's Complaint. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

1

In 2014, a Bowling Green State University ("BGSU") sophomore was determined to have engaged in "sexual contact without permission," and BGSU officials suspended him. (Complaint, Doc. 1 at PageID 7.) The student pled no contest to one count of gross sexual imposition in an Ohio state court related to that incident. (*Id.* at PageID 6.)

Ultimately, the former BGSU student enrolled at UC. In January 2019, the UC College of Arts and Sciences published an article highlighting "students who show the passion and drive to complete their degree despite facing . . . roller-coaster challenges." (*Id.* at PageID 7.) The former BGSU student was selected for the honor of wearing a "triumph cord" at his UC graduation to "showcase the level of adversity the students have gone through and signal that they have overcome it . . . [as UC] reserves this distinction for students whose stories show how overcoming major challenges can lead to triumph." (*Id.*)

Although the article did not detail the student's "challenges," other UC students soon discovered that the student was a convicted sex offender who had been suspended from BGSU for sexual misconduct. (*Id.* at PageID 7.) Plaintiff alleges that "[m]any students at UC, including survivors of sexual assault, responded negatively to the article . . . [and] indicated they did not feel safe on campus and were traumatized to learn that a sex offender had been living and studying amongst them without their knowledge." (*Id.*) When the UC College of Arts and Sciences tweeted about the student overcoming his "immaturity" and added "#TriumphCord," replies included comments critical of UC, such as "#RapeCultureLivesHere," "#RapistsAreSafeHere," and "Good to know our local college is out here supporting rapists. #boycottUC." (Doc. 1 at PageID 8–9.) Similar comments were made to the UC College of Arts and Sciences Facebook post celebrating the student, including "Applauding sexual predators is a slap in the face to student survivors [so] [t]his post should be removed" and "how many people

2

would I have to rape, theoretically, to get an award from you University of Cincinnati??" (*Id.* at PageID 9–10.)

In February 2019, Plaintiff Goldblum became aware of the social media attention surrounding this student and the award UC had given to him. (Doc. 1 at PageID 10–11.) Students complained to Goldblum that giving this student an award contributed to a hostile learning environment for others at UC. (*Id.* at PageID 11.) Goldblum, in her role as Title IX Coordinator, informed UC administrators that UC "was required to provide adequate resources to these students and was failing to do so." (*Id.* at PageID 12.)

Goldblum drafted a letter "addressing the students who had complained and listing possible resources." (*Id.*) UC administrators deemed the letter unsatisfactory and advised Goldblum not to publish the letter. (*Id.*) Goldblum revised the letter and informed UC administrators that she planned to send the letter to the UC student newspaper for publication. (*Id.* at PageID 12–13.) When Goldblum received no prompt response from UC administrators, she sent the revised letter to the student newspaper. (*Id.* at PageID 13.)

Administrators later expressed anger at Goldblum for sending the letter and advised her not to "ever do anything like that again." (*Id.* at PageID 13.) The UC student newspaper never published the letter, and Goldblum believed the matter had been resolved. (*Id.*)

On February 15, 2019, the student newspaper published an article noting the "backlash" on social media and stating that "faculty nominators [and others] were all unaware of [the student's] criminal history." (*Id.*) Goldblum then initiated an informal investigation to determine "whether any UC personnel had knowledge that [the student] was a convicted sex offender either prior to his admission or prior to his receipt of an award." (Doc. 1 at PageID 14.) Goldblum also inquired "into whether his admission or presence on campus with minimal

3

restrictions and without informing the student body violated any of the UC Title IX policies." (*Id.*)

On March 15, 2019, UC administrators informed Goldblum that sending the letter to the student newspaper constituted insubordination for which she would be terminated effective immediately. (*Id.*) In lieu of termination, Goldblum was permitted to resign. (*Id.* at PageID 15.) Goldblum alleges UC constructively discharged her for investigating, complaining about, and reporting potential Title IX violations related to the admission of and the award given to the student at issue.

### B. Procedural Posture

Plaintiff Goldblum filed this action alleging that her constructive discharge constituted unlawful retaliation in violation of Title IX, 20 U.S.C. § 1681, and Title VII, 42 U.S.C. §§ 2000e, *et seq*. Defendant UC filed a Motion to Dismiss the Complaint for Failure to State a Claim pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. 7.) This Court referred the case to a magistrate judge pursuant to 28 U.S.C. § 636(b).

On October 21, 2019, Magistrate Judge Stephanie K. Bowman issued a Report and Recommendation on UC's Motion to Dismiss. (Doc. 17.) Magistrate Judge Bowman recommended that UC's Motion to Dismiss be denied on Count I (Goldblum's Title IX retaliation claim). However, because Goldblum does not allege that she opposed a discriminatory employment practice as protected by Title VII, Magistrate Judge Bowman recommended that UC's Motion to Dismiss be granted on Count II (Goldblum's Title VII retaliation claim).[2]

---

[2] Goldblum acknowledges that she "brought a Title VII claim as an alternative in the event that UC argued that [her] Title IX claims are preempted by Title VII." (Doc. 18 at PageID 126.) As the Magistrate Judge correctly noted, UC has not raised a preemption argument. (Doc. 17 at PageID 121.)

Goldblum objected to the recommended dismissal of her Title VII claim "solely for the purposes of retaining any applicable appellate rights." (Doc. 18 at PageID 126.) UC objected to the recommended denial of its Motion to Dismiss as to Goldblum's Title IX claim, contending that the Magistrate Judge erred in failing to apply the manager rule to a Title IX retaliation claim brought by a Title IX coordinator. (Doc. 21.)

## II.　MOTION TO DISMISS

Federal Rule of Civil Procedure 12(b)(6) allows a party to move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To withstand a motion to dismiss, a complaint must comply with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009) (quoting Rule 8(a)).

A complaint must include sufficient facts to state a claim that is plausible on its face and not speculative. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Mere "labels and conclusions [or] a formulaic recitation of the elements of a cause of action" will not suffice. *Twombly*, 550 U.S. at 555. A district court examining the sufficiency of a complaint must accept well-pleaded facts as true, but not legal conclusions or legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 678–79.

Where a motion to dismiss is referred to a magistrate judge for Report and Recommendation, the District Court conducts a *de novo* review of any properly filed objections to the recommendation. Fed. R. Civ. P. 72(b)(3). The Court may "accept, reject, or modify the

recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." *Id.*

### III. ANALYSIS

UC contends that the manager rule should apply to Title IX retaliation claims raised by Title IX coordinators. The Court disagrees.

Courts analyze Title IX retaliation claims using the same standards applied to Title VII retaliation claims. *Doe v. Belmont Univ.*, 367 F. Supp. 3d 732, 755 (M.D. Tenn. 2019); *see also Nelson v. Christian Bros. Univ.*, 226 F. App'x 448, 454 (6th Cir. 2007) ("Generally, courts have looked to Title VII, 42 U.S.C. §§ 2000e, as an analog for the legal standards in both Title IX discrimination and retaliation claims."). A plaintiff may establish retaliation either through direct or circumstantial evidence. *Doe*, 367 F. Supp. 3d at 756. If relying on circumstantial evidence of retaliation, the *McDonnell Douglas*[3] burden-shifting framework applies. *Id.*; *Fuller v. Michigan Dept. of Transp.*, 580 F. App'x 416, 421 (6th Cir. 2014).

To establish a *prima facie* case of retaliation, a plaintiff must allege: "(1) she engaged in a protected activity; (2) her 'exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was materially adverse to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action.'" *Hubbell v. FedEx SmartPost, Inc.*, 933 F.3d 558, 568 (6th Cir. 2019) (quoting *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 775 (6th Cir. 2018)). Under what some courts call the "manager rule," complaints made within the scope of an employee's job cannot serve as "protected activity." *Kelley v. Iowa State Univ. of Science and Tech.*, 311 F. Supp. 3d 1069 (S.D. Iowa 2018) (quoting *Atkinson v. Lafayette Coll.*, 653 F. Supp. 2d 581, 596 (E.D. Pa. 2009)). Courts

---

[3] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973).

that apply the manager rule require an employee to "step outside his or her role of representing the company" before their actions can constitute "protected activity." *Atkinson*, 653 F.Supp.2d at 598 (quoting *Claudio-Gotay v. Becton Dickinson Caribe, Ltd.*, 375 F.3d 99, 102 (1st Cir. 2004)).

### A. Creation of the Manager Rule

The manager rule has its roots in Fair Labor Standards Act ("FLSA") case law. In *McKenzie v. Renberg's Inc.*, 94 F.3d 1478, 1486 (10th Cir. 1996), the court—citing only to the language of the FLSA—required the personnel manager plaintiff to "step outside his or her role of representing the company" and take action "adverse to the employer" "[i]n order to engage in protected activity under [29 U.S.C.] § 215(a)(3)." The Court in *McKenzie* emphasized that "it is the assertion of statutory rights . . . by taking some action adverse to the company . . . that is the hallmark of protected activity under § 215(a)(3)." *McKenzie,* 94 F.3d at 1486.

Two years after the Tenth Circuit issued its decision in *McKenzie* regarding an FLSA retaliation claim, the Eighth Circuit—citing *McKenzie*—imposed a "requirement of 'stepping outside' a normal role. . . by showing that the employee took some action against a discriminatory policy" in a Title VII racial discrimination case. *EEOC v. HBE Corp.*, 135 F.3d 543, 554 (8th Cir. 1998).[4] From there, the Fifth Circuit—again citing *McKenzie*—explained the underlying logic of what has come to be called the "manager rule" in another FLSA case:

> This rule is eminently sensible for management employees like Hagan, because a part of any management position often is acting as an intermediary between the manager's subordinates and the manager's own superiors. The role necessarily involves being mindful of the needs and concerns of both sides and appropriately

---

[4] The Eighth Circuit distinguished *McKenzie* on the facts of the case rather than addressing whether the "step outside" an employee role requirement even applied in Title VII cases. *HBE Corp.*, 135 F.3d at 554 ("Unlike the plaintiff in *McKenzie* who merely alerted management of potential violations of the law in order to avoid liability for the company, [plaintiff] refused to implement a discriminatory company policy. This placed him outside the normal managerial role which is to further company policy.")

> expressing them. Voicing each side's concerns is not only *not adverse* to the company's interests, it is exactly what the company *expects* of a manager. If we did not require an employee to "step outside the role" or otherwise make clear to the employer that the employee was taking a position adverse to the employer, nearly every activity in the normal course of a manager's job would potentially be protected activity under [29 U.S.C.] Section 215(a)(3). An otherwise typical at-will employment relationship could quickly degrade into a litigation minefield, with whole groups of employees—management employees, human resources employees, and legal employees, to name a few—being difficult to discharge without fear of a lawsuit. For those reasons, we agree that an employee must do something outside of his or her job role in order to signal to the employer that he or she is engaging in protected activity under Section 215(a)(3).

*Hagan v. Echostar Satellite, L.L.C.*, 529 F.3d 617, 628 (5th Cir. 2008).

Relying on *Hagan* and its progeny, at least two courts extended the manager rule to Title IX retaliation cases. *Atkinson*, 653 F. Supp. 2d at 599 (using manager rule to dismiss athletic director's Title IX retaliation claim); *Kelley*, 311 F. Supp. 3d at 1070–71. In one of those cases, however, the Court concluded that the Title IX coordinator stepped outside her employment role by refusing to obey university directives that she cease complaining about alleged Title IX violations and had, therefore, engaged in protected activity. *Kelley*, 311 F. Supp. 3d at 1070–71.

### B. Courts Decline to Apply the Manager Rule to Employment Discrimination Cases

Other courts have flatly refused to extend the manager rule beyond the FLSA context. In declining to apply the manager rule to employment discrimination cases, the Second Circuit concluded that "if an employee—even one whose job responsibilities involve investigating complaints of discrimination—actively 'support[s]' other employees in asserting their Title VII rights or personally 'complain[s]' or is 'critical' about the 'discriminatory employment practices' of her employer, that employee has engaged in protected activity." *Littlejohn v. City of New*

8

*York*, 795 F.3d 297, 318 (2d Cir. 2015) (quoting *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990)).[5]

Like the Second Circuit, the Fourth Circuit explicitly rejected application of the manager rule in Title VII cases:

> DeMasters and the EEOC argue that, whatever place it may have in FLSA jurisprudence, the "manager rule" does not apply to Title VII. We agree. Nothing in the language of Title VII indicates that the statutory protection accorded an employee's oppositional conduct turns on the employee's job description or that Congress intended to excise a large category of workers from its anti-retaliation protections.

*DeMasters v. Carilion Clinic*, 796 F.3d 409, 422 (4th Cir. 2015) (footnote omitted).

State courts, too, have refused to apply *McKenzie*'s manager rule in the employment discrimination context, stating:

> In the single paragraph dedicated to the step outside issue, no mention is made that *McKenzie* is an FLSA case, not a Title VII case. Adopting the step outside rule would strip HR, management, and legal employees of [anti-discrimination] protection. These employees are often the best situated to oppose an employer's discriminatory practices. We therefore decline to deprive them of the statutory protection against retaliation.

*Lodis v. Corbis Holdings, Inc.*, 172 Wash. App. 835, 851 (Div. 1 2013).

### C. The Sixth Circuit's Approach

While not employing the term "manager rule," the Sixth Circuit has similarly declined to remove high level officials from Title VII protections, concluding:

---

[5] Several courts have speculated whether the Supreme Court's decision applying a broad definition of "opposing" an unlawful employment practice in *Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 276 (2009) superseded the manager rule. *Littlejohn*, 795 F.3d at n.16; *see also Weeks v. Kansas*, 503 F. App'x 640, 643 (10th Cir. 2012) ("well after *McKenzie*, the Supreme Court [in *Crawford*] suggested that all one has to do to oppose an unlawful employment practice in Title VII cases is to 'antagonize . . . ; contend against; . . . confront; resist; [or] withstand' it"); *Furr v. Ridgewood Surgery and Endoscopy Center, LLC*, 192 F. Supp. 3d 1230, 1248 (D. Kan. 2016); *but see Brush v. Sears Holdings Corp.*, 466 F. App'x 781, 787 (11th Cir. 2012) ("While Brush argues that *Crawford* has foreclosed the 'manager rule,' we cannot agree." (footnote omitted)).

> That is not to say that every job-related action undertaken by a high-level affirmative action official should be considered protected conduct. However, when the action undertaken by the official is the advocacy of hiring practices that do not discriminate on the basis of race, sex, or ethnicity . . . the advocacy can indeed be considered protected conduct under Title VII and § 1981, and a jury should decide whether a defendant employer has discriminated or retaliated against the high-level affirmative action official for this advocacy.

*Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 578 (6th Cir. 2000). The Sixth Circuit reiterated its opposition to imposing the manager rule to Title VII cases in *Warren v. Ohio Dept. of Public Safety*, 24 F. App'x 259, 265 (6th Cir. 2001) (quoting *Johnson*, 215 F.3d at 579–80), concluding:

> There is no qualification on who the individual doing the complaining may be or on who the party to whom the complaint is made. Thus, the fact that the plaintiff is a human resource director who may have a 'contractual duty to voice such concerns' does not defeat a claim of retaliation.

There is no reason to conclude the Sixth Circuit would take the opposite view now.

### D. The Manager Rule Does Not Apply Here

Contrary to UC's contention, the manager rule does not apply here for several reasons. First, courts generally look to Title VII cases "as an analog for the legal standards in both Title IX discrimination and retaliation claims." *Nelson*, 226 F. App'x at 454. As explained above, the Sixth Circuit has clearly rejected application of the manager rule to Title VII cases. Thus, it is unlikely the Sixth Circuit would apply it in the Title IX context.

Second, as the Magistrate Judge correctly noted, Title IX's language suggests even broader protections than those available under Title VII. In recognizing that Title IX provides a private cause of action for retaliation, the Supreme Court specifically emphasized that "the text of Title IX . . . broadly prohibits a funding recipient from subjecting *any person* to 'discrimination' 'on the basis of sex.'" *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005) (quoting 20 U.S.C. § 1681) (emphasis added). Indeed, Title IX's private right of action

applies "where the funding recipient retaliates against *an individual* because he has complained about sex discrimination." *Id.* at 171 (emphasis added); *see also Kelley*, 311 F. Supp. 3d at 1064.

Third, it makes no sense to remove Title IX coordinators from the ranks of those protected by Title IX. Title IX coordinators are frequently in the best position to recognize and oppose university policies that violate Title IX. Therefore, they should be entitled to at least the same anti-retaliation protections as every other university employee. For these reasons, the Court declines UC's invitation to apply the manager rule to Goldblum's Title IX retaliation claim.

### IV. CONCLUSION

For the reasons set forth above, the parties' objections are overruled, and the Court accepts the Report and Recommendation (Doc. 17). Defendant's Motion to Dismiss for Failure to State a Claim (Doc. 7) is hereby **GRANTED** as to Plaintiff's Title VII retaliation claim but **DENIED** as to Plaintiff's Title IX retaliation claim.

**IT IS SO ORDERED**.

Dated:  November 25, 2019          S/Susan J. Dlott_____
                                    Judge Susan J. Dlott
                                    United States District Court