**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | |
|---|---|
| ANDREA GOLDBLUM | Case No. 1:19-CV-00398 |
| Plaintiff, | Judge: MATTHEW W. MCFARLAND |
| v. | OPPOSITION TO MOTION FOR SUMMARY JUDGMENT |
| THE UNIVERSITY OF CINCINNATI, | |
| Defendant | |

Plaintiff Andrea Goldblum respectfully submits this Opposition to the Motion for Summary Judgment by the University of Cincinnati ("UC"). (Doc#65.)

**TABLE OF CONTENTS**

FACTS .................................................................................................................. 1

ARGUMENT ......................................................................................................... 1

    A.   Standard .................................................................................................. 1

        1.   Summary Judgment ........................................................................ 1

        2.   The *Mcdonnell Douglas* Test ......................................................... 1

    B.   Uc Is Not Entitled To Summary Judgment ......................................... 2

        1.   The *Prima Facie* Case Of Retaliation ........................................... 3

            a.   Plaintiff Engaged In Protected Activity .................................. 3

            b.   Reasonable, Good Faith Belief ............................................... 4

            c.   Plaintiff's Supervisor Knew Of Her Protected Activity ...................... 8

        2.   Causal Connection ......................................................................... 9

        3.   Pretext ........................................................................................... 10

            a.   The Claimed Misconduct Did Not Have A Basis In Fact ............... 10

                i.   The Letter To The Editor Was Not Misconduct ................... 10

                ii.   There Is An Issue Of Facts About Other Misconduct ......... 12

            b.   The Claimed Misconduct Did Not Actually Motivate Defendant ............ 17

            c.   The Claimed Misconduct Was Insufficient To Support Defendants' Actions. ........... 18

CONCLUSION ...................................................................................................... 20

**FACTS**

The Court is familiar with the underlying facts of this case as a result of the Motion to Dismiss and various discovery Motions. Accordingly, Plaintiff incorporates the Response to Defendant's Proposed Undisputed Facts and the Plaintiff's Proposed Disputed Issues of Material Fact.

**ARGUMENT**

**A.      Standard**

      **1.      Summary Judgment**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant has the burden of establishing that there are no genuine disputes of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388-89 (6th Cir. 1993). The Court must draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Pittman v. Cuyahoga Cty. Dep't of Children & Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011).

      **2.      The *McDonnell Douglas* Test**

Title IX provides, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance." 20 U.S.C. § 1681(a). Individuals may sue funding recipients for violating Title IX. *See Cannon v. Univ. of Chi.*, 441 U.S. 677, 717 (1979). This implied right of action includes retaliation claims; "when a funding recipient retaliates against a person because he complains of sex discrimination, this constitutes intentional 'discrimination' 'on the basis of sex,' in violation of Title IX." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005).

1

Title IX retaliation claims are analyzed using the same standard as Title VII retaliation claims. *Fuhr v. Hazel Park Sch. Dist.*, 710 F. 3d 668, 673 (6th Cir. 2013); *Nelson v. Christian Bros. Univ.*, 226 F. App'x 448, 454 (6th Cir. 2008).  Accordingly, Title IX retaliation claims are analyzed under the *McDonnell Douglas* burden-shifting framework.  *Fuller v. Mich. Dep't of Transp.*, 580 F. App'x 416, 423 (6th Cir. 2014); *Gordon v. Traverse City Area Pub. Schools*, 686 F.App'x 315, 319-320 (6th Cir. 2017). Under that framework, there is a three-part analysis:

- First, the employee must establish a *prima facie* case of retaliation by a preponderance of the evidence;
- Second, the employer may articulate a legitimate, nondiscriminatory reason for the adverse employment action;
- Third, the employee may then seek to show that the legitimate reasons offered by the defendant were not its true reasons but were a pretext for retaliation.

*See McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).  To establish a *prima facie* case, a plaintiff must show the following elements: (1) she was engaged in a protected activity; (2) her employer knew that she engaged in the protected activity; and (3) her employer discharged her as a result of the protected activity. *Jones-McNamara v. Holzer Health Sys.*, 630 F.App'x 394, 398 (6th Cir.2015), *citing Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 566 (6th Cir. 2003). A Plaintiff can show pretext, *i.e.* refute the legitimate, nondiscriminatory reason offered by a defendant, by showing that the proffered reason: (1) had no basis in fact; (2) did not actually motivate the defendant's challenged conduct; or (3) was insufficient to warrant the challenged conduct.  *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003), *citing Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000).

**B.     UC Is Not Entitled To Summary Judgment**

This is a textbook retaliation case.  UC was aware that Plaintiff was complaining about, and had initiated an investigation into, whether the admission and promotion of a convicted felony sex offender, William Houston, had created a hostile environment where students, and especially survivors of sexual assault, did not feel safe.  Plaintiff complained that the Houston Matter had exposed potential

2

violations of Title IX, including systemic problems in the UC admissions process that permitted the admission with minimal safeguards of a convicted sex offender who had been credibly accused of previously assaulting multiple students on multiple campuses and who potentially had sexually assaulted more students on the UC campus. The termination of Plaintiff by VP Bleuzette Marshall – with the knowledge and approval of the University President – was not only part of an effort to cover-up wrongdoing but sent a strong message to others at UC to protect the image of UC above the safety of students.

UC, of course, denies any wrongdoing. This case should go to trial because there is a material issue of fact about whether Plaintiff was terminated in violation of the anti-retaliation provisions of Title IX. One student puts it succinctly:

> I believe that it is completely credible that UC would seek to terminate Goldblum in order to prevent her from investigating or complaining about the Houston Matter. In my experience, Marshall sees her role as to protect the image and profit of UC and the narrative that is shared with the public. Marshall's view has often been "Let's put a band-aid on and save face for the university."

(Cunningham Aff., R.69-3, PageID#2880. *See also* Corey Aff., R.69-4, PageID#2883 ("Marshall… consistently made false statements and then sought to sweep things under the rug.").)

## 1.     The *Prima Facie* Case Of Retaliation

### a.     Plaintiff Engaged In Protected Activity

UC does not seriously contest that Goldblum complained about the Houston Matter.[1] Plaintiff communicated her concerns to Marshall and other UC administrators about the Houston

---

[1] UC claims that Plaintiff did not describe every protected activity in an EEOC complaint. Def. Memo., PageID#2390 n.12. This is irrelevant. Unlike Title VII claims, Plaintiff was not required to file anything with the EEOC in order to pursue claims under Title IX claims. *Summa v. Hofstra Univ.*, 708 F.3d 115, 131 (2d Cir. 2013) ("Title VII provides an administrative procedure by which an individual claiming harassment or retaliation must first pursue administrative remedies before the EEOC prior to seeking judicial relief… while Title IX does not.").

Matter, the University's response, and the admissions process for convicted sex offenders in general. (*See* Marshall Depo., R.55, PageID#1277-78; Goldblum Aff., R.69-1, PageID#2699.)

      **b.**      **Reasonable, Good Faith Belief**

UC argues that Plaintiff did not have a "reasonable, good faith belief" that the Houston Matter or the UC admission process could have been a Title IX violation. Def. Memo., PageID#2389-91. UC, by arguing that the Houston Matter did not create a hostile environment, seems to be suggesting that Plaintiff needs to prove the merits of the Title IX violation. This is not the law.[2] A plaintiff does not need to "prove the merits of the underlying discrimination complaint" but need only show a "good faith, reasonable belief that a violation existed" for purposes of establishing that the plaintiff engaged in a protected activity in the Title IX retaliation context.[3] *Moore v. City of Phila.*, 461 F.3d 331, 342 (3d Cir. 2006). This Court has observed that a plaintiff's "success on her retaliation claim does not depend on the merits of the underlying discrimination claim." *Burns v. Jacor Broadcasting Corp.*, 128 F. Supp.2d 497 (S.D. Ohio 2001), *citing Powell v. Morris*, 37 F. Supp. 2d 1011, 1016 (S.D. Ohio 1999).

Even if the Court accepts UC's formulation of the law about the underlying impact of the Houston Matter, there is clearly an issue of fact about whether students were potentially impacted by the Houston Matter. *Compare* Def. Memo., PageID#2390. There is sufficient evidence for a reasonable juror to conclude both that Plaintiff had a reasonable, good faith, belief that a Title IX

---

[2] The policy reason is obvious: UC's arguments suggests that an employer can always escape liability by successfully thwarting an investigation or conducting a successful cover-up of misconduct.

[3] An employee is entitled to protection for opposition to employment practices that may not actually be unlawful. *Yazdian v. ConMed Endoscopic Technologies, Inc.*, 793 F.3d 634, 646-647 (6th Cir. 2015). UC cites a Sixth Circuit Title VII case, *Wasek v. Arrow Energy Servs.*, 682 F.3d 463, 469 (6th Cir. 2012). This case supports Plaintiff. In *Wasek*, the evidence failed to show that the plaintiff was abused because of his gender. But the retaliation claim was viable, nonetheless. The Sixth Circuit explained that the claim was "not so devoid of factual support as to be patently unreasonable" and, therefore, Plaintiff "definitely could have" had "a reasonable, good faith belief that he was being sexually harassed." *Id.*

violation had occurred.[4]  There were numerous complaints by students on Facebook.[5]  (Facebook, R.66, PageID#2499-2519.)  A number of emails from students specifically suggested concerns. (Email, R.72-1, PageID#3064; Email, R.72-1, PageID#3066.)  On February 6, 2019, a student wrote to an administrator suggesting that Houston had sexually assaulted women at UC.  (Email, R.72-1, PageID#3071.)  On February 7, 2019, administrators at the College of Arts & Sciences realized that there was a problem.  An administrator wrote, "We need to figure out how to deal with this ASAP. Because this could be REALLY bad." An administrator responded in an email, "Oh no. I don't even know how he would have gotten admitted to UC." (Email, R.66, PageID#2522.)

Plaintiff was required to wait until students were, as UC suggests, actually impacted -- the Sixth Circuit is clear that protected activity includes complaints about "potential" violations.  *Trujillo v. Henniges Auto. Sealing Sys. N. Am., Inc.*, 495 Fed.Appx. 651, 655 (6th Cir. Aug. 20, 2012) ("We have repeatedly held that complaints… regarding potential violations of Title VII constitute protected activity for purposes of establishing a prima facie case of retaliation.").  Regardless, the argument by UC that there was "no student" was negatively impacted is contradicted by the Affidavits of two students accompanying this response, Plaintiff's testimony and Affidavit, and an expert opinion. *Compare* Def. Memo., PageID#2390.  One student, who is familiar with the Houston Matter and is a leader of student advocacy groups for Title IX issues, states:

---

[4] UC's arguments about deliberate indifference are not relevant.  Regardless, there is an issue of fact, as Plaintiff's Affidavit states,  "I told Marshall that if UC failed to adequately inform students about available resources, then UC could be considered to be deliberately indifferent to the harm caused by the Houston Matter." (Goldblum Aff., R.69-1, PageID#2699.)

[5] Comments included: "Applauding sexual predators is a slap in the face to student survivors…."; "The whole city already jokes about UC parties being where girls go to get raped. At least y'all at the administration are admitting you know this is happening. Thank you for publicly taking a side."  Comments on Twitter also demonstrated potential impact:  "…Just admit UC as a whole hates women" and "Good to know our local college is out here supporting rapists. #boycottUC… And this is NOT THE FIRST TIME UC HAS DONE THIS."

> I am aware the UC claims that the Houston Matter did not create a sexually hostile environment. This is not true. The Houston Matter made female UC students feel vulnerable to sexual assault. In my experience, based on my own experiences and conversations with other students, I believe that the Houston Matter unreasonably interfered with my, and other students' work or academic performance and created an intimidating, hostile and offensive work or learning environment for students.

(Cunningham Aff., R.69-3, PageID#2882.) Another student also says that UC's claim of no impact "is not true" and also observes that "the Houston Matter unreasonably interfered with my, and other students; work and academic performance and created an intimidating, hostile and offense work or learning environment." (Corey Aff., R.69-4, PageID#2881-2882.) She explained:

> The Houston Matter made female UC students feel vulnerable to sexual assault. This was a terrifying revelation to me and other students. I, along with other students, were concerned about how many more sex offenders remain on the UC campus, whether UC Pubic Safety had taken adequate preventive steps, and whether Houston had assaulted other students at UC.

(Corey Aff., R.69-4, PageID#2882.) Plaintiff complained that UC's handling of the Houston Matter and the underlying problems with admissions constituted a violation of Title IX.[6] She testified:

> I recall telling [Marshall] that there is community impact; that we need to acknowledge that there are people feeling harm; that we could be considered deliberately indifferent under Title IX if we did not offer resources and let people know where they could find their options.

(Goldblum Depo., R.54, PageID#794.) This is also clear from her Affidavit and does not appear to be disputed. (Goldblum Aff., R.69-1 PageID#2699.) Goldblum has multiple years of experience as a Tile IX Coordinator.[7] (Complaint, ¶13; Bullard Rep., R.69-6, PageID#2919.) In assessing

---

[6] On February 9, 2019, for example she wrote, "There may be questions re: who knew what when he was admitted…" (Email, R.66, PageID#2528.)

[7] UC's argument that "there are no facts that could lead someone in her position to reasonably believe a Title IX violation had occurred" is wrong. Def. Memo., PageID#2390. The pertinent question is whether a jury could conclude that a reasonable person in the same factual circumstances with the same training and experience as Plaintiff would believe that the conduct complained of was unlawful. *Compare Rhinehimer v. U.S. Bancorp Invs., Inc.*, 787 F.3d 797 (6th Cir. 2015) (interpreting the reasonable-belief requirement of the Sarbanes-Oxley Act's anti-retaliation provision). This is not an issue amenable to summary judgment. The Sixth Circuit has cautioned that this inquiry is "necessarily fact-dependent, varying with the circumstances of the case" and that "the issue of objective reasonableness should be decided as a matter of law only when no reasonable person could have believed that the facts known to the employee amounted to a violation or otherwise justified the

reasonableness, Plaintiff's opinion, as set forth in her Affidavit, that the Houston Matter or the UC admission process could have been a Title IX violation should be accorded substantial weight. *Rhinehimer v. U.S. Bancorp Invests., Inc.*, 787 F.3d 797, 812 (6th Cir. 2015) (reasonableness of employee's belief is "analyzed in light of the employee's training and experience"). *See also Bishop v. PCS Administration (USA), Inc.*, N.D.Ill. No. 05 C 5683, 2006 U.S. Dist. LEXIS 37230, at *20 (May 23, 2006) (Title IX claim; "The employee's access to information, experience, and background are considerations in determining whether he or she had a reasonable belief."). The reasonableness of Plaintiff's belief is buttressed by the opinion of an expert.

> Houston's admission to UC had the potential to constitute a Title IX violation in that it had the potential effect of unreasonably interfering with students' work or academic performance or of creating an intimidating, hostile or offensive work or learning environment.

(Bullard Rep., R.69-6, PageID#2939.)

Finally, UC argues that Plaintiff's complaints were too general.[8] Def. Memo., PageID#2393. There is an issue of fact here, as Plaintiff's Affidavit describes numerous specific complaints. (Goldblum Aff., R.69-1, PageID#2699.) This Court has already rejected essentially the same argument by UC. In denying Defendant's Motion to Dismiss (affirmed by this Court), Magistrate Judge

---

employee's belief that illegal conduct was occurring. *Yazdian v. ConMed Endoscopic Technologies, Inc.*, 793 F.3d 634, 646-647 (6th Cir. 2015).

[8] Plaintiff's complaint about the Houston Matter was not an impermissibly vague "general complaint." *Compare* Def. Memo., PageID#2393. The basis of Plaintiff's Title IX retaliation claims is her complaints about, and investigation into, the Houston Matter and the UC admissions process for convicted sex offenders. These concerns led Plaintiff to contact and meet with Marshall and other UC administrators about these issues on multiple occasions. UC was, thus, well aware that Plaintiff's complaints specifically referenced the school's obligation under Title IX. (*See* Marshall Depo., R.55, PageID#1277-78.) *Compare McKinley v. Skyline Chili, Inc.*, 2012 U.S. Dist. LEXIS 114020, *9-10 (CITE) (letter complaining that employee "felt discriminated against" was not protected activity); *Pastura v. CVS Caremark*, CITE 2012 U.S. Dist. LEXIS 182991*10 (S.D. Ohio) (employee's verbal complaints that he suffered discrimination were merely "vague protests"); *Weaver v. Ohio State Univ.*, 71 F. Supp. 2d. 789, 793 (S.D. Ohio 1998) (complaints about the field conditions were not framed in terms of Title IX sex discrimination, and therefore could not be considered protected activity).

Bowman wrote that Plaintiff's complaints "all arguably constitute protected activities sufficient to put UC "on notice" about Plaintiff's Title IX concerns." 2019 U.S. Dist. LEXIS 181324, at *17-18.

### c.     Plaintiff's Supervisor Knew Of Her Protected Activity

UC claims that Marshall lacked knowledge of the protected activity. Def. Memo., PageID#2395. The record shows a disputed issue of fact on this point. Marshall admitted in her deposition that Plaintiff complained that the Houston Matter presented Title IX concerns:

> Q And did she ever express to you concerns that the decision to admit William Houston to the University of Cincinnati raised Title IX concerns?
> A Yes.

(Marshall Depo., R.55, PageID#1269.) Later, Marshall testified that she was aware of Plaintiff's complaints that the Houston Matter had created Title IX issues when she decided to terminate Plaintiff.

> Q …you received information about the substance of her complaints, too, right?
> A Yes.
> Q The substance of her complaints were about the Houston article.
> A Correct.
> Q And, in particular, about whether the University's response to the Houston article was sufficient under Title IX.
> A Yes.

(Marshall Depo., R.55, PageID#1276.) Marshall tied this knowledge directly to the employment decision. (Marshall Depo., R.55, PageID#1276.)[9] She testified:

> Q So while you were aware that [Goldblum] was complaining about the manner of the University in the handling of the Houston matter, that's when you were deciding whether you were going to issue a written reprimand or potentially terminate her.
> A Yes.

---

[9] UC, nonetheless, claims "it is undisputed that Marshall had no knowledge that Goldblum was purportedly conducting an investigation." Def. Memo., PageID#2395. This is not true; at best this is highly disputed fact. The UC human resources employee who worked with Marshall on the termination testified that Marshall "may have" mentioned Plaintiff's complaints about the Houston Matter. (Awadalla Depo., R.34-3, PageID#362.)

(Marshall Depo., R.55, PageID#1278.)   Plaintiff testified that she informed Marshall about her concerns about the Houston Matter.  (Goldblum Depo., R.54, PageID#795-796.)  She testified:

> I told her [Marshall] that I believed that [the Houston Matter] could potentially violate Title IX, that it would -- that the reason would be deliberate indifference because we were not doing what we were supposed to be doing.

(Goldblum Depo.at PageID#856.)  And, lest there be any ambiguity in her deposition testimony, Plaintiff has submitted an Affidavit specifically contradicting Marshall's testimony that she lacked knowledge of her complaints and investigation.  Plaintiff states unequivocally that she "communicated [her] concerns to Marshall and other UC administrators about the Houston Matter and possible systemic issues in the admissions process" and that Marshall's testimony otherwise is "absolutely false." (Goldblum Aff., R.69-1, PageID#2700.)

    **2.**       **Causal Connection**

Defendant's claim that "temporal proximity alone cannot establish a causal connection" is not the current law in the Sixth Circuit.[10]  Def. Memo., PageID#2396.  Timing, *alone*, can provide evidence of causation under Sixth Circuit precedents.  The Sixth Circuit has been explicit:

> Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a *prima facie* case of retaliation.

*Fuhr*, 710 at 675, *citing Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) ("temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a *prima facie* case of retaliation").  This view was reaffirmed in April 2020. *Green v. Beaudry*, 6th Cir. No. 19-2027, 2020 U.S. App. LEXIS 10330, at *6 (Apr. 1, 2020) ("Temporal proximity between protected conduct and adverse action, alone" may be sufficient to satisfy *prima*

---

[10] Defendant also argues that "Marshall's lack of knowledge breaks the causation inference."  Def. Memo., PageID#2396.  There is an issue of fact about Marshall's knowledge.  *See supra*.

*faciae* retaliation case), *quoting Muhammad v. Close*, 379 F.3d 413, 417-18 (6th Cir. 2004). *See also Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 505 (6th Cir. 2014) (temporal proximity "is significant enough to constitute evidence of a causal connection for the purposes of satisfying a *prima facie* case"); *Amos v. McNairy Cty.*, 622 F. App'x 529, 537 (6th Cir. 2015) ("this court has explicitly held that temporal proximity alone can establish causation.").[11]

### 3.      Pretext

Plaintiff only has to present sufficient evidence on any one of the three forms of pretext.  See *Baseball at Trotwood, LLC v. Dayton Professional Baseball Club*, S.D.Ohio No. C-3-98-260, 2003 U.S. Dist. LEXIS 27460, at *199 (Sep. 2, 2003) ("If there is a sufficient evidentiary basis for finding that any of these three forms of pretext exists, then it is for the trier of fact to determine whether the defendant was truly motivated by race"), *citing Manzer v. Diamond Shamrock Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994).

### a.      The Claimed Misconduct Did Not Have A Basis In Fact

### i.      The Letter To The Editor Was Not Misconduct

There is an issue of fact about whether sending the letter to the editor was misconduct, even in the face of a direct order.  The Letter is found at R.72-1, PageID#3075.  Plaintiff states, "Based on my training and experience, sending the letter was not misconduct but, instead, was required in order to fulfill the University's Title IX obligations."  (Goldblum Aff., R.69-1, PageID#2702.)  The UC

---

[11] Plaintiff engaged in the protected activity in Mid-February.  On or about February 27, 2019, Marshall decided to terminate Goldblum.  (Marshall Depo., R.55, PageID#1290-1291.)  This is well within the time period to be sufficient, by itself, under Sixth Circuit precedent.  *Stein v. Atlas Indus., Inc.*, 730 F. App'x 313, 319 (6th Cir. 2018) ("How close is 'very close'?... [O]ur cases indicate that the line should be drawn shy of the ten-week mark."); *Adamov v. U.S. Bank Nat'l Ass'n*, 681 F. App'x 473, 475-76 (6th Cir. 2017) (plaintiff terminated approximately one month after complaining of national-origin discrimination) *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 283 (6th Cir. 2012) (time period of approximately two months after a plaintiff engaged in protected activity "suffice[d]… to meet the low threshold of proof necessary to establish a *prima facie* case of retaliatory discharge"); *Herrera v. Churchill McGee, LLC*, 545 F.App'x 499, 502 (6th Cir. 2013) (employee terminated month following complaint; this "presents a sufficiently close temporal proximity to allow us to make an inference of causation").

Motion is devoid of any description of why the letter to the editor was so objectionable that it warranted termination without progressive discipline. A number of UC witnesses did not believe that the letter from Plaintiff to the student newspaper was actually inappropriate. The Senior Assistant Dean for the College of Arts and Sciences testified:

> Q Is there anything in this letter that you believe is inappropriate?
> A No.

(Holstrom Depo., R.57, at PageID#1831.) The Dean of the College of Arts and sciences testified similarly:

> Q So let me ask you, as you look at this letter, if you could review it and tell me if there's anything in there that is inappropriate.
> A To my eye, no. Nothing stands out as being inappropriate.

(Petren Depo., R.58, PageID#1926.)

Plaintiff's alleged misconduct must be evaluated in light of her role as a Title IX Coordinator. A Title IX coordinator, in accordance with guidance from the Department of Education, should have "the appropriate authority, both formal and informal, to effectively coordinate the recipient's compliance with Title IX" April 24, 2015 Dear Colleague Letter. The role of the Title IX Coordinator, thus, involves independent discretion and Title IX coordinators may use this discretion to make independent determinations as to notification of resources and referrals.[12] (Goldblum Aff., R.69-1, PageID#2702.) One of the experts retained by Plaintiff has concluded that the letter Plaintiff proposed to send "was reasonable, fell under her duties as Title IX Coordinator, and was in line with OCR expectations and industry standard." (Bullard Rep., R.69-6, PageID#2943.) This expert explains

---

[12] Marshall acknowledged that the intention of the Title IX coordinator is to act independently in accordance with federal guidance. (Marshall Depo., R.55, PageOD#1153, PageID#1193.) This includes 2001 Guidance from the Department of Education specifically suggesting that a school could respond to anonymous complaints in a publication by submitting a letter to the student newspaper. Marshall admitted that a letter to the newspaper, such as that proposed by Plaintiff, would be appropriate under this Guidance. (Marshall Depo., R.55, PageID#1134.)

that it was not misconduct to send the letter even if the supervisor disagreed with the decision because, in part, it is not unusual for a "Title IX Coordinator's proposed action" to "run afoul of other campus administrators, including their direct supervisor or campus leadership."[13] (Bullard Rep., R.69-6, PageID#2943.) A second expert is even more explicit that Plaintiff's refusal to follow Marshall's directive was permissible and consistent with the guidance from the Department of Education:

> While Ms. Goldblum's behavior may have been deemed "severe" because she "defied a direct order," she acted in a way that is required of a Title IX Coordinator…. The role of the Title IX Coordinator involves independent discretion and they are trained to use this discretion to make determinations as to notification of resources and referrals.

(Dougherty Rep., R.69-2, PageID#2864, *citing* April 24, 2015 Dear Colleague Letter.)

### ii. There Is An Issue Of Facts About Other Misconduct

No concerns about Plaintiff's performance were ever mentioned prior to this Litigation.[14] (Goldblum Aff., R.69-1, PageID#2698 ("At no time did Marshall ever tell me that my work as Title IX Coordinator was unsatisfactory or deficient in any way.").) No misconduct unrelated to sending a letter to the newspaper was mentioned during the meeting when Plaintiff was terminated; the only thing Marshall says while meeting with Plaintiff is "I wanted to let you know that I've given a lot of thought to our February 12th incident…" (Goldblum Aff., R.69-1, PageID#2703, *citing* video and transcript (PageID#2850-2857).)

---

[13] Marshall, not Plaintiff, committed the actual misconduct: "Marshall, who did not serve as the Title IX Coordinator or have the extensive Title IX training and experience as Ms. Goldblum, interfered with Ms. Goldblum's responsibilities." (Bullard Rep, R.69-5, PageID#2942.)

[14] Prior to the meeting, the video from the police officer body camera captured Marshall dancing with the HR representative. (Video, R.71, available at https://youtu.be/XA-GvrjWBFs). A student group described Marshall as dancing "joyfully" prior to the meeting. https://www.facebook.com/studentsforsurvivors/posts/853308348434667. Marshall denies this, offering the strained explanation that she was demonstrating "Zumba" moves. (Marshall Depo., R.55, PageID#1312.) This is further evidence of motive, as the video seems to show a supervisor happy because she was getting rid of a problem for the institution.

Defendant, perhaps recognizing that terminating Plaintiff for sending a letter offering resources to victims of sexual assault was inconsistent with Department of Education Guidance and industry standards (not to mention UC's principles of progressive discipline, *see infra.*), has changed her story. Defendant *now* claims that Marshall, acting alone, terminated Plaintiff not only because of insubordination but also for two additional reasons: (1) she had received reports that Plaintiff was acting in an unprofessional manner and disrupting the work environment; and (2) she had received reports that that Plaintiff was not performing her job adequately by delaying assigning cases.[15] (Marshall Depo., R.55, PageID#1172-1173.) These appear to be serious concerns – yet there is reason a jury could doubt the veracity. For example, the human resources employee who met with Marshall

---

[15] Defendant cannot claim the honest belief exception. *See Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001)("as long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect") In determining whether Marshall had an "honest belief" in her reasons, this Court must examine whether Marshall established a "reasonable reliance" on the particularized facts available to her. *Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001)*, quoting Smith v. Chrysler Corp.*, 155 F.3d 799, 806-07 (6th Cir. 1998).

The Sixth Circuit has explained, "the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Id.* Marshall made essentially no inquiry. In claiming that Plaintiff was disruptive to the Title IX Office, she contacted one person, Shaw – a person with a significant conflict of interest and limited experience. Marshall admitted to her lack of reasonable inquiry in her deposition:

> Q Did you attempt to verify any of the information that Morgan Shaw had shared with you?
> A No….
> Q In the information [Shaw] gave you, a lot of it seems to be subjective views... Did you talk to anyone else at the Title IX office in order to verify whether the information that [Shaw] provided was accurate?
> A No.

(Marshall Depo., R.55, PageID#1284-1285.) Marshall also, after attempting to obfuscate, could not testify that she took steps to verify the claim that Plaintiff had delayed assigning cases:

> Q So, in particular, [Shaw] told you that there was a delay in cases being assigned. Did you do anything to try to determine whether that was accurate?
> A … not from a full on inquiry perspective…
> Q What did you do to verify the information?
> A I could look at our tracking log.
> Q Did you do that?
> A I don't remember.

(Marshall Depo., R.55, PageID#1284-1285.)

13

could not testify that Marshall initially raised any complaints about Plaintiff outside of the Houston Matter.

> Q. Do you have any specific recollection of Marshall indicating any complaints about the job performance of Andrea Goldblum?
> A. No.

(Awadalla Depo, PageID#363.) And none of these reasons are explicitly set forth in the draft letter Marshall was going to use to terminating Goldblum. (Email, R.66, PageID#2577-2579.)

Marshall's shifting stories, especially when combined with the other evidence undermining her proffered justification, is sufficient to create a genuine issue of material fact as to whether Plaintiff was terminated in retaliation for her protected activity.[16] The Sixth Circuit has found that inconsistencies can support a finding of pretext. *See White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789 (6th Cir. 2004) (offer of contradictory reasons for a challenged job transfer "supported a finding of pretext"). *See also Dennis v. Columbia Collection Med. Ctr.*, 290 F.3d 639 (4th Cir. 2002) ("The fact that an employer has offered inconsistent post hoc explanations for its employment decisions is probative of pretext.").

There is more. Marshall lied to at least two people related to Plaintiff's termination.[17] One witness states, "I, along with some other students, spoke to Marshall about the termination of Goldblum on or about April 26, 2019. Marshall lied to us during that conversation." (Corey Aff., R.69-4, PageID#2881-2882.) Another states, "I spoke to Marshall about Title IX issues on the date that Goldblum was terminated. Marshall lied to me." (Cunningham Aff., R.69-3, PageID#2881.) *See also* Email, R.72-1, PageID#3220.) This, alone, may be sufficient evidence of pretext. "Evidence that

---

[16] Later, the HR representative testified slightly differently, suggesting that Marshall had raised other concerns. But she was only was able to provide vague examples of Plaintiff being disruptive, suggesting in a conclusory manner that Plaintiff was "showcasing subjective opinions and emotions." (Awadalla Depo. R.34-3, PageID#367.) Needless to say, as the UC witness acknowledged, "showcasing subjective opinions and emotions" is not a violation of UC policy. (*Id.*)

[17] This is why the Deposition of Pinto is necessary. Marshall discussed the termination with Pinto, and the reasons she gave to Pinto for the termination are important. *See* 56(f) Motion.

tends to show that decisionmakers lied about material facts regarding a plaintiff's protected activity and subsequent adverse employment action can serve as evidence of pretext." *Hawthorne v. Univ. of Tennessee Health Science Ctr.*, 203 F. Supp. 3d 886, 894 (E.D.Tenn. 2016), *citing Youssef v. Holder*, 19 F. Supp. 3d 167, 185 (D.D.C 2014) (noting that evidence that decision-makers lied about their knowledge of protected activity could constitute evidence of retaliatory intent).

And… even if this Court accepts the shifting reasons from Marshall as more than post-hoc justifications, there is still an issue of fact about whether the misconduct occurred. Not a single contemporaneous document supports Marshall's claimed motivation. This lack of contemporaneous documentary evidence is important under Sixth Circuit precedents. The Sixth Circuit has observed, "we are skeptical of undocumented accounts of employee conduct that may have been created post-termination." *Abdulnour v. Campbell Soup Supply Co., LLC*, 502 F.3d 496, 503 (6th Cir. 2007). In regard to the alleged disruptive conduct, Marshall testified:

> Q … So what I want to focus in on are the other reasons that you gave. Are you aware of any documents that support your statement that Andrea Goldblum disrupted the work environment?
> A No.

(Marshall Depo., R.55, PageID#1174-1175.)[18] Similarly, in regard to the alleged delay in assigning cases, Marshall testified that no contemporaneous documents exist:

> Q Are you aware of any documents that support your statement that there was a delay in assigning cases?
> A No.

---

[18] While Marshall contends that she learned of the unprofessional conduct from others, Marshall testified that she did not create any notes or memoranda documenting her conversations with others about Plaintiff. (Marshall Depo., R.55, PageID#1176-1178.)

(Marshall Depo., R.55, PageID#1178.) In contrast, Plaintiff has submitted an Affidavit unequivocally denying any unprofessional conduct.[19] (Goldblum Aff., R.69-1, PageID#2701.) Plaintiff has, in her affidavit, also denied any delay in assigning cases and provided specific reasons for her actions in this small subset of cases. (Summaries of the cases are attached to her Affidavit.) UC acknowledged that the cases with alleged delays include only a small portion of the reports to the Title IX Office. Plaintiff explains that many of the 'delayed' reports were not responded to because they were duplicative, involved frivolous matters, did not involve UC students, or were impossible to investigate because the alleged perpetrator could not be identified. Others did not require a response because the alleged victims had already received notices of available resources from other UC sources, such as the police or residential life. (Goldblum Aff., R.69-1, PageID#2701.)

Marshall claims she relied on *one* member of the Title IX staff, Morgan Shaw, to support claims of unprofessional conduct by Plaintiff. This reliance is suspect on its face, as Shaw only became an investigator in the Title IX Office about a month before Plaintiff was terminated and had a familial interest in seeing that Plaintiff's investigation into the Houston Matter was stopped.[20] (Shaw Depo., R.56, PageID#1603.) The only example of unprofessional conduct by Plaintiff Shaw could describe was, "She would oftentimes talk about others in the office." (Shaw Depo., R.56, PageID#1651.) Shaw was notably unable to support many of the details cited by Marshall. When asked specific questions about Marshall's description of her conversation, Shaw said "I don't recall" or the equivalent on numerous occasions. (*See* Shaw Depo., R.56, PageID#1724-733.) In fact, her most relevant

---

[19] Even Marshall's examples are vague. When asked about Plaintiff's unprofessional conduct with UC staff, Marshall came up with one only one conversation, but then could not provide details: "I don't remember the specifics of it – where [Plaintiff]... may have been a little too strong." (Marshall Depo., R.55, PageID#1194.)

[20] Shaw, it cannot be emphasized enough, is the daughter of one of the persons Plaintiff would have been investigating. (*See* Marshall Depo., R.55, PageID#1317 ("Q And the only person you spoke to who gave you information about Andrea Goldblum's conduct in the Title IX office was Daniel Cummins' daughter. A Correct.").)

16

testimony may be an admission tying Plaintiff's termination to her complaints about the handling of the Houston Matter; Shaw testified that she did not observe any "defiant" conduct by Plaintiff unrelated to the letter to the editor.[21]  (Shaw Depo., R.56, PageID#1724.)

### b. The Claimed Misconduct Did Not Actually Motivate Defendant

The evidence permits an inference that Plaintiff was terminated, in part, to prevent the disclosure of facts related to the Houston Matter or the systemic issues related to the admission of sex offenders at UC. *Compare* Def. Memo., PageID#2398-99.  The Court should not consider Defendant's self-serving statements denying an improper motive unsupported by any evidence. *Hooks v. Rumpke Transp. Co., LLC*, 6th Cir. No. 16-3681, 2017 U.S. App. LEXIS 26226, at *11 (Aug. 8, 2017) (rejecting summary judgment because jury could "disbelieve [defendant's] self-serving statement" about reason for terminating employee).  The Sixth Circuit has explained that a court should "not grant a defendant summary judgment in an employment discrimination action merely because the defendant states that it did not" violate civil rights laws. *Shaw v. Danley*, 6th Cir. No. 98-6579, 2000 U.S. App. LEXIS 545, at *19-20 (Jan. 10, 2000).

Plaintiff's concern about systemic issues in the UC admissions process were well-founded; UC had a lot to hide and admissions staff tellingly did not respond to Plaintiff's inquiries.  (Byland Depo., R. 69-5, PageID#2907-2908.)  UC is supposed to consult with public safety officials before admitting convicted sex offenders, yet did not do so for Houston and, apparently, other applicants with similar background. (Miller Depo., R.62, PageID#2225-2226; Responses to Plaintiff's 2d Set of Ints., R.69-7, PageID#2958.)  The termination of Plaintiff prevented any investigation into the allegation that Houston had sexually assaulted a student on UC's campus or into the flawed admissions

---

[21] Shaw, in fact, supports the claim that Plaintiff was complaining about the Houston Matter.  Shaw testified that Plaintiff convened the Title IX team to discuss the response to the Houston Matter, but also acknowledged that there was nothing "inappropriate about that."  (Shaw Depo., R.56, PageID#1732.).

process at UC.[22]  The investigation by Plaintiff was transferred to her successor (selected by Marshall) on the day she was terminated and closed a month later with no evidence of any work being conducted. (Maxient Report, R.72-1, PageID#3076-3083.)  UC also seems to have created a fake investigation to be conducted by the person alleged to have been involved in the initial misconduct!  (Maxient Report, R. 72-1, PageID#3084.)  An admission by Marshall in her deposition that she has effectively buried this issue is particularly revealing:

> Q Do you intend to take any actions to change the manner in which the University of Cincinnati decides to admit convicted sex offenders?...
> [A]: I don't know. I need to learn what the process is.
> Q In the past 11 months, have you taken any actions to learn what the process is for the University of Cincinnati to admit convicted sex offenders?
> A No.

(Marshall Depo., R.55, PageID#1321 (objection omitted).)  Plaintiff's expert describes the significant exposure this created for UC.  (Bullard Rep., R.69-6 at PageID#2043-2944.)   This is evidence of pretext: "It should be obvious that a company with real misconduct to hide would have more motive to terminate a whistle-blowing employee than would a company with clean hands." *Blakeslee v. Shaw Infrastructure, Inc.*, D. Alaska No. 3:09-CV-0214, 2010 U.S. Dist. LEXIS 76295, at *2 (July 27, 2010).

### c.   The Claimed Misconduct Was Insufficient To Support Defendants' Actions.

Defendant's Motion rests on the premise that the termination of an employee with no prior disciplinary history for sending an email to the student newspaper offering resources to victims of sexual assault without permission – even when that email was never published – raises no questions of an ulterior motive.  This claim is dubious, almost laughable, on its face.

---

[22] The failure of the admissions process in the Houston matter is particularly acute.  UC ignored police reports indicating that Houston had sexually assaulted *multiple* women at Bowling Green. (Police Report, PageID#2470-2478.)

Plaintiff has no history of prior disciplinary issues at UC. In fact, the University's PR representative praised Plaintiff's work on the Houston Matter: "Thanks for your help here and the great, much needed strides you've made in Title IX." (Email, R.66, PageID#2549.) An issue of fact is created because Plaintiff has obtained an expert opinion that academic institutions would typically impose a reprimand for this type of conduct consistent with the principles of progressive discipline.

> I am not aware of any institution of higher learning that applies principles of progressive discipline that would terminate Ms. Goldblum under those circumstances. Instead, institutions of higher learning would impose a reprimand or warning, at most, in such circumstances... This highly unusual action permits an inference that Marshall was actually motivated by other reasons.

(Dougherty Rep., R.69-2, PageID#2865.)[23] A second expert testifies, "Even assuming Ms. Goldblum's approach was not supported by her supervisor, it was certainly not an action that would warrant termination at any other comparable institution." (Bullard Rep., R.69-6, PageID#2944.) Notably, Defendant has not obtained an expert opinion to the contrary.

Pretext may also be shown by the fact that other high-ranking employees were not similarly punished for similar misconduct. The Sixth Circuit has observed that in evaluating retaliation claims, courts may consider whether the employer treated the plaintiff differently from similarly situated individuals. *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 516-517 (6th Cir. 2009). The Sixth Circuit has also observed that evidence of an employer's treatment of other employees is often relevant to an employer's motive in acting against a plaintiff. *Griffin v. Finkbeiner*, 689 F.3d 584, 600 (6th Cir. 2012).

---

[23] Initially, Marshall intended to give Plaintiff a warning or reprimand. This action would have been consistent with the principles of progressive discipline under UC policies. (Compare Marshall Depo., R.55, PageID#1162-1163 (discussing importance of progressive discipline). Even if not conclusive, the failure of UC to follow its procedures is further evidence of pretext. *See e.g. Deboer v. Musashi Auto Parts, Inc.*, 124 F. App'x 387, 394 (6th Cir. 2005) (failure to follow handbook calling for counseling prior to their termination or demotion was probative of pretext); *Brewer v. New Era, Inc.*, 564 F. App'x 834, 841 (6th Cir. 2014) (failure to adhere to seniority policy, when considered in combination with other evidence of pretext, sufficient to create a genuine issue of material fact on pretext claim).

In this case, UC produced the records related to comparable employees who also violated rules against insubordination. These records show that UC has reprimanded employees who have engaged in more serious conduct and reserves terminations for the most egregious and repeated conduct by high ranking officials. Plaintiff's expert summarizes:

> The records produced by UC confirm my opinion that no institution of higher learning that applies principles of progressive discipline that would have terminated Goldblum under for her alleged misconduct. These records show that UC commonly reprimands employees who engage in more serious conduct, follows principles of progressive discipline, and has only terminated employees who have shown a pattern of severe misconduct. *In my opinion, the inconsistencies between UC's action in this case and actions in other cases permits an inference that Marshall was actually motivated by other reasons.*

(Dougherty Aff., R.69-2, PageID#2859 (emphasis supplied).) This discovery of other employees who were disciplined, thus, creates an issue of fact that the termination of Plaintiff was pretextual because, in light of discipline for other instances for insubordination at UC, the misconduct was insufficient to warrant termination. *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003), *citing Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000); *Manzer*, 29 F.3d 1078, 1084 (6th Cir. 1994) (pretext may be shown by "evidence that other employees… were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff").

## CONCLUSION

The Motion should be denied.

Respectfully submitted,


_____/s/ Joshua A. Engel_____
Joshua Adam Engel (0075769)
Jim Hardin (0056247)
ENGEL AND MARTIN, LLC
4660 Duke Dr., Suite 101
Mason, OH 45040
(513) 445-9600
engel@engelandmartin.com


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been electronically served via the Court's ECF System this May 19, 2020 upon all counsel of record.

_____/s/ Joshua Engel_____
Joshua Adam Engel (0075769)