IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| ANDREA GOLDBLUM | Case No. 1:19-CV-00398 |
| Plaintiff, | Judge: DLOTT |
| v. | |
| THE UNIVERSITY OF CINCINNATI, | RESPONSE TO PROPOSED UNDISPUTED FACTS OF DEFENDANT UNIVERSITY OF CINCINNATI |
| Defendant | |

Plaintiff Andrea Goldblum respectfully submits this Response to Proposed Undisputed Facts of Defendant University of Cincinnati.

*1. The University is a public institution located within the city limits of Cincinnati, Ohio.*

Response*:* Admitted.

*2. The University has more than 90 undergraduate and graduate programs, with an enrollment of roughly 46,000 students within its 13 individual colleges.*

Response*:* Admitted.

*3. To educate, manage, and accommodate such a large student population, the University employs nearly 15,000 faculty and staff members across its three campuses.*

Response*:* Admitted.

*4. Employees are subject to University Policy 15.02 on Conduct.*

Response*:* Admitted.

*5. Policy 15.02 outlines that it is a violation for any employee to engage in insubordination, or other deviations from standard and acceptable behavior.*

Response*:* Admitted, except to the extent that the paragraph omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. Defendant is paraphrasing a larger document. (Policy, PageID#2428.)

1

Policy 15.02 must also be read in conjunction with UC Policy 15.03, which states that Defendant "subscribes to the principle of progressive corrective action…" (Policy, PageID#2431.)

*6. The University's Office of Gender Equity & Inclusion oversees the University's efforts to comply with Title IX of the Education Amendments of 1972, 20 U.S.C. §1681(a) ("Title IX").*

Response: Admitted.

*7. The University provides several Title IX resources to students, faculty, and staff. All of those resources are listed on the University's public facing website, and in its annual Clery report.*

Response: Admitted, except to the extent that the paragraph omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. Resources are listed in multiple places. UC is attempting to suggest that it has provided adequate notice of available resources to students, faculty, and staff in regard to the Houston Matter. The 2011 Dear Colleague Letter and other guidance from the Department of Education provides that notice to the campus of grievance procedures, that provide prompt and equitable resolution of sex discrimination complaints, be widely distributed to students and recommends that the notice be "prominently posted on school Web sites and at various locations throughout the school and published in electronic and printed publications of general distribution that provide information to students and employees about the school's services and policies. (Bullard Rep., R.69-6 PageID#2945, *citing* Dept. Of Ed. Guidance; Goldblum Depo., R.54, PageID#844.)

*8. The University also provides Title IX outreach through online training for new students, class syllabi, posters, tabling events, presentations, and on-campus advocates, among other resources.*

Response: Admitted, except to the extent that the paragraph omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. Resources are listed in multiple places. UC is attempting to suggest that it has provided adequate notice of available resources to students, faculty, and staff in regard to the Houston Matter. The 2011 Dear Colleague Letter and other guidance from the Department of Education provides that notice to the campus of grievance procedures, that provide prompt and equitable resolution of sex discrimination complaints, be widely distributed to students and recommends that the notice be "prominently posted on school Web sites and at various locations throughout the school and published in electronic and printed publications of general distribution that provide information to students and employees about the school's services and policies. (Bullard Rep., R.69-6 PageID#2945, *citing* Dept. Of Ed. Guidance; Goldblum Depo., R.55, PageID#844.)

*9. Plaintiff Andrea Goldblum was hired as the University's Executive Director, Gender Equity & Inclusion ("Title IX Coordinator") in June 2018.*

Response: Admitted.

*10. Goldblum was responsible for day-to-day application and review of the University's policies and practices related to Title IX.*

Response: Admitted, except to the extent that the paragraph omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. The 2015 DCL outlines the responsibilities and authority of a Title IX Coordinator, with the primary responsibility being to coordinate the recipient's compliance with Title IX. This guidance states:

> The Title IX coordinator is responsible for coordinating the recipient's responses to all complaints involving possible sex discrimination. This responsibility includes monitoring outcomes, identifying and addressing any patterns, and assessing effects on the campus climate. Such coordination can help the recipient avoid Title IX violations, particularly violations involving sexual harassment and violence, by preventing incidents from recurring or becoming systemic problems that affect the wider school community.

(Bullard Rep., R.69-6 PageID#2945, *citing* Dept. Of Ed. Guidance.

*11. More specifically, Goldblum was responsible for overseeing a case management plan for each reported Title IX incident which included ensuring timely, impartial investigations of complaints of alleged instances of sexual harassment and/or sexual assault, and tracking each incident.*

Response: Admitted, except to the extent that the paragraph omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. The 2015 DCL outlines the responsibilities and authority of a Title IX Coordinator, with the primary responsibility being to coordinate the recipient's compliance with Title IX. This guidance states:

> The Title IX coordinator is responsible for coordinating the recipient's responses to all complaints involving possible sex discrimination. This responsibility includes monitoring outcomes, identifying and addressing any patterns, and assessing effects on the campus climate. Such coordination can help the recipient avoid Title IX violations, particularly violations involving sexual harassment and violence, by preventing incidents from recurring or becoming systemic problems that affect the wider school community.

(Bullard Rep., R.69-6 PageID#2945, *citing* Dept. Of Ed. Guidance.) Goldblum's duties were intended to be consistent with Department of Education guidance. (Marshall Depo., R.55, PageID#1152-1153.) The relevant portion of the job description provides:

> Lead investigation processes; oversee case management plan for each reported Title IX incident; ensure timely, impartial and thorough investigations of complaints of sexual harassment, sexual assault, and relationship violence, as well as other forms of discrimination and harassment, by/against faculty, staff, and students; ensure collection of relevant facts related to the reported Title IX incident, collaborate and

consult with internal partners (e.g. HR, EOA, athletics, public safety, student affairs, general counsel, and provost office), and others, as appropriate, to ensure accurate and consistent application of university policies and practices; assess incident; document facts, analyze findings and summarize investigation, make recommendations that ensure the safety of the impacted reporting party(complainant) and the community; and track incidents and analysis of informal and formal complaints and investigations.

(Job Description, PageID#950.)

12. *Goldblum was solely responsible for assigning reported Title IX incidents to a University Title IX staff member for investigation or other services, such as providing supportive measures.*

Response: Admitted, except to the extent that the paragraph omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. There was no requirement to assign every case. (Goldblum Aff., R.69-1, PageID#271 ("There was no obligation at UC to assign an investigator to every case.").) The deposition testimony cited by Defendant is that the office would "determine whether or not" an investigation was warranted and that an assignment would be made "If there is going to be an investigation of an allegation that somebody did something to somebody else." (Goldblum Depo., R.55, PageID#749-750.)

Denied, further, to the extent that the paragraph is inconsistent with guidance from the Department of Education. The 2015 DCL outlines the responsibilities and authority of a Title IX Coordinator, with the primary responsibility being to coordinate the recipient's compliance with Title IX. This guidance states:

The Title IX coordinator is responsible for coordinating the recipient's responses to all complaints involving possible sex discrimination. This responsibility includes monitoring outcomes, identifying and addressing any patterns, and assessing effects on the campus climate. Such coordination can help the recipient avoid Title IX violations, particularly violations involving sexual harassment and violence, by preventing incidents from recurring or becoming systemic problems that affect the wider school community.

(Bullard Rep., R.69-6 PageID#2945, *citing* Dept. Of Ed. Guidance.) Marshall testified that Goldblum's duties were intended to be consistent with Department of Education guidance. (Marshall Depo., R.55, PageID#1152-1153.) The relevant portion of the job description provides:

Lead investigation processes; oversee case management plan for each reported Title IX incident; ensure timely, impartial and thorough investigations of complaints of sexual harassment, sexual assault, and relationship violence, as well as other forms of discrimination and harassment, by/against faculty, staff, and students; ensure collection of relevant facts related to the reported Title IX incident, collaborate and consult with internal partners (e.g. HR, EOA, athletics, public safety, student affairs, general counsel, and provost office), and others, as appropriate, to ensure accurate and consistent application of university policies and practices; assess incident; document

facts, analyze findings and summarize investigation, make recommendations that ensure the safety of the impacted reporting party(complainant) and the community; and track incidents and analysis of informal and formal complaints and investigations.

(Job Description, PageID#950.)

13. *Goldblum assigned reported Title IX incidents to herself for investigation.*

Response: *See* Response to ¶12, *supra.* Denied further on the grounds that the deposition testimony cited by Defendant is that Plaintiff would have a caseload less than the other investigators in the UC Title IX Office. (Goldblum Depo., R.55, PageID#751-752.)

14. *When necessary, Goldblum would "make recommendations to ensure the safety" of the Title IX incident reporting party/complainant.*

Response: Admitted, except to the extent that the paragraph omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. The paragraph suggests that there was a requirement to respond to every case. The Affidavit of Plaintiff states, "In many instances, no action by the Title IX Office was required because the alleged victims had already received notices of available resources from other UC sources, such as from the police or residential life." (Goldblum Aff., R.69-1, PageID#2701.) The paragraph is inconsistent with guidance from the Department of Education and the job description. *See supra.*

15. *Goldblum had to consult with internal partners to ensure accurate and consistent application of University policies.*

Response: Denied. The paragraph is inconsistent with guidance from the Department of Education. The 2001 Guidance states, in part, "The Title IX coordinator's role should be independent." The 2015 DCL outlines the responsibilities and authority of a Title IX Coordinator, with the primary responsibility being to coordinate the recipient's compliance with Title IX. This guidance states:

> The Title IX coordinator is responsible for coordinating the recipient's responses to all complaints involving possible sex discrimination. This responsibility includes monitoring outcomes, identifying and addressing any patterns, and assessing effects on the campus climate. Such coordination can help the recipient avoid Title IX violations, particularly violations involving sexual harassment and violence, by preventing incidents from recurring or becoming systemic problems that affect the wider school community.

(Bullard Rep., R.69-6 PageID#2945, *citing* Dept. Of Ed. Guidance.) Marshall testified that Plaintiff's job duties were intended to be consistent with Department of Education guidance. (Marshall Depo., R.55, PageID#1152-1153.) Marshall further testified that Plaintiff was empowered to act independently:

Q Are [Title IX Coordinators at UC] empowered to act independently?
A What do you mean by independently?
Q Well, are they entitled to conduct investigations even if higher authorities at the University did not wish those investigations to take place?
A Yes.
Q Do they have full discretion in determining the best way to raise awareness about issues involving discriminatory harassment?...
A Yes.

(Marshall Depo., R.55, PageID#1159.)

*16. Dr. Bleuzette Marshall is the University's Vice President for Equity, Inclusion and Community Impact.*

Response:  Admitted.

*17. Marshall was Goldblum's supervisor.*

Response:  Admitted, except to the extent that the paragraph omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.  Plaintiff was empowered to act independently.  *See supra* Response to ¶15.  The reporting structure for the UC Title IX coordinator is inconsistent with guidance from the Department of Education.  (Bullard Rep. at PageID#2946.)    Plaintiff's expert observes, "This situation, that required that Ms. Goldblum talk with Dr. Marshall who then consulted with the President of UC, is an excellent example of a campus falling short in its compliance efforts as a result of the prescribed reporting structure."  (Bullard Rep. at PageID#2946.)

*18. One of Marshall's primary job responsibilities is making sure the University has inclusive practices, and also practices that help retain students.*

Response*:  Denied.  The paragraph implies Marshall actually successfully accomplishes those tasks; the record contains no evidence of these facts.  An Affidavit submitted by a student at UC states that Marshall is more concerned with protecting the reputation of the school than accomplishing these tasks.  The student testified:

I am aware that other persons at UC who work on Title IX issues fear being punished if they speak out. In other cases dealing with Title IX issues, UC administrators, including Marshall, have been consistently made false statements and then sought to sweep things under the rug.

(Corey Aff. at PageID#2883.)  Another student testified similarly:

In my experience, Marshall sees her role as to protect the image and profit of UC and the narrative that is shared with the public.  Marshall's view has often been "Let's put a band-aid on and save face for the university."

(Cunningham Aff., R.69-3, PageID#2880.)

*19. Marshall is quite familiar with Title IX.*

Response: Denied. The paragraph implies Marshall actually is knowledgeable; the deposition testimony cited is about her claimed knowledge. The record contains no evidence of these facts. An expert has provided a report indicating that "The individual in the best position to determine the appropriate response was Ms. Goldblum as Title IX Coordinator" and that "Marshall, who did not serve as the Title IX Coordinator or have the extensive Title IX training and experience as Ms. Goldblum, interfered with Ms. Goldblum's responsibilities." (Bullard Rep., R.69-6 PageID#2941-2942.) A student submitted an Affidavit stating, "During the time I worked with Marshall, she has made a number of false claims about Title IX issues…" (Corey Aff., R.69-4, PageID#2882.)

*20. On January 23, 2019, the University's College of Arts and Sciences ("College") published an online article recognizing graduating students who wore a "triumph cord" at graduation.*

Response: Admitted.

*21. Triumph cords are a private recognition given by the College to students who have overcome some type of adversity to get to the graduation stage.*

Response: Admitted.

*22. To receive a triumph cord, a faculty/staff member from the College sends a student's name to the College's administration.*

Response: Admitted.

*23. The student is then notified to pick up the triumph cord.*

Response: Admitted.

*24. The students are not vetted before receiving the cords and there is no evaluation process.*

Response: Admitted.

*25. The College asks students who receive a triumph cord if they are willing to talk to a student writer, share their story, and have it featured in an article on the College's webpage*

Response: Admitted.

26. Studies show that students experiencing adversity are more likely to succeed if they see other students who have overcome adversity.

Response: Admitted.

*27. Six students agreed to be in the article and among those students one was a student who had attended six colleges over five and one-half years (the "Student").*

Response: Admitted, except to the extent that the paragraph omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. The "student," William Houston, was a convicted sex offender who was the subject of misconduct investigations at multiple universities. (PageID#2447-2478; PageID#2485-2492.)

*28. The article was published online on January 23, 2019 (the "Article").*

Response: Admitted.

*29. Some individuals responded to the Article about the Student by posting comments on the College's Facebook page.*

Response: Admitted.

*30. One of the Facebook page comments linked to a Toledo Blade article containing additional information about the Student.*

Response: Admitted, except to the extent that the paragraph omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. The "student," William Houston, was a convicted sex offender who was the subject of misconduct investigations at multiple universities. (PageID#2447-2478; PageID#2485-2492.)

*31. None of the Facebook comments said the Student had engaged in any wrongdoing while at the University.*

Response: Admitted, except to the extent that the paragraph omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. The social media posts suggested that the publication of the article made female UC students feel vulnerable to sexual assault and, as a result, unreasonably interfered with students' work or academic performance and created an intimidating, hostile and offensive work or learning environment for students. One student states:

> I engaged with students and faculty members about the Houston Matter both in person and on social media. A number of students expressed concern about the admissions process at UC for convicted sex offenders. Many asked, "how can this happen -- how can he be allowed to be on college campus or how he was honored?"…
>
> The Houston Matter made female UC students feel vulnerable to sexual assault. This was a terrifying revelation to me and other students. I, along with other students, were concerned about how many more sex offenders remain on the UC campus, whether UC Public Safety had taken adequate preventive steps, and whether Houston had assaulted other students at UC.
>
> In my experience, based on my own experiences and conversations with other students, I believe that the Houston Matter unreasonably interfered with my, and other

students' work or academic performance and created an intimidating, hostile and offensive work or learning environment for students. I did not feel safe on campus. The problem was made worse by a lack of transparency from UC about the issues raised by the Houston Matter, including whether there were problems in the admissions process. I, along with other students, were concerned that UC was hiding information in order to protect its reputation.

(Corey Aff., R.69-4, PageID#2882.  See also Cunningham Aff., R.69-3, PageID#2880.)   The University also received emails suggesting that Houston had assaulted persons on campus.  (Email, R.66, PageID#2531).  Marshall acknowledged this in her deposition:

> Q And this email… appears to include an allegation that William Houston had raped or sexually assaulted one or more students at the University of Cincinnati…
> A Yes.
> Q So as of your first conversation on February 11, 2019, Andrea Goldblum was aware of complaints being received by the Title IX office about the Houston article, correct?
> A Yes.
> Q And she was aware of potential allegations that William Houston had sexually assaulted one or more persons at the University of Cincinnati.
> A Yes.

.
(Marshall Depo., R.55, PageID#1217-1221 (Unredacted Version at PageID#404.)

*32.  Unbeknownst to the College, the Student had previously been suspended from Bowling Green State University ("BGSU") stemming from a conviction for gross sexual imposition.*

Response: Denied.  UC was aware that William Houston, was a convicted sex offender who was the subject of misconduct investigations at multiple universities prior to his admission.  (R.66, PageID#2447-2478; R.66, PageID#2485-2492.)

*33. BGSU suspended the Student for two years.*

Response: Admitted.

*34. The suspension ended prior to his admission to the University.*

Response: Admitted.

*35. As part of the Student's admission application to the University, the Student described the circumstances surrounding his suspension from BGSU.*

Response:  Admitted to the extent that Houston provided a statement.  Denied to the extent that the paragraph suggests that Houston provided a fair and complete description of his conduct or that he accepted responsibility.  (Email, R.66, PageID#2557-2558.  *See also* Cummins Depo., PageID#2115-2116.)

36. The University's Admissions Office enlisted the help of the University's Assistant Dean of Students, Daniel Cummins, with reviewing the Student's application.

Response: Admitted, except to the extent that the paragraph omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. The procedure from admissions staff was to include input from public safety. This did not occur. (Miller Depo., PageID#2225-2226; Responses to Plaintiff's Second Set of Interrogatories, PageID#2958.)

37. *Cummins spoke with the Student on multiple occasions.*

Response: Denied. No contemporaneous records support Cummins' self-serving claims that he met with the student on more than one occasion. (Cummins Depo., PageID#2117.)

38. *Cummins' recommendation to the University's Admissions Office was that he would support the Student's admission if the Student would agree to meet with Cummins on a regular basis.*

Response: Admitted, except to the extent that the paragraph omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. The procedure from admissions staff was to include input from public safety. This did not occur. (Miller Depo., PageID#2225-2226; Responses to Plaintiff's Second Set of Interrogatories, PageID#2958.)

39. *Cummins noted that BGSU only suspended, but did not expel, the Student.*

Response: Admitted, except to the extent that the paragraph omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. UC was aware that William Houston, was a convicted sex offender who was the subject of misconduct investigations at multiple universities prior to his admission. (PageID#2447-2478; PageID#2485-2492.) The procedure from admissions staff was to include input from public safety. This did not occur. (Miller Depo., PageID#2225-2226; Responses to Plaintiff's Second Set of Interrogatories, PageID#2958.)

40. *Cummins found BGSU's willingness to let the Student re-enter its community after serving the suspension an important factor.*

Response: Admitted, except to the extent that the paragraph omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. UC was aware that William Houston, was a convicted sex offender who was the subject of misconduct investigations at multiple universities prior to his admission. (PageID#2447-2478; PageID#2485-2492.) The procedure from admissions staff was to include input from public safety. This did not occur. (Miller Depo., PageID#2225-2226; Responses to Plaintiff's Second Set Of Interrogatories, PageID#2958.)

41. *The University admitted the Student for Fall of 2016.*

Response: Admitted, except to the extent that the paragraph omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. The procedure from admissions staff was to include input from public safety. This did not occur. (Miller Depo., PageID#2225-2226; Responses to Plaintiff's Second Set of Interrogatories, PageID#2958.)

42. *After the University admitted the Student, its then Interim Title IX Coordinator, Karla Phillips, and the University's Public Safety Office, specifically Lt. David Brinker, were alerted and able to express any concerns about the student.*

Response: Admitted, except to the extent that the paragraph omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. Brinker and Phillips became aware of the presence on campus after contact by a probation officer subsequent to the admission of the student; they were not "alerted" by UC officials. The record does not indicate that any "concerns" raised by Brinker and Phillips were addressed. (*See* Phillips Depo., PageID#2180-2181.)

43. *The student met with Cummins on at least a monthly basis after his admission to the University.*

Response: Denied. No contemporaneous records supports Cummins' self-serving claims that he met with the student on more than one occasion. (Cummins Depo., PageID#2117.)

44. *The College's Senior Assistant Dean, Lisa Holstrom, learned about the Facebook comments late on February 6, 2019.*

Response: Admitted.

45. *Holstrom began monitoring the postings, and alerted her superior, the College's Dean, Ken Petren, as well the University's Executive Director of Public Relations, M.B. Reilly.*

Response: Admitted.

46. *Reilly recommended against deleting the Article because that was inconsistent with journalistic standards, which compel retraction only if content is factually wrong.*

Response: Admitted.

47. *Reilly also advised against issuing a public statement, and instead asked that, for the time being, all inquiries be forwarded to her.*

Response: Admitted.

48. Late in the afternoon on Friday, February 8, 2019, Goldblum became aware of the Facebook postings after a member of her staff, Morgan Shaw, forwarded an email to her from a student concerned about the Article.

Response: Admitted.

*49. On February 9, 2019, Goldblum contacted Reilly telling her to check out the Facebook comments.*

Response: Admitted.

*50. Goldblum also thought Reilly should be prepared to answer questions about the Student's admission to the University.*

Response: Denied. Plaintiff wrote, "There may be questions re: who knew what when he was admitted ..." (Email, R.66, PageID#2528.) Plaintiff testified:

> I recall many times emphasizing that we had an affirmative duty to offer resources, to let people know about their options, and that there were systemic issues surrounding this as to -- questions as to who knew what when he was admitted, when William Houston was admitted, and what kind of processes were in place, and that we had people expressing harm, that they had experienced harm.

(Goldblum Depo., R.55, PageID#795.)

*51. Reilly told Goldblum to forward any questions about the Article to her.*

Response. Denied. Reilly responded, "I am prepared to take questions. Feel free to send any you might get my way." (Email, R.66, PageiD#2528.)

52. One of the e-mail inquiries Holstrom received was from a University alumnus who alleged that the Student assaulted their friend, but no names were provided and no timeframes.

Response: Denied to the extent the paragraph mischaracterizes the email. The email states,

> … my friend told me at diner [sic] that she was raped by William Houston, who is featured in the article. As she is one of my closest friends from UC, I believe her whole heartedly. She also told me that other girls in the UC community had experienced similar encounters… I struggle with him being highlighted as a hero when he's allegedly hurt a lot of people."

(Email, R.66, PageID#2531.) Marshall acknowledged this in her deposition:

> Q And this email… appears to include an allegation that William Houston had raped or sexually assaulted one or more students at the University of Cincinnati…
> A Yes.
> Q So as of your first conversation on February 11, 2019, Andrea Goldblum was aware of complaints being received by the Title IX office about the Houston article, correct?
> A Yes.
> Q And she was aware of potential allegations that William Houston had sexually assaulted one or more persons at the University of Cincinnati.
> A Yes.

.

12

(Marshall Depo., R.55, PageID#1217-1221 (Unredacted Version at PageID#404).)

*53. Holstrom forwarded the inquiry to Reilly, and Reilly sent it on to Goldblum.*

Response: Admitted.

*54. Goldblum does not recall speaking to the alumnus who made the allegation.*

Response: Denied to the extent the paragraph mischaracterizes Plaintiff's testimony. Plaintiff testified, "I don't recall, specifically, whether I asked somebody else to reach out to that student or to me, or whether I tried to reach out to the student. That's typically what we would do is try to find out who that person was." (Goldblum Depo., R.55, PageID#785.)

*55. On Monday, February 11, 2019, Goldblum briefly spoke with Reilly about the University's Title IX, student conduct, and admissions processes. Reilly suggested Goldblum contact the appropriate University offices for more information.*

Response: Admitted.

*56. Afterwards, at 9:44 a.m. on February 11, 2019, Goldblum emailed the University's Assistant Vice Provost of Admissions, Tamara Byland, saying an issue had arisen about a student who was admitted in 2015 and just graduated. Goldblum did not mention the student by name. Goldblum wanted to talk about the Student and the admissions process in cases involving a student with a criminal or disciplinary history.*

Response: Denied to the extent the paragraph mischaracterizes the email. The email states:

An issue has arisen with a student who just graduated, who was admitted in 2015. He came with a criminal and disciplinary history and is a registered sex offender. When you have some time, I would like to speak with you about this student, the admissions process in cases like this, and mandatory reporting obligations of staff. I have a few questions about these matters.

(Email, R.66, PageID#2559.)

*57. At 9:59 a.m. on February 11, 2019, Byland forwarded Goldblum's email to her superior, Caroline Miller, because Byland was not at the University at the time the Student was admitted. Miller provided additional information about the admission process for the student but did not mention the Student by name. Miller stated it would "probably be a good conversation" to have with Title IX about engaging them in the admissions process.*

Response: Admitted to the extent that Byland did not respond to Goldblum. Denied as to the truth of the remaining self-serving testimony. One witness testified:

> Q Is it the standard practice of the admissions office to respond to inquiries from other members of the community -- University community?
> A That would be an appropriate professional action.
> Q So do you have any insight as to why Tamara would not have responded to Andrea?

      A I do not.

(Miller Depo., PageID#2249.)  Byland admitted that she did not respond.  (Byland Depo., PageID#2900.)  Byland admitted an obligation to respond to Title IX inquiries and could not recall any other inquiries from investigators that she similarly failed to respond to.  (Byland Depo., PageID2908.)

      *58. Byland's work schedule prevented her from responding to Goldblum right away and Goldblum's email did not use urgent language.*

      Response: Admitted to the extent that Byland did not respond to Goldblum.  Denied as to the truth of the remaining self-serving testimony.

      *59. Byland assumed Goldblum would follow-up with her if the matter was urgent.*

Response: Admitted to the extent that Byland did not respond to Goldblum.  Byland admitted an obligation to respond to Title IX inquiries and could not recall any other inquiries from investigators that she similarly failed to respond to.  (Byland Depo., PageID2908.)

     Denied as to the truth of the remaining self-serving testimony.

      *60. Goldblum contacted Marshall for the first time about the Student and Article on the evening of February 11, 2019, but did not provide Marshall with the Student's name.*

      Response: Admitted that there was communication on February 11, 2019.  Plaintiff's Affidavit states:

> Marshall's testimony during her deposition that I did not tell her during our meeting on February 11, 2019 that the Title IX office had received complaints from one or more students about the Houston Matter is false.  (Doc#55, PageID#1217.)  I informed her about student complaints, including specifically the complaint outlined in a February 8, 2019 email, my office received regarding the Houston Matter.  This email alleged that Houston had sexually assaulted students at UC.

(Goldblum Aff., R.69-1, PageID#2700.)

      *61. Marshall assumed the student enrolled at the University prior to her time assuming responsibilities over the Gender Equity & Inclusion office, so she directed Goldblum to speak with the Vice President of Student Affairs, Debra Merchant, for more information.*

      Response: Admitted to the extent that Goldblum spoke with Merchant.  Denied as to the truth of the remaining self-serving testimony.  Marshall was aware that the Title IX office had received complaints from one or more students about the Houston Matter.  (Goldblum Aff., R.69-1, PageID#2699-2700.)

     62. The next morning, February 12, 2019, Goldblum met with Debra Merchant and Juan Guardia, the Dean of Students, to have a general conversation about admissions processes for students

with criminal/discipline histories and to share her experience with The Ohio State University's admissions process.

Response: Admitted.

*63. Following the February 12, 2019 meeting between Goldblum, Merchant, and Guardia, Merchant asked Cummins to create a secure electronic file in Maxient and upload correspondence related to his involvement in the Student's admission to the University. Merchant asked that Cummins use Maxient because she was requesting to see records protected by the Family Educational Rights and Privacy Act, and Maxient assures only individuals with permission may access the information. Merchant's intention in having the Maxient file created was so she could better understand the University's admissions process.*

Response: Admitted that Cummins created a Maxient file and assigned himself as the investigator. Denied as to the truth of the remaining self-serving testimony. (Report, PageID#2541.)

*64. Maxient is a database used by universities for a variety of purposes.*

Response: Admitted.

*65. At 10:28 a.m. on February 12, 2019, Cummins opened a Maxient file and uploaded to the file emails he had regarding the Student's admission, and immediately pinged Merchant and Guardia who both accessed the Maxient file within the hour.*

Response: Admitted that Cummins created a Maxient file and assigned himself as the investigator. Denied as to the truth of the remaining self-serving testimony. (Report, PageID#2541.)

*66. Merchant reviewed the admission process for the Student and confirmed the University had followed its process for reviewing the applications of applicants who disclose a criminal or disciplinary history had been followed.*

Response. Denied. The procedure from admissions staff was to include input from public safety. This did not occur. (Miller Depo., PageID#2225-2226; Responses to Plaintiff's Second Set of Interrogatories, PageID#2958.) Plaintiff's expert has provided an opinion that Houston's admission to UC revealed systemic Title IX issues. (Bullard Rep., R.69-6 PageID#2939-2941.)

*67. Merchant had no further discussions with Cummins regarding the Student and she did not direct Cummins to conduct an investigation into the admission of the Student.*

Response. Admitted that Cummins opened a case on February 12, 2019 and that the matter was assigned to Cummins. (Report, PageID#2541.) Denied as to the truth of the remaining self-serving testimony.

*68. Around 8 a.m. on February 12, 2019, Goldblum called Reilly and told her she wanted to contact the University's student newspaper and provide them with information.*

Response: Admitted.

69. Reilly told Goldblum to contact Marshall first.

15

Response: Admitted.

70. Goldblum and Marshall spoke and corresponded through e-mail and text message throughout the day on February 12, 2019.

Response: Admitted.

71. During their initial call on February 12, 2019, Goldblum and Marshall discussed the Facebook comments. Marshall told Goldblum she reviewed the Facebook comments and saw that people were venting and sharing their frustrations, and upset about the student being recognized, but no one was saying the Student actually did anything to them. Marshall asked Goldblum if she had received any such complaints and Goldblum said "no."

Response: Denied. Marshall admitted in her deposition that Plaintiff complained that the Houston Matter presented Title IX concerns. (Marshall Depo., R.55, PageID#1269.) Marshall testified that she was aware of Plaintiffs complaints that the Houston Matter had created Title IX issues when she decided to terminate Plaintiff. (Marshall Depo., R.55, PageID#1276.) Plaintiff testified that she informed Marshall about her concerns about the Houston Matter. (Goldblum Depo., R.55, PageID#795-796.) She testified further: "I told her that I believed that [the Houston Matter] could potentially violate Title IX, that it would -- that the reason would be deliberate indifference because we were not doing what we were supposed to be doing." (Goldblum Depo., R.55, PageID#856.) Goldblum has submitted an Affidavit specifically contradicting Marshall's testimony that she lacked knowledge of her complaints and investigation.

> Marshall's testimony during her deposition that I did not tell her during our meeting on February 11, 2019 that the Title IX office had received complaints from one or more students about the Houston Matter is false. (Doc#55, PageID#1217.) I informed her about student complaints, including specifically the complaint outlined in a February 8, 2019 email, my office received regarding the Houston Matter. This email alleged that Houston had sexually assaulted students at UC.

(Goldblum Aff., R.69-1, PageID#2700.)

72. *During their initial call on February 12, 2019, Goldblum expressed the need for sending a letter to the University's student newspaper. Goldblum stated her intent for the letter was to build trust between her office and the community and to let people know that their messages were heard.*

Response: Admitted that Goldblum expressed the need for sending a letter. Goldblum testified about her motivation:

> I believe it was my responsibility to offer resources and to let people know how they could find out their options or contact us, because there were a number of people that were impacted by the William Houston situation and no one else had responded in a way to offer resources to them and there were no other alternatives given.

(Goldblum Depo., R.55, PageID#805.)

16

*73. During their initial call on February 12, 2019, Marshall asked Goldblum to email her a copy of the letter Goldblum proposed sending to the University's student newspaper. Marshall asked Goldblum to send the letter to her via a Box account.*

Response: Admitted.

*74. At 11:59 a.m. on February 12, 2019, Goldblum sent a draft of her letter to Marshall via a Box account.*

Response: Admitted.

*75. Marshall asked if any other members of the University community could deliver the message or conduct outreach to individuals.*

Response: Denied. Plaintiff testified that Marshall was using "delay tactics." (Goldblum Depo., R.55, PageID#803.)

*76. Marshall was not against issuing a response but indicated she would need to speak with colleagues to see what was happening.*

Response: Denied. Plaintiff testified that Marshall was using "delay tactics." (Goldblum Depo., R.55, PageID#803.)

77. During their initial call on February 12, 2019, Marshall told Goldblum not to send anything to the University's student newspaper until Marshall finished having conversations with her colleagues.

Response: Admitted. Plaintiff testified that Marshall was using "delay tactics." (Goldblum Depo., R.55, PageID#803.)

78. After her conversation with Goldblum, Marshall learned that the Dean of the College, Ken Petren, was going to provide a response.

Response: Admitted.

79. Petren wanted to provide a response on behalf of the College to show support to his students.

Response: Admitted

80. Marshall followed up with Goldblum later that day and shared that Petren was providing a response.

Response: Admitted.

81. In that same conversation, Marshall reviewed the letter with Goldblum again, asking her questions about the problematic portions of the letter, such as: (1) it identified the Student by name; (2) it was written in the collective when Goldblum was not tasked with issuing messages on behalf of the entire University; (3) it included the representation that "[w]e are looking into various processes

at work so that we can improve them," but when asked what that meant, Goldblum did not have an answer; and (4) it stated "We must do better. We will do better," but when asked what that meant, Goldblum did not have an answer. Marshall shared with Goldblum that "before we issue any University communications, we typically develop a FAQ, because once we put something out, folks will generally have more questions. And so we have to go through and have all of the potential questions already set up and answered so that members will have as much information as possible."

Response:  Denied.  Plaintiff testified that Marshall only indicated that "She was upset that I had sent it and said I had defied her direct order."  (Goldblum Depo., R.55, 808.)  Plaintiff later testified: "I recall her saying that she was concerned -- or that people, she said 'people' expressed concern that it might be biased. I don't know who those people are and she didn't tell me." (Goldblum Depo., R.55, 814.)  Plaintiff has submitted an affidavit stating the opposite as Marshall:

> I am aware that Marshall claims she shared questions and criticism about the letter. This is not true.  Marshall never told me that the letter was inappropriate because (1) it identified the Student by name; (2) it was written in the collective; (3) it included the representation that "[w]e are looking into various processes at work so that we can improve them"; or (4) it stated "We must do better. We will do better."  Marshall also never said the letter should not be sent without a FAQ.  Her testimony on these conversations is a complete fabrication.

(Goldblum Aff., R.69-1, PageID#2702.)

*82. Marshall told Goldblum that she would continue conversations with colleagues about the University's response and to hold off sending anything, but would get back to her either way.*

Response: Denied.  Plaintiff testified that Marshall was using "delay tactics."  (Goldblum Depo., R.55, PageID#803.)

*83. One conversation Marshall had was with Merchant about the resources provided by the on-campus advocates.*

Response:  Denied as self-serving.

*84. Karla Phillips, the Interim Title IX Coordinator prior to Goldblum, agreed that Goldblum's letter was problematic and not an appropriate statement to make on behalf of the entire University.*

Response:  Denied.  The testimony of Phillips cited does not share the alleged concerns of Marshall.  (Phillips Depo., PageID#2201.)  The Senior Assistant Dean for the College of Arts and Sciences and Dean of the College of Arts and Sciences both testified that the letter was not inappropriate.  (Holstrom Depo., R.57, PageID#1831; Petren Depo., R.58. at PageID#1926.)  One of the experts has submitted a report concluding that the letter Plaintiff proposed to send "was reasonable, fell under her duties as Title IX Coordinator, and was in line with OCR expectations and industry standard."  (Bullard Rep., R.69-6 PageID#2943.)

18

*85. At 4:36 p.m. on February 12, 2019, Goldblum emailed a draft of her letter to Reilly. She did not ask for Reilly's approval or input.*

Response: Admitted.

86. Reilly did not review the letter, instead she forwarded Goldblum's email to Marshall assuming Goldblum received permission from Marshall to send the letter.

Response: Admitted.

*87. At 4:49 p.m. on February 12, 2019, Petren emailed Reilly and others to let them know he would be modifying the online article by removing the portion referencing the student and posting an editorial note which read "Out of sensitivity to members of our community, the original information in this article has been modified. Our priority is to provide a safe and inclusive environment for all students. The College of Arts and Sciences is launching a thorough review of our award processes, to be sure that we are using all the information available to make the best choices for all of our students."*

Response: Admitted.

*88. At 5:08 p.m. on February 12, 2019, Goldblum sent a text message to Marshall that read, "I am going to send in the letter to the editor. If there are any repercussions, I will accept them. I want to be done and go home."*

Response: Admitted. Plaintiff has submitted an Affidavit explaining, "I was referring to any negative publicity that UC might receive. I never conceived of the possibility that I would be terminated for sending an email to the student newspaper describing resources available to victims of sexual assault." (Goldblum Aff., R.69-1, PageID#2702.)

*89. Marshall responded, "I'm on a call regarding the letter. Please do not send."*

Response: Admitted.

*90. At 5:26 p.m. on February 12, 2019, Goldblum sent her letter to University's student newspaper.*

Response: Admitted.

*91. After Marshall was done with her call, she contacted Goldblum and asked her if she had sent the letter, to which Goldblum stated she had and did not regret it and would deal with the consequences. Marshall expressed her disappointment and explained to her, "You can't get ahead of our colleagues. There was already a process in place. We can't insert ourselves into the system or into a process."*

Response: Admitted.

*92. At 5:40 p.m. on February 12, 2019, Petren informed Goldblum about his editorial note.*

Response: Admitted.

19

*93. After receiving the email from Petren, Goldblum called Marshall to discuss Petren's editorial note, to which Marshall asked Goldblum to contact Petren directly to address her concerns.*

Response: Admitted.

*94. At 6:26 p.m. on February 12, 2019, Goldblum emailed Petren asking if they could talk about his editorial note.*

Response: Admitted.

*95. At 6:33 p.m. on February 12, 2019, Goldblum forwarded to Marshall her email asking to talk with Petren.*

Response: Admitted.

*96. At 6:40 p.m. on February 12, 2019, Petren responded to Goldblum that the editorial note had already been posted.*

Response: Admitted.

*97. At 6:56 p.m. on February 12, 2019, Goldblum emailed Marshall a copy of Petren's editorial note.*

Response: Admitted.

*98. At 7:27 a.m. on February 13, 2019, Goldblum sent an email to the student newspaper asking that it disregard her letter from the day before and to use the attached new version. The letter was similar to the first letter, except that it referenced the Title IX office.*

Response: Admitted.

*99. At 1:50 p.m. on February 13, 2019, Goldblum opened a Maxient file relating to the February 8, 2019 email forwarded to her from Shaw. The Title IX office used Maxient to track incident reports and subsequent cases.*

Response: Admitted to the extent that Goldblum opened Maxient file. Goldblum testified that she opened the investigation to look into "systemic issues." (Goldblum Depo., R.55, PageID#830.)

*100. Goldblum does not recall contacting the student who sent the February 8 email.*

Response: Denied to the extent the paragraph mischaracterizes Plaintiff's testimony. Plaintiff testified, "I don't recall, specifically, whether I asked somebody else to reach out to that student or to me, or whether I tried to reach out to the student. That's typically what we would do is try to find out who that person was." (Goldblum Depo., R.55, PageID#785.)

*101. All Maxient files have audit trails showing who has accessed the file. Goldblum was the only person who accessed the file prior to her resignation. She accessed it only on February 13, when it was created and again on March 14, the day before her resignation. No documents were uploaded to the file.*

Response: Admitted.

*102. Goldblum did not inform anyone she had opened the Maxient file and no one knew.*

Response: Denied to the extent that the paragraph seeks to suggest that Marshall did not have knowledge of Plaintiff's complaints and investigation. Marshall admitted in her deposition that Plaintiff complained that the Houston Matter presented Title IX concerns. (Marshall Depo., R.55, PageID#1269.) Marshall testified that she was aware of Plaintiffs complaints that the Houston Matter had created Title IX issues when she decided to terminate Plaintiff. (Marshall Depo., R.55, PageID#1276.) Plaintiff testified that she informed Marshall about her concerns about the Houston Matter. (Goldblum Depo., R.55, PageID#795-796.) She testified further: "I told her that I believed that [the Houston Matter] could potentially violate Title IX, that it would -- that the reason would be deliberate indifference because we were not doing what we were supposed to be doing." (Goldblum Depo., R.55, PageID#856.) Goldblum has submitted an Affidavit specifically contradicting Marshall's testimony that she lacked knowledge of her complaints and investigation. (Goldblum Aff., R.69-1, PageID#2700.)

*104. Petren and Holstrom met with student government leaders.*

Response: Admitted

*105. Petren and Holstrom conducted a town hall meeting.*

Response: Admitted.

*106. Holstrom met with the students for sexual survivors' group.*

Response: Admitted.

*107. During those meetings, Petren and Holstrom listened to students' concerns and tried to address them.*

Response: Admitted.

*108. Marshall first contacted Human Resources ("HR") on February 13, 2019 to discuss Goldblum's insubordination. On February 15, Marshall spoke with the University's Chief Human Resources Officer on the phone about taking employment action against Goldblum. Marshall then met with HR on February 21 to discuss discipline options.*

Response: Admitted.

*109. On February 21, 2019, Marshall and Goldblum met for a regularly scheduled one-on-one during which Goldblum remained steadfast that the University missed an opportunity and should have responded differently to the Facebook comments. Marshall responded that they had to work as a team and in a coordinated fashion, and that Marshall was still dealing with the matter.*

Response: Admitted.

*110. Between February 23 and 25, 2019, Marshall spoke with Merchant and Guardia to get insight into Goldblum's demeanor around the time she sent the letter.*

Response: Admitted that a conversation occurred; denied as to the self-serving remainder.

*111. Between February 23 and 25, 2019, Marshall spoke with one of the University's Title IX investigators, Morgan Shaw to get insight into Goldblum's demeanor around the time she sent the letter.*

Response: Admitted that a conversation occurred; denied as to the self-serving remainder.

*112. Shaw shared with Marshall that Goldblum was very upset the day after sending the letter, she was crying a lot, convened the entire staff to discuss the matter multiple times, and shared with the staff that Marshall had told her to wait to send the letter but she sent it anyway.*

Response: Denied.  Plaintiff denies any inappropriate conduct.  Plaintiff's Affidavit states:

> I deny Shaw's allegation that I acted in an unprofessional manner.  Shaw has misinterpreted by criticism of other parts of the University, such as personnel, Student Conduct Office, with unprofessionalism.  Criticism of the University when it fails to live up to appropriate national standards or guidance from the Department of Education is part of the job of the Title IX Office.

(Goldblum Aff., R.69-1, PageID#2701.)  The only example of unprofessional conduct by Plaintiff Shaw could describe was, "She would oftentimes talk about others in the office." (Shaw Depo., R.56, PageID#1651.) Shaw was unable to support many of the details cited by Marshall.  When asked about Marshall description of her conversation, Shaw said "I don't recall" or the equivalent on numerous occasions when asked about specific claims by Marshall.  (*See* Shaw Depo., R.56, PageID#1724-733.) Shaw admitted that she did not observe any "defiant" conduct by Plaintiff unrelated to the letter to the editor.  (Shaw Depo., R.56, PageID#1724.)

113. Shaw also shared that in general, Goldblum would often interrupt the staff's work for 1-2 hours at a time to just talk, she was delayed in assigning incident reports, and Goldblum would often make personal attacks against a colleague to the staff.

Response: Denied.  Plaintiff denies any inappropriate conduct.  Plaintiff's Affidavit states:

> I deny Shaw's allegation that I acted in an unprofessional manner.  Shaw has misinterpreted by criticism of other parts of the University, such as personnel, Student Conduct Office, with unprofessionalism.  Criticism of the University when it fails to live up to appropriate national standards or guidance from the Department of Education is part of the job of the Title IX Office.

(Goldblum Aff., R.69-1, PageID#2701.)  The only example of unprofessional conduct by Plaintiff Shaw could describe was, "She would oftentimes talk about others in the office." (Shaw Depo., R.56, PageID#1651.) Shaw was unable to support many of the details cited by Marshall.  When asked about Marshall description of her conversation, Shaw said "I don't recall" or the equivalent on numerous

occasions when asked about specific claims by Marshall. (*See* Shaw Depo., R.56, PageID#1724-733.) Shaw admitted that she did not observe any "defiant" conduct by Plaintiff unrelated to the letter to the editor. (Shaw Depo., R.56, PageID#1724.)

Plaintiff further denies any delay in assigning cases. Plaintiff's Affidavit states:

> I deny the allegations that I delayed assigning cases. I always responded to cases in a manner consistent with my professional obligations and industry standards. There was no obligation at UC to assign an investigator to every case. In many instances, no action by the Title IX Office was required because the alleged victims had already received notices of available resources from other UC sources, such as from the police or residential life.

(Goldblum Aff., R.69-1, PageID#2701.) UC acknowledged that the cases with alleged delays include only a small portion of the reports to the Title IX Office. Plaintiff explained that many of the 'delayed' reports were not responded to because they were duplicative, involved frivolous matters, did not involve UC students, or an were impossible to investigate because the alleged perpetrator could not be identified. Others did not require a response because the alleged victims had already received notices of available resources from other UC sources, such as the police or residential life. (Goldblum Aff., R.69-1, PageID#2701.)

*114. On February 27, 2019, Marshall decided she would give Goldblum the opportunity to resign in lieu of termination.*

Response: Denied to the extent the paragraph implies Plaintiff resigned voluntarily. (Goldblum Depo., R.55, PageID#844.)

*115. Marshall determined that Goldblum violated sections 3(c) and 3(ff) of the University's conduct policy (Policy 15.02) prohibiting insubordination and deviations from standard and acceptable behavior.*

Response: Denied to the extent that there was a "determination." Human Resources did not independently verify the information provided by Marshall. (Awadalla Depo., PageID#368.)

*116. Goldblum engaged in insubordination by sending her letter to the University's student newspaper after Marshall instructed her to wait.*

Response: Denied. The letter to the editor sent by Plaintiff was not misconduct, even in the face of a direct order. Plaintiff has stated:

> Based on my training and experience, sending the letter was not misconduct but, instead, was required in order to fulfill the University's Title IX obligations. As Title IX Coordinator, I possessed independent discretion and Title IX coordinators in other institutions use this discretion to make independent determinations as to notification of resources and referrals.

(Goldblum Aff., R.69-1, PageID#2702.) A number of UC witnesses did not believe that the letter from Plaintiff to the student newspaper was actually inappropriate. (Holstrom Depo., R.57, PageID#1831; Petren Depo., R.58. at PageID#1926.) The role of the Title IX Coordinator, thus, involves independent discretion and Title IX coordinators may use this discretion to make independent determinations as to notification of resources and referrals. (Dougherty Report, PageID#2863-2864.) Marshall acknowledged that the intention of the Title IX coordinator is to act in accordance with federal guidance and the independent role of the Title IX Coordinator in her deposition. (Marshall Depo., R.55, PageID#1153, PageID#1193.) One of the experts retained by Plaintiff has submitted a report concluding that the letter Plaintiff proposed to send "was reasonable, fell under her duties as Title IX Coordinator, and was in line with OCR expectations and industry standard." (Bullard Rep., R.69-6 PageID#2943.) This expert explains that it was not misconduct to send the letter even if the supervisor disagreed with the decision. The expert notes that it is not unusual for a "Title IX Coordinator's proposed action" to run" afoul of other campus administrators, including their direct supervisor or campus leadership." (Bullard Rep., R.69-6 PageID#2941.)

*117. Goldblum deviated from standard and acceptable behavior by disrupting the work of the Title IX, telling her subordinates she was insubordinate to Marshall, bragging about being insubordinate, making personal and unprofessional comments about a colleague to her staff, and delaying assigning Title IX reports.*

Response: Denied. Plaintiff denies any inappropriate conduct. Plaintiff's Affidavit states:

I deny Shaw's allegation that I acted in an unprofessional manner. Shaw has misinterpreted by criticism of other parts of the University, such as personnel, Student Conduct Office, with unprofessionalism. Criticism of the University when it fails to live up to appropriate national standards or guidance from the Department of Education is part of the job of the Title IX Office.

(Goldblum Aff., R.69-1, PageID#2701.) The only example of unprofessional conduct by Plaintiff Shaw could describe was, "She would oftentimes talk about others in the office." (Shaw Depo., R.56, PageID#1651.) Shaw was unable to support many of the details cited by Marshall. When asked about Marshall description of her conversation, Shaw said "I don't recall" or the equivalent on numerous occasions when asked about specific claims by Marshall. (*See* Shaw Depo., R.56, PageID#1724-733.) Shaw admitted that she did not observe any "defiant" conduct by Plaintiff unrelated to the letter to the editor. (Shaw Depo., R.56, PageID#1724.)

Plaintiff further denies any delay in assigning cases. Plaintiff's Affidavit states:

I deny the allegations that I delayed assigning cases. I always responded to cases in a manner consistent with my professional obligations and industry standards. There was no obligation at UC to assign an investigator to every case. In many instances, no action by the Title IX Office was required because the alleged victims had already received notices of available resources from other UC sources, such as from the police or residential life.

(Goldblum Aff., R.69-1, PageID#2701.) UC acknowledged that the cases with alleged delays include only a small portion of the reports to the Title IX Office. Plaintiff explained that many of the 'delayed'

reports were not responded to because they were duplicative, involved frivolous matters, did not involve UC students, or an were impossible to investigate because the alleged perpetrator could not be identified. Others did not require a response because the alleged victims had already received notices of available resources from other UC sources, such as the police or residential life. (Goldblum Aff., R.69-1, pageID#2701.)

118. *On March 13, 2019, Goldblum was asked to meet with Marshall on March 15, 2019 about the direction of the Title IX Office.*

Response: Admitted that a meeting occurred on March 15, 2019. Goldblum was not told about the exact nature of the meeting, despite requests. (Goldblum Depo., R.55, PageID#846-847.)

119. *On March 14, 2019, Goldblum emailed Marshall a weekly report in anticipation of the March 15, 2019 meeting.*

Response: Admitted.

120. *On March 15, 2019, Marshall and a representative from HR met with Goldblum. Marshall let Goldblum know that she was ending her employment but gave her the opportunity to resign.*

Response: Denied to the extent the paragraph implies Plaintiff resigned voluntarily. (*See* Goldblum Depo., R.55, PageID#844.)

121. *Goldblum chose to resign in lieu of termination.*

Response: Denied to the extent the paragraph implies Plaintiff resigned voluntarily. (*See* Goldblum Depo., R.55, PageID#844.) She testified:

> A …I was told, if I didn't sign this, then I would be terminated immediately. It was made under duress.
> Q Why do you say it was made under duress?
> A Because I was told that, if I didn't sign it, I would be terminated immediately…. I was given an untenable choice. Either way it meant that I was leaving without – I was involuntarily being made to leave

(Goldblum Depo., R.55, PageID#845.)

122. *If Goldblum would have chosen to be terminated, she could have followed the administrative appeal process as set forth in University Policy, 15.03.*

Response: Denied as speculative.

123. *On March 15, 2019, after Goldblum resigned, she sent the following text to Marshall, "BTW, you may mot [sic] be aware, but FYI I had changed the letter. It only spoke about Title IX office supporting people and not the University. I am sure you can get it from my email, though I guess that doesn't matter now."*

Response: Admitted.

*124. After Goldblum's departure, the Interim Title IX Coordinator discovered 50 incident reports that appeared not to have been assigned or responded to. Further research revealed that 37 incident reports had not been responded to.*

Response: Plaintiff denies any delay in assigning cases or that the numbers cited are accurate. Plaintiff's Affidavit states:

> I deny the allegations that I delayed assigning cases. I always responded to cases in a manner consistent with my professional obligations and industry standards. There was no obligation at UC to assign an investigator to every case. In many instances, no action by the Title IX Office was required because the alleged victims had already received notices of available resources from other UC sources, such as from the police or residential life.

(Goldblum Aff., R.69-1, PageID#2701.) UC acknowledged that the cases with alleged delays include only a small portion of the reports to the Title IX Office. Plaintiff explained that many of the 'delayed' reports were not responded to because they were duplicative, involved frivolous matters, did not involve UC students, or an were impossible to investigate because the alleged perpetrator could not be identified. Others did not require a response because the alleged victims had already received notices of available resources from other UC sources, such as the police or residential life. (Goldblum Aff., R.69-1, PageID#2701.)

Respectfully submitted,

_____/s/ Joshua A. Engel_____
Joshua Adam Engel (0075769)
Jim Hardin (0056247)
ENGEL AND MARTIN, LLC
4660 Duke Dr., Suite 101
Mason, OH 45040
(513) 445-9600
engel@engelandmartin.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been electronically served via the ECF system this May 19, 2020 upon all counsel of record.

_____/s/ Joshua Engel_____
Joshua Adam Engel (0075769)