**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | |
|---|---|
| ANDREA GOLDBLUM | Case No. 1:19-CV-00398 |
| Plaintiff, | |
| v. | Judge: MATTHEW W. MCFARLAND |
| | STATEMENT OF DISPUTED FACTS |
| THE UNIVERSITY OF CINCINNATI, | |
| Defendant | |

Plaintiff Andrea Goldblum respectfully submits this Statement of Disputed Facts in Opposition to the Motion for Summary Judgment by Defendant University of Cincinnati ("UC"). (Doc#65.)

**Issue I: Whether Plaintiff engaged in a protected activity**

1.  William Houston was a student at UC. Houston was a former Bowling Green State University football player who was convicted of gross sexual imposition. Houston had originally been indicted on one count of attempted rape. He was convicted after he entered a no contest plea as part of a plea bargain. The charges against Houston arose from a July 20, 2014, incident. Houston, a sophomore at the time, allegedly got on top of his female victim in her bed, touched her inappropriately, took her hand to touch his genitals, and kissed her. Houston was suspended by Bowling Green State University following an investigation and hearing under the university's code of student conduct. He was found responsible for "sexual contact without permission." (PageID#2447-2478; PageID#2485-2492.)

1

2. UC was aware that William Houston, was a convicted sex offender who was the subject of misconduct investigations at multiple universities prior to his admission. (PageID#2447-2478; PageID#2485-2492.)

3. The procedure from admissions staff for prospective students with criminal backgrounds was to include input from public safety. This did not occur for Houston. (Miller Depo., PageID#2225-2226; Responses to Plaintiff's Second Set Of Interrogatories, PageID#2958.)

4. Instead of a review by Public Safety, the UC admissions staff contacted Daniel Cummins, the Assistant Dean of Students who worked in the Student Affairs Office. After meeting with Houston, Cummins recommended that Houston be admitted to UC. (Miller Depo. at 23.)

5. Houston's admission to UC had the potential to constitute a Title IX violation in that it had the potential effect of unreasonably interfering with students' work or academic performance or of creating an intimidating, hostile or offensive work or learning environment. This could in turn have subjected UC to an OCR investigation or litigation and been considered deliberate indifference by UC. (Bullard Report, PageID#2939.)

6. Houston's admission to UC may have also been a violation of UC Policy 11-02 because his admission had the foreseeable effect of unreasonably interfering with an identifiable individual's work or academic performance or of creating an intimidating, hostile, or offensive work or learning environment for that individual. As stated in the Policy, "[i]t is not necessary that the consequences actually occur, but the test of

whether they are foreseeable is to be determined objectively by reference to all the circumstances of the particular case.  (Bullard Rep., R.69-6 PageID#2940.)

7. The admission of students, like Houston, with backgrounds as convicted sex offenders could pose a risk to the community.  (Miller Depo., PageID#2229.)

8. Once admitted, UC did not put appropriate measures in place to ensure the safety of the campus community.  (Bullard Rep., R.69-6 PageID#2940.)

9. On January 23, 2019, the University published an online article recognizing graduating students who wore a "triumph cord" at graduation. The social media posts in response to the Article suggested that the publication of the article made female UC students feel vulnerable to sexual assault and, as a result, unreasonably interfered with students' work or academic performance and created an intimidating, hostile and offensive work or learning environment for students.  (Corey Aff., R.69-4, PageID#2882.  See also Cunningham Aff., R.69-3, PageID#2879-2880.)

10. The University received emails suggesting that Houston had assaulted persons on campus.  (Email, R.66 PageID#2531; Marshall Depo., R.55, PageID#1217-1221 (Unredacted Version at PageID#404.)

11. On February 7, 2019 administrators at the College of Arts & Sciences realized that there was a problem.  An administrator responded, "Oh no. I don't even know how he would have gotten admitted to UC." Another administrator wrote, "We need to figure out how to deal with this ASAP. Because this could be REALLY bad." (Email, R.66 PageID#3141.)

12. Plaintiff first learned about the Houston Matter around February 5, 2018.  Plaintiff also reviewed the Facebook and Twitter postings.  (Goldblum Depo., R.54, PageID#758-760.)

13. Plaintiff was concerned about the posts and believed that UC was obligated to respond under Title IX and UC Policy.  She believed that UC had an obligation under Title IX to acknowledge that the students who were traumatized by the Houston article and awards had been heard by the UC administration. Part of Plaintiff's concern was that the Facebook and/or Twitter postings indicated that they were by students, but many did not use their actual names, so it was difficult to verify.  (Goldblum Depo., R.54, PageID#782-784.)

14. Plaintiff was concerned that UC honoring a sex offender showed that UC sided with sex offenders, which could make those on campus not feel safe in reporting or not trusting UC.  (Goldblum Depo., R.54, PageID#800.)

15. On February 9, 2019 Plaintiff received a copy of email indicating that Houston may have sexually assaulted students at UC.  (Email, R.66 PageID#2530-2532.)

16. Plaintiff was concerned that there were unidentified members of the campus community that were indicating they were assaulted by Houston.  (Goldblum Depo., R.54, PageID#784.)

17. Plaintiff believed that her job required her to respond by offering resources to who were traumatized by the Houston Matter.  Plaintiff also was concerned about possible systemic issues in the University of Cincinnati admissions process.  (Goldblum Depo., R.54, PageID#858.)

18. The Houston Matter made female UC students feel vulnerable to sexual assault. (Cunningham Aff., R.69-3, PageID#2879; Corey Aff., R.69-4, PageID#2882.)

19. Plaintiff was aware that a number of students expressed concern about the admissions process at UC for convicted sex offenders. (Goldblum Aff, PageID#2698-2699.)

20. Based on her training and experience, Plaintiff believed that the Houston Matter unreasonably interfered with students' work or academic performance and created an intimidating, hostile and offensive work or learning environment for students. Plaintiff was concerned that the admission of students, like Houston, with backgrounds as convicted sex offenders could pose a risk to the community. She also was concerned about possible systemic issues in the University of Cincinnati admissions process, including whether public safety or the Title IX Office was consulted prior to the admission of the student. (Goldblum Aff, PageID#2698-2699.)

21. Plaintiff, based on her training and experience, believed that if UC was not taking proper precautions, conducting risk assessments, or following established procedures, the admission of convicted sex offenders could unreasonably interfere with students' work or academic performance and create an intimidating, hostile and offensive work or learning environment for students. (Goldblum Aff, PageID#2698-2699.)2600

22. Based on her training and experience, Plaintiff believed that UC providing resources on its web page and through training events on campus was insufficient. Plaintiff believed the best way to share resources, such as the counseling center, the on-campus advocates, medical assistance options and off-campus resources, was through a letter to the editor to the student newspaper. (Goldblum Depo., R.54, PageID#782-783, 792.)

23. Plaintiff communicated her concerns to Marshall and other UC administrators about the Houston Matter and possible systemic issues in the admissions process.

24. Plaintiff complained that the Houston Matter, and the University's response, created potential Title IX violations. Plaintiff told Marshall that if UC failed to adequately inform students about available resources, then UC could be considered to be deliberately indifferent to the harm caused by the Houston Matter. (Goldblum Aff, PageID#2699.)

25. Plaintiff told Marshall that the issue extended beyond Houston's admission and that there were systemic concerns. Plaintiff believed that although Houston had graduated, there was a safety risk because if Houston was admitted, other similarly situated students may have been admitted without following proper procedures. Plaintiff expressed a concern that there was no process in place to appropriately vet students with similar backgrounds which could lead to systemic issues because there could be others on campus who were a risk to the community. (Goldblum Depo., R.54, PageID#871-874.)

26. Plaintiff complained to Marshall about additional Title IX concerns, including under-sanctioning and women leaving school because they were afraid of the accused students. Dr. Marshall responded that was the business of student affairs. (Goldblum Depo., R.54, PageID#875-876.)

27. As the UC Title IX Coordinator, consistent with federal guidance, Plaintiff was empowered to initiate and conduct investigations designed to identify and expose patterns or systemic problems with Title IX compliance at UC. (Goldblum Aff, PageID#2699.)

28. On February 9, 2019, Plaintiff wrote in an email, "There may be questions re: who knew what when he was admitted…" (Email, R.66 PageID#3198.)

29. During a meeting on February 11, 2019, Plaintiff informed Marshall that the Title IX office had received complaints from one or more students about the Houston Matter. Plaintiff informed Marshall about student complaints, including specifically the complaint outlined in a February 8, 2019 email alleging that Houston had sexually assaulted students at UC. (Goldblum Aff, PageID#2700.)

30. On February 11, 2019, Plaintiff sent an email to the UC Admissions Office requesting more information about the process for the admission of Houston and students with criminal records. (Email, R.66 PageID#2559.)

31. On or about February 13, 2019, Plaintiff told Marshall that she would be commencing an investigation into the Houston Matter in particular and the admissions process for convicted sex offenders in general. (Goldblum Aff, PageID#2700.)

32. On or about February 13, 2019, Plaintiff told Marshall that she believed UC had an obligation to offer resources to the community. (Goldblum Depo., R.54, PageID#794-795.)

33. During a February 12, 2018 meeting with Debra Merchant, the UC Vice President for Student Affairs, and Juan Guardia, the Assistant Vice President for Student Affairs, described in ¶5 of Merchant's Affidavit, Plaintiff told the other UC officials that I would be commencing an investigation into the Houston Matter in particular and the admissions process for convicted sex offenders in general. (Goldblum Aff, PageID#2700.)

34. On February 13, 2019, Plaintiff initiated a formal investigation into the Houston matter and systemic issues in the admissions process. Plaintiff opened a formal investigation in the UC case management system, "Maxient." (Goldblum Depo., R.54, PageID#831; Report, PageID#2539.)

35. On February 13, 2019, Cummins opened a formal investigation in Maxient. He assigned himself to the investigation. (Report, PageID#2541.)

36. On February 12, 2019 Plaintiff drafted a letter to the student newspaper, the News Record, and shared a copy with Marshall and others at UC. Plaintiff drafted the Letter as a way to get out information about resources and options to the community. Based on her training and experience, Plaintiff did not believe just listing resources on the web page was sufficient. (Goldblum Depo., R.54, PageID#793.)

37. Marshall told Plaintiff not to send the letter, but Plaintiff sent the letter, anyway, on February 12, 2019. On the morning of February 13, 2019, Plaintiff sent a revised letter. (Goldblum Depo., R.54, PageID#803.)

38. The letter was never published by the News Record. (*See* Marshall Depo., R.55, PageID#1248.)

39. A reasonably prudent Title IX Coordinator in Plaintiff's position would have investigated the circumstances surrounding Houston's admission and the publication of the Houston Article. (Bullard Rep., R.69-6 PageID#2943.)

40. A reasonably prudent Title IX Coordinator in Plaintiff's position would believe that if she did not investigate the circumstances surrounding Houston's admission and the article, she would have deviated from her job duties and put UC at risk for possible investigation by OCR or litigation. (Bullard Rep., R.69-6 PageID#2943.)

**Issue II: Whether the temporal proximity between the protected activity and the corrective action is significant enough to constitute evidence of a causal connection for the purposes of satisfying a *prima facie* case of retaliation.**

41. On or about February 9 through February 13, 2019, Plaintiff complained that the Plaintiff complained that the Houston Matter, and the University's response, created potential Title IX violations. Plaintiff told Marshall that if UC failed to adequately inform students about available resources, then UC could be considered to be deliberately indifferent to the harm caused by the Houston Matter. (*See supra*)

42. On February 21, 2019, Marshall met with a representative of Human Resources. The HR representative testified that Marshall had decided that a reprimand was the appropriate action. (Awadalla Depo., PageID#363.)

43. While Marshall was aware that Plaintiff was complaining about the manner of the University in the handling of the Houston matter, that's when she was deciding whether you she was going to issue a written reprimand or potentially terminate her. (Marshall Depo., R.55, PageID#1278.)

44. On or about February 27, 2019, Marshall changed her mind and decided to terminate Plaintiff. (Marshall Depo., R.55, PageID#1292.)

45. On March 15, 2019, Marshall, accompanied, by a representative from HR and a uniformed police officer, met with Plaintiff. Plaintiff was told that she was being terminated but was given the option to resign in lieu of a termination. (Marshall Depo., R.55, PageID#1181.)

46. Plaintiff resigned and was escorted off campus. This resignation was not voluntary. (*See* Goldblum Depo., R.54, PageID#844.)

9

**Issue III: Whether Plaintiff can show pretext by showing that the proffered reason for the corrective action had no basis in fact.**

47. A number of UC witnesses did not believe that the letter from Plaintiff to the student newspaper was actually inappropriate. (Holstrom Depo., R.57, at PageID#1831; Petren Depo. at PageD#1926.)

48. A Title IX coordinator, in accordance with guidance from the Department of Education, should have "the appropriate authority, both formal and informal, to effectively coordinate the recipient's compliance with Title IX" April 24, 2015 Dear Colleague Letter. The role of the Title IX Coordinator, thus, involves independent discretion and Title IX coordinators may use this discretion to make independent determinations as to notification of resources and referrals. (Dougherty Report at PageID#2864; Goldblum Aff. at PageID#2702.)

49. The letter Plaintiff proposed to send was reasonable, fell under her duties as Title IX Coordinator, and was in line with OCR expectations and industry standards. (Bullard Rep., R.69-6 PageID#2943; Dougherty Rep., R.69-2, PageID#2864-2865, citing April 24, 2015 Dear Colleague Letter. *See also* Goldblum Aff. at PageID#2702 ("Based on my training and experience, sending the letter was not misconduct but, instead, was required in order to fulfill the University's Title IX obligations.").)

**Issue IV: Whether Plaintiff can show pretext by showing that the proffered reason for the corrective action did not actually motivate the defendant's challenged conduct**

50. No concerns about Plaintiff's performance outside of the Letter were ever mentioned prior to this Litigation. (Goldblum Aff. at PageID#2698.)

51. Prior to the Houston matter, she did not have any issues with Plaintiff's job performance. (Marshall Depo., R.55, PageID#1189.)

52. No misconduct unrelated to the Houston Matter was mentioned during the meeting when Plaintiff was terminated. (Goldblum Aff. at PageID#2703, citing video and transcript.)

53. Marshall initially did not raise any complaints about Plaintiff outside of the Houston Matter. (Awadalla Depo., PageID#363.)

54. Marshall did not raise any complaints about Plaintiff's job performance outside of the Houston Matter in the draft letter Marshall was going to use to terminating Plaintiff. (Email, R.66 PageID#2577-2579.)

55. Marshall lied to multiple people about to Plaintiff's termination. (Cunningham Aff., R.69-3, PageID#2881; Email, PageID#2680; Corey Aff., R.69-4, PageID#2881. *Cf.* Marshall Depo., R.55, PageID#1307.)

56. In other matters dealing with Title IX Issues, Marshall and other UC administrators have made false statements and sought to sweep problems under the rug. (Corey Aff, PageID#2883; Cunningham Aff., R.69-3, PageID#2880.)

57. Marshall is not committed to protecting survivors of sexual assault and enforcing UC's Title IC obligations. Marshall sees her role as to protect the image and profit of UC. (Cunningham Aff., PageID#2880; Corey Aff., R.69-4, PageID#2882.)

58. No contemporaneous documentary evidence supports the claim that Plaintiff disrupted the work environment. (Marshall Depo., R.55, PageID#1174-1175.) S

59. No contemporaneous documentary evidence supports the claim that Plaintiff delayed assigning cases. (Marshall Depo., R.55, PageID#1178.)

60. Marshall lacked a good faith, honest belief that Plaintiff was disruptive, unprofessional, or delayed assigning cases. Marshall failed to make a reasonably informed and considered decision before taking an adverse employment action. Marshall primarily relied on a subordinate with a significant conflict of interest and limited experience. Marshall made no effort to verify any of the information that the subordinate had shared. (Marshall Depo., R.55, PageID#1284-1285.)

61. Plaintiff did not engage in any unprofessional conduct. (Goldblum Aff., R.69, PageID#2701.)

62. Plaintiff did not delay in assigning cases. (Goldblum Aff., R.69, PageID#2701.)

63. Plaintiff always responded to cases in a manner consistent with her professional obligations and industry standards. In many instances, no action by the Title IX Office was required. (Goldblum Aff., R.69, PageID#2701.)

64. There was no obligation at UC to assign an investigator to every case. (Goldblum Aff., R.69, PageID#2701.)

65. The files produced by UC in discovery where Plaintiff allegedly delayed assigning cases represent only a small portion of the reports that came into the UC Title IX Office. Many of the allegedly 'delayed' reports were duplicative, involved frivolous matters, did not involve UC students, or an were impossible to investigate because the alleged perpetrator could not be identified. (Goldblum Aff., R.69, PageID#2701.)

66. The termination of Plaintiff prevented any investigation into the allegation that Houston had sexually assaulted a student on UC's campus or into the admissions process at UC. The investigation by Plaintiff was transferred to her successor (selected by Marshall) on the day she was terminated, and closed a month later with

no evidence of any work being conducted. (Maxient Report, PageID#2536-2543; Bullard Rep. at PageID#2943-2944.)

67. Marshall has taken no steps to identify or address the systemic issues being investigated by Plaintiff. Marshall Depo., R.55, PageID#1321 (objection omitted).)

**Issue V: Whether Plaintiff can show pretext by showing that the proffered reason for the corrective action was insufficient to warrant the challenged conduct.**

68. UC is unable to identify an employee who was terminated for similar conduct. Far worse misconduct has received either a reprimand or gone unpunished. (Goldblum Aff., R.69, PageID#2703.)

69. UC Policy 15.03, which states that Defendant "subscribes to the principle of progressive corrective action…" (Policy, PageID#2431.)

70. UC did not apply progressive discipline with Plaintiff. (Dougherty Report, PageID#2863-2864.)

71. Plaintiff has never observed an employee being fired for this type of insubordination. (Goldblum Aff., R.69, PageID#2703.)

72. The uncontested expert testimony in this case is that academic institutions would typically impose a reprimand for this type of conduct consistent with the principles of progressive discipline. (Dougherty Rep., R.69-2, PageID#2864-2856.)

73. The uncontested expert testimony in hits case is that no institution of higher learning that applies principles of progressive discipline that would terminate Plaintiff under these circumstances. Instead, institutions of higher learning would impose a reprimand or warning, at most, in such circumstances. (Dougherty Report, PageID#2863-2864; Bullard Rep., R.69-6 PageID#2944.)

13

Respectfully submitted,

_____/s/ Joshua A. Engel_____
Joshua Adam Engel (0075769)
Jim Hardin (0056247)
ENGEL AND MARTIN, LLC
4660 Duke Dr., Suite 101
Mason, OH 45040
(513) 445-9600
engel@engelandmartin.com


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been electronically served via the Court's ECF System this May 19, 2020 upon all counsel of record.

_____/s/ Joshua Engel_____
Joshua Adam Engel (0075769)

14