IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION – CINCINNATI

| | |
|---|---|
| ANDREA GOLDBLUM, | Case No. 1:19-cv-398 |
| Plaintiff, | Judge Matthew W. McFarland |
| v. | |
| UNIVERSITY OF CINCINNATI, | |
| Defendant. | |

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This case is before the Court on Defendant University of Cincinnati's motion for summary judgment (Doc. 65). The plaintiff, Andrea Goldblum, was formerly employed by the University as a Title IX coordinator. The only surviving claim is for retaliation under Title IX, 20 U.S.C. § 1681 et seq.

The facts backgrounding this case involve the agonizing subject of sexual assault. The narrow legal issue this Court must determine, however, is whether there is evidence that the University had an unlawful, discriminatory motive when it asked Goldblum to resign following a controversy at the school. Upon review, the Court finds no evidence that the University's reasons for firing Goldblum were a pretext for discrimination. Accordingly, the Court grants the University's motion for summary judgment.

**FACTS**

**A. Factual Background**

In June 2018, Andrea Goldblum was hired as the University's Executive Director

1

of Gender Equity and Inclusion ("Title IX Coordinator"). (Doc. 73-1, Pg. ID 3427, ¶ 9.) In that role, she was responsible for ensuring that the University's policies and practices complied with Title IX and other laws. (Ex. B Goldblum Dep., Doc. 54-1, Pg. ID 950.) This included assigning reported Title IX incidents to a University Title IX staff member for investigation. (Doc. 73-1, Pg. ID 3249, ¶ 12.) Dr. Bleuzette Marshall, the University's Vice President for Equity, Inclusion, and Community Impact, was Goldblum's supervisor. (Goldblum Decl., Doc. 69-1, Pg. ID 2698, ¶ 2; Doc. 73-1, Pg. ID 3251, ¶ 16.)

The College of Arts and Sciences (the "College") gives "triumph cords" to students who have overcome adverse circumstances before reaching graduation. To receive a triumph cord, a faculty or staff member from the College nominates a student to the College administration. There is no vetting or evaluation process. Although the triumph cord is a private recognition, the College asks triumph cord recipients if they would like to share their story to be featured in an article. From the December 2018 graduating class, six students who received a triumph cord agreed to be in the article. On January 23, 2019, the College published the article on its Facebook page. (Doc. 73-1, Pg. ID 3252, ¶¶ 20-25; Holstrom Dep., Doc. 57, Pg. ID 1784-85.)

The article received hundreds of comments. (Ex. 14 Marshall Dep., Doc. 55-1, Pg. ID 1422-39.) Most of the comments focused on one student in particular (the "Student"). He was a classified sex offender who had attended six colleges over five and a half years. One of those colleges was Bowling Green State University, from which he had been suspended for two years after being found guilty of gross sexual imposition. (Doc. 73-1, Pg. ID 3252-54, ¶¶ 27, 33; Doc. 66-1, Pg. ID 2485; Doc. 75, Pg. ID 3355-56.) Many

2

commenters were "venting and sharing their frustrations" and "upset about [the Student] being recognized." (Marshall Dep., Doc. 55, Pg. ID 1212.) The College's Senior Assistant Dean, Lisa Holstrom, learned about the Facebook comments on February 6, 2019. She told her supervisor, the Dean of the College, Ken Petren, and the University's Executive Director of Public Relations, M.B. Reilly. Reilly recommended against deleting the article on the basis that deletion would be inconsistent with journalistic standards, but advised that all inquiries be forwarded to her. (Doc. 73-1, Pg. ID 3256, ¶¶ 44, 45, 47.)

On February 8, 2019, Goldblum became aware of the Facebook postings about the Student's history. She asked Reilly to look at them. On February 11, Goldblum spoke with Reilly about the University's Title IX, student conduct, and admissions processes. (*Id.* at ¶¶ 48, 49, 55.) Dr. Marshall first learned of the matter later that evening after Goldblum called her. (Marshall Dep., Doc. 55, Pg. ID 1212-13.)

By the next morning, February 12, Goldblum and Dr. Marshall were heavily invested in addressing the controversy over the Student and the article featuring him. Goldblum told Reilly she wanted to contact the University's student newspaper about the incident. Reilly told Goldblum to contact Dr. Marshall first. Goldblum and Dr. Marshall spoke through email and text messages throughout that day. During their first phone call that day, Goldblum expressed to Dr. Marshall the need for sending a letter to the student newspaper. Dr. Marshall asked her to email her a copy of the letter Goldblum proposed to send. Goldblum emailed Dr. Marshall her proposed letter around noon. Dr. Marshall told Goldblum not to send anything to the student newspaper until Dr. Marshall finished speaking with her colleagues. (Doc. 73-1, Pg. ID 3260-62, ¶¶ 68-70, 72-

3


74, 77.)

Dr. Marshall learned later that day that Dean Petren planned to respond to the article controversy. She relayed this information to Goldblum. (Doc. 73-1, Pg. ID 3262, ¶¶ 78-80.) Dr. Marshall also spoke with Dr. Neville Pinto, the President of the University. They discussed what the University response would be. She told the President that Goldblum wanted to send a letter to the student newspaper. But the President told her that Dean Petren would be addressing the situation. (Marshall Dep., Doc. 55, Pg. ID 1254-56.)

Goldblum had been told that "people were determining what the University's response would be," but she felt that Dr. Marshall was engaging in "delay tactics." (Goldblum Dep., Doc. 54, Pg. ID 803.) That afternoon, she expressed to Dr. Marshall her desire to receive an answer about her proposed letter by 5:00 P.M. (Goldblum Dep., Doc. 54, Pg. ID 808-09; Marshall Dep., Doc. 55, Pg. ID 1256.) Dr. Marshall told her she would "get back to her either way, and to wait." (Marshall Dep., Doc. 55, Pg. ID 1257.)

At 4:36 P.M., Goldblum emailed a draft of her letter to Reilly. (Doc. 73-1, Pg. ID 3264, ¶ 85.) It read as follows:

Dear Editor:

I am writing in response to the feedback and concerns expressed by members of our community regarding the award to and article about [the Student]. I understand that members of our community are being impacted by this situation and are hurting. *Please be assured that I hear you.* We are looking into various processes at work so that we can improve them. In the meantime, we have resources on campus for your support. . . . We must do better; we *will* do better, continuing to work to make the environment safe and equitable. Please don't give up on us, as we are not giving up on you. We are here and we hear you.

4

(Doc. 75, Pg. ID 3403-04.) Reilly did not review the letter. Instead, she forwarded it to Dr. Marshall, assuming Dr. Marshall had given Goldblum permission to send the letter. (Doc. 73-1, Pg. ID 3261, ¶ 86; Doc. 55-1, Pg. ID 1456-57.) At 4:49 P.M., Dean Petren emailed Reilly and others, telling them he would be modifying the online article and posting an editorial note about the reasons for the modification. At 5:08 P.M., Goldblum texted Dr. Marshall: "I am going to send in the letter to the editor. If there are any repercussions, I will accept them. I want to be done and go home." (Doc. 73-1, Pg. ID 3264, ¶¶ 87, 88; Doc. 55-1, Pg. ID 1487, 1561.) Dr. Marshall responded: "I'm on a call regarding the letter. Please do not send." (Doc. 73-1, Pg. ID 3264, ¶ 89.) At 5:26 PM, Goldblum sent the letter to the University's student newspaper. (*Id.* at ¶ 90.)

After Dr. Marshall's phone call, she called Goldblum and said, "Please tell me you didn't send the letter." (Marshall Dep., Doc. 55, Pg. ID 1251.) Goldblum told her she did send the letter, that she did not regret it, and she would deal with the consequences. (Doc. 73-1, Pg. ID 3264, ¶ 91.) Dr. Marshall expressed her disappointment and explained: "You can't get ahead of our colleagues. There was already a process in place. We can't insert ourselves into the system or into a process." (Doc. 73-1, Pg. ID 3264, ¶ 91.)

The next morning, February 13, Goldblum emailed the student newspaper again. She attached a revised but substantially similar version of the letter from the day before. She told them to disregard the prior day's letter and use the attached one instead. (*Id.* at ¶ 98; Doc. 55-1, Pg. ID 1458.) Also that day, Dr. Marshall began discussing with Human Resources Goldblum's decision to send the letter to the student newspaper despite being

told not to. A couple days later, she spoke with the University's Chief HR Officer about taking employment action against Goldblum. And, about a week after that, she met with HR to discuss discipline options. She also met with Goldblum. Goldblum reiterated that the University "missed an opportunity" and should have responded differently to the Facebook comments. Dr. Marshall responded that they had to work as a team and that she was still dealing with the matter. (Doc. 73-1, Pg. ID 3266, ¶¶ 108, 109.)

By February 27, Dr. Marshall had decided that she was going to give Goldblum the chance to resign. If Goldblum refused to resign, she would be dismissed. (Marshall Dep., Doc. 55, Pg. ID 1291-92.) She based this decision largely on her conclusion that Goldblum had violated sections 3(c) and 3(ff) of the University's Human Resource Conduct Policy, 15.02, to which all University employees are subject. (*Id.* at Pg. ID 1167-68; Doc. 73-1, Pg. ID 3246, ¶ 4.)

Section 2 of the conduct policy provides: "For conduct and rule violations disciplinary action up to and including immediate termination may occur." (Doc. 55-1, Pg. ID 1351.) Section 3 identifies several violations. Section 3(c) specifies insubordination as one such violation, defining "insubordination" as "refusal of an employee to follow instructions or to perform designated work where such instructions or work normally and properly are required of an employee." (*Id.*) Section 3(ff) includes "[a]ny other deviation from standard and acceptable behavior." (*Id.*)

On March 15, Dr. Marshall met with Goldblum. (Goldblum Dep., Doc. 54, Pg. ID 845; Marshall Dep., Doc. 55, Pg. ID 1299.) Dr. Marshall permitted Goldblum to resign, as opposed to being terminated. (Marshall Dep., Doc. 55, Pg. ID 1300.) Goldblum was given

6

a resignation letter, which she signed. (Goldblum Dep., Doc. 54, Pg. ID 852; Doc. 64-1, Pg. ID 2307-10.)

## B. Procedural Background

Goldblum brought this lawsuit against the University a couple months later. She brought one count for retaliation under Title IX, 20 U.S.C. § 1681(a), arguing that retaliation against a person because that person has complained of sex discrimination is a form of sex discrimination. She also brought a Title VII retaliation claim, which has been dismissed. *Goldblum v. Univ. of Cincinnati*, 415 F. Supp. 3d 799, 807 (S.D. Ohio 2019).

## ANALYSIS

When there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law, the district court shall grant summary judgment. Fed. R. Civ. P. 56(a). The moving party has the burden to conclusively show that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). If the moving party meets that burden, then it becomes the nonmoving party's responsibility to point out specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A court is under no obligation to plumb the record for genuine issues of material fact. *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087 (6th Cir. 1996). A "mere scintilla" of evidence in support of the nonmoving party's position is not enough to avoid summary judgment. *Daniels v. Woodside*, 396 F.3d 730, 734 (6th Cir. 2005). Rather, to preclude summary judgment, the nonmoving party must put forward probative evidence on which a jury could reasonably reach a verdict in that party's favor. *Anderson*,

7

477 U.S. at 251-52; *Lansing Dairy*, 39 F.3d at 1347. If the nonmoving party fails to make the necessary showing for an element upon which it has the burden of proof, then the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

The only remaining claim here is Goldblum's retaliation claim arising under Title IX, 20 U.S.C. § 1681. Title IX prohibits sex discrimination by recipients of federal education funding. The statute provides: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). "Retaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005).

Courts generally analyze Title IX retaliation claims using the same standards as Title VII retaliation claims. *Doe v. Belmont Univ.*, 367 F. Supp. 3d 732, 755 (M.D. Tenn. 2019). A plaintiff can establish a retaliation claim either through direct evidence of retaliation or circumstantial (i.e., indirect) evidence that supports an inference of retaliation. *Imwalle v. Reliance Med. Prod., Inc.*, 515 F.3d 531, 543 (6th Cir. 2008). Reliance upon circumstantial evidence triggers the familiar *McDonnell Douglas* burden-shifting framework. *Belmont*, 367 F. Supp. 3d at 755. To make a prima facie case of Title IX retaliation, a plaintiff must show that (1) she engaged in a protected activity under Title IX; (2) the defendant knew of this activity; (3) the defendant then took an adverse school-related action against her; and (4) a causal connection exists between the protected

activity and the adverse action. *Gordon v. Traverse City Area Pub. Sch.*, 686 F. App'x 315, 320 (6th Cir. 2017). If the plaintiff succeeds, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse action. If the defendant does that, the burden shifts back to the plaintiff to "undermine the defendant's proffered reason as pretextual." *Belmont*, 367 F. Supp. 3d at 756.

The Court will assume for the sake of discussion that Goldblum establishes a prima facie case of retaliation under Title IX. *See, e.g., Frizzell v. Sw. Motor Freight*, 154 F.3d 641, 646 (6th Cir. 1998); *Rosenthal v. Faygo Beverages, Inc.*, 701 F. App'x 472, 476 (6th Cir. 2017).

**A. Legitimate, nondiscriminatory basis.**

The University offers a legitimate, nondiscriminatory reason for seeking her resignation: Goldblum's violation of sections 3(c) and 3(ff) of the University's conduct policy.

The March 15 letter Goldblum received explains that, on February 12, 2019, she "violated a direct order" from Dr. Marshall "to refrain from taking certain actions" until Dr. Marshall was able to "confer with colleagues on a preferred direction." (Doc. 64-1, Pg. ID 2307.) It goes on to say that Goldblum "chose to act on [her] own accord by moving forward despite [Dr. Marshall's] directive," that she indicated she would accept the repercussions, and that she "communicated [her] defiance" of Dr. Marshall's directive to other University employees. (*Id.*) In short, her conduct was "insubordinate." (*Id.*)

The letter's substance tracks with both the evidence of record and the provisions of the conduct policy. Dr. Marshall spent a substantial amount of time on February 12

9

discussing with other University staff what the official response to the article controversy would be. She kept Goldblum apprised of these conversations. She knew Goldblum wanted to address the situation too. But she asked her to wait as she discussed the problem with other decision-making colleagues. Instead of waiting, Goldblum held Dr. Marshall—her own supervisor—to a "deadline" of her own making, feeling she "needed to do [her] duty" and because it "had already been delayed a week." (Goldblum Dep., Doc. 54, Pg. ID 808-09.) When Goldblum pressed Dr. Marshall again through a text message, Dr. Marshall responded in no uncertain terms: "Please do not send." Goldblum sent the letter anyway. And the next morning, after time to reflect on the propriety of sending the letter, she again decided to act in contradiction to her supervisor and sent a revised version.

These events fall under the conduct policy's definition of "insubordination." Under the policy, an employee is insubordinate if she refuses to follow instructions when such instructions "normally and properly are required" of her. (Doc. 55-1, Pg. ID 1351.) Insubordination constitutes a violation under the policy and violations may result in "disciplinary action up to and including *immediate* termination." (*Id.*) Goldblum does not contest that Dr. Marshall was her supervisor. Nor does she deny that she refused to follow her supervisor's instructions. Those instructions simply asked her to refrain from sending a letter that would speak for the University, while Dr. Marshall worked out a solution with the University President and College Dean. Such a directive was normal and proper under these circumstances. Accordingly, the basis for seeking Goldblum's resignation—her insubordination—was legitimate, nondiscriminatory, and non-

retaliatory here.

That leaves pretext.

### B. Pretext

The fundamental question in the pretext analysis is this: Did the employer make the adverse employment decision for the stated reason or not? *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012). Plaintiffs often attempt to refute an employer's proffered legitimate reason by showing that that reason (1) has no basis in fact, (2) did not actually motivate the challenged conduct, or (3) was insufficient to warrant the challenged conduct. *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003). Though the University offered another reason for seeking Goldblum's resignation (her job performance), the Court limits its analysis to reason above pertaining to the events of February 12, as it is dispositive. *E.g., Smith v. Chrysler Corp.*, 155 F.3d 799, 809 (6th Cir. 1998); *Sims v. Cleland*, 813 F.2d 790, 793 (6th Cir. 1987).

#### 1. Basis in fact

First, Goldblum makes a basis-in-fact argument. She claims that there is an issue of fact as to whether sending the letter was misconduct, even in the face of a direct order. She avers: "Based on my training and experience, sending the letter was not misconduct but, instead, was required in order to fulfill the University's Title IX obligations." (Goldblum Decl., Doc. 69-1, Pg. ID 2702.) She also includes expert reports opining that the letter was not misconduct. One expert stated that "there are times where the Title IX Coordinator's proposed action runs afoul of other campus administrators, including their direct supervisor or campus leadership." (Bullard Rep., Doc. 69-6, Pg. ID 294.) Another

11

expert observed that, while her behavior may have been deemed "severe" because she defied a direct order, she nevertheless acted like a Title IX Coordinator should and used her independent discretion appropriately. (Dougherty Rep., Doc. 69-6, Pg. ID 2864.)

None of this evidence shows that the University's proffered reason lacked a basis in fact. To challenge the factual basis of an employer's termination rationale, Goldblum must prove that the thing that the University said happened did not actually happen. *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 888–89 (6th Cir. 2020). This she fails to do. Indeed, she concedes that she sent the letter over and against a direct order to the contrary. It was this insubordinate act that the University identified as the basis for seeking her resignation. Since she cannot show that it "never happened," she fails to undermine the University's factual basis for its employment decision. *Id.*

### 2. Actual motivation

Goldblum next argues that her conduct on February 12 did not actually motivate the University to end her employment. In her view, the evidence permits an inference that she was terminated in part to prevent the disclosure of facts related to the article controversy or what she characterizes as systemic issues related to the admission of sex offenders. She contends that her forced resignation prevented any investigation into allegations of sexual assault by the Student or the admissions process.

When challenging an employer's actual motivation, a plaintiff generally admits the factual basis underlying the discharge, acknowledges that her conduct *could* motivate the discharge, but attacks the employer's explanation by showing circumstances that tend to show that an illegal motive was *more* likely than the one the defendant offers. *Gunn v.*

12

*Senior Servs. of N. Kentucky*, 632 F. App'x 839, 844 (6th Cir. 2015). One problem Goldblum faces is that she does not admit the factual basis for the University's adverse employment decision. *Pelcha v. MW Bancorp, Inc.*, 455 F. Supp. 3d 481, 509 (S.D. Ohio 2020). The greater problem is that the "sheer weight" of the circumstantial evidence fails to show that the University's proffered rationale is "more likely than not" a coverup for something unlawful. *Smith v. Leggett Wire Co.*, 220 F.3d 752, 759 (6th Cir. 2000).

Goldblum points to a report on the Student and a "fake investigation," evidence which she says shows the University did nothing to investigate the underlying issue about admitting a sex offender to the school. (Doc. 72-1, Pg. ID 3076-84.) She also cites Dr. Marshall's testimony that in the preceding eleven months she had not yet learned what the University's process is regarding the admission of convicted sex offenders. (Marshall Dep., Doc. 55, Pg. ID 1321.) On the strength of these items she maintains that the University's actual motivation was to prevent further investigation. The problem is that there is little to nothing, besides her own speculation, connecting this mostly post hoc material to the University's actual motivation. Contrast that to the quick action Dr. Marshall took in *direct response* to Goldblum's February 12 conduct: the day after, Dr. Marshall spoke with HR to discuss Goldblum's defiance of a clear instruction; a few days after that, she spoke with the chief HR officer about taking action in response to Goldblum's conduct; then again with HR to discuss discipline options; and a meeting with Goldblum herself where Dr. Marshall told her she was still dealing with what happened on February 12. The record shows that Goldblum's conduct is what triggered Dr. Marshall's contact with HR about what to do. Thus, the sheer weight of the evidence

suggests that Goldblum's conduct on February 12 is what actually motivated the University's decision to seek her resignation.

### 3. Sufficient warrant

Finally, counsel for Goldblum takes aim at the University's position that the termination of an employee such as herself, with no prior disciplinary history, for sending an email to a student newspaper "raises no questions of an ulterior motive." (Response in Opposition, Doc. 73, Pg. ID 3242.) The brief contends that this claim is "dubious, almost laughable, on its face." (*Id.*)

This argument calls to the fore the Sixth Circuit's warning: "There are good reasons not to call an opponent's argument 'ridiculous'"—or, as here, "laughable." *Bennett v. State Farm Mut. Auto. Ins. Co.*, 731 F.3d 584, 584–85 (6th Cir. 2013). As in *Bennett*, the biggest reason here is because the claim Goldblum's counsel lambastes as laughable is actually correct.

The University's conduct policy clearly provides that a rule violation may trigger disciplinary action up to and including *immediate termination*. (Doc. 55-1, Pg. ID 1351.) One such violation is insubordination. An employee's refusal to follow normal and proper instructions constitutes insubordination. Goldblum does not deny that she refused to follow Dr. Marshall's normal and proper instruction to refrain from emailing the student newspaper. Far from laughable, the University's proffered rationale for seeking Goldblum's resignation is sufficiently warranted under the school's conduct policy.

Goldblum refers to other University employees who violated rules against

14

insubordination but were reprimanded instead of terminated. These comparators, she argues, create an issue of fact as to whether insubordination is sufficient to warrant termination. She is wrong for two reasons. First, the plain language of the conduct policy provides that any violation, including insubordination, suffices to result in immediate termination. Second, a plaintiff must show that her conduct is similar to proposed comparators in "all relevant respects" and, at the pretext stage, that requires "substantially identical conduct." *Miles*, 946 F.3d at 893. Her brief does not describe these comparators at all, so it fails to show they engaged in substantially similar conduct or are similar in all relevant respects.

## CONCLUSION

For the reasons above, Goldblum fails to show that the University's reason for seeking her resignation was pretextual. Accordingly, the Court **GRANTS** the University's motion for summary judgment (Doc. 65). The Court **DENIES AS MOOT** the pending motion to set jury trial (Doc. 83) and motion for oral argument (Doc. 87) and **TERMINATES** this matter from its docket.

**IT IS SO ORDERED.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

By: /s/ Matthew W. McFarland
JUDGE MATTHEW W. McFARLAND