**UNITED STATES COURT OF APPEALS**
FOR THE SIXTH CIRCUIT

| | 100 EAST FIFTH STREET, ROOM 540 | |
|---|---|---|
| Deborah S. Hunt | POTTER STEWART U.S. COURTHOUSE | Tel. (513) 564-7000 |
| Clerk | CINCINNATI, OHIO 45202-3988 | www.ca6.uscourts.gov |

Filed: March 10, 2023

Mr. Joshua Adam Engel
Engel & Martin
4660 Duke Drive
Suite 101
Mason, OH 45040

Ms. Marissa J. Palumbo
Office of the Attorney General
Constitutional Offices Section
30 E. Broad Street
16th Floor
Columbus, OH 43215

     Re: Case No. 22-3289, *Andrea Goldblum v. UC*
        Originating Case No. : 1:19-cv-00398

Dear Counsel,

 The court today announced its decision in the above-styled case.

 Enclosed is a copy of the court's published opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

        Yours very truly,

        Deborah S. Hunt, Clerk


        Cathryn Lovely
        Deputy Clerk

cc: Mr. Richard W. Nagel

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0037p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

———————

ANDREA GOLDBLUM,

    *Plaintiff-Appellant*,

    *v*.

UNIVERSITY OF CINCINNATI,

    *Defendant-Appellee*.

No. 22-3289

Appeal from the United States District Court for the Southern District of Ohio at Cincinnati.
No. 1:19-cv-00398—Matthew W. McFarland, District Judge.

Argued: January 26, 2023

Decided and Filed: March 10, 2023

Before: GRIFFIN, WHITE, and THAPAR, Circuit Judges.

———————

## COUNSEL

**ARGUED:** Joshua Adam Engel, ENGEL & MARTIN, LLC, Mason, Ohio, for Appellant. Marissa J. Palumbo, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** Joshua Adam Engel, ENGEL & MARTIN, LLC, Mason, Ohio, for Appellant. Marissa J. Palumbo, Colleen Koehler, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

———————

## OPINION

———————

THAPAR, Circuit Judge. Citing her insubordination and other infractions, the University of Cincinnati ("UC" or the "University") requested that Andrea Goldblum resign as its Title IX Coordinator. Because Goldblum believes that UC retaliated against her for engaging in activity

No. 22-3289　　　　　　　　*Goldblum v. Univ. of Cincinnati*　　　　　　　　Page 2

protected under Title IX, she sued for unlawful retaliation. The district court granted summary judgment for UC and denied Goldblum's motions for additional discovery. We affirm.

I.

In January 2019, UC's College of Arts and Sciences awarded "triumph cords" to graduating students who had overcome some form of adversity. R. 73-1, Pg. ID 3252. The College awarded these cords based on nominations by faculty and staff—it didn't vet the nominees. As a result, the College unintentionally awarded a cord to a convicted sex offender who had also been suspended for sexual misconduct at one university and investigated for the same at another. When members of the UC community discovered this student's criminal record, they became upset, "venting and sharing their frustrations" on social media. R. 55, Pg. ID 1212.

Once Goldblum learned of the College's oversight, she told her direct supervisor, Dr. Bleuzette Marshall, and other UC officials that: (1) she planned to investigate how UC evaluated admissions applications from convicted sex offenders, and (2) she believed that UC could be considered deliberately indifferent toward potential sex discrimination unless it provided resources to students who "didn't feel safe on campus." R. 54, Pg. ID 858.[1] Goldblum also passed the news along to M.B. Reilly, UC's Executive Director of Public Relations, and expressed her intention to formally address the controversy in a letter published by the University's student newspaper. That letter reads as follows:

> Dear Editor:
>
> 　　I am writing in response to the feedback and concerns expressed by members of our community regarding the award to and article about [the student]. I understand that members of our community are being impacted by this situation and are hurting. <u>Please be assured that I hear you</u>. We are looking into various processes at work so that we can improve them. In the meantime, we have resources on campus for your support. . . .
>
> 　　We must do better; we *will* do better, continuing to work to make the environment safe and equitable. Please don't give up on us, as we are not giving up on you. We are here and we hear you.

---

[1]In briefing and at oral argument, Goldblum's counsel represented that these conversations took place "approximately around February 5," Argument 1:42–3:59, and "certainly by February 11, 2019," Reply Br. 7.

No. 22-3289     *Goldblum v. Univ. of Cincinnati*     Page 3

R. 66-1, Pg. ID 2534.  The letter also included the phone numbers for several counseling services.

In response, Reilly directed Goldblum to check with her direct supervisor before submitting anything.  So Goldblum forwarded the letter to Marshall.

After reading the letter during the afternoon of February 12, Marshall ordered Goldblum not to submit anything until Marshall obtained permission and coordinated with other University officials.  While discussing the letter with her colleagues, Marshall discovered that the UC administration had authorized Ken Petren, the Dean of the College of Arts and Sciences, to formally address the controversy.  Marshall then informed Goldblum of her discovery, reminding her that Dean Petren, not Goldblum, had been "tasked with issuing [the] University response[]."  R. 55, Pg. ID 1246.  Marshall also identified problems with the content of Goldblum's letter.  For one, the letter included the offending student's name.  For another, it made vague promises—like "we will do better"—which Goldblum lacked the power to both make and keep.  *Id.*

Marshall also identified a procedural concern: before issuing any official communications, the University would typically develop an FAQ, anticipating and answering questions potentially arising from such communications.  But there was no FAQ accompanying Goldblum's letter.  Nevertheless, Marshall promised to continue discussing the letter with her colleagues and ordered Goldblum not to submit anything unless and until Marshall obtained approval.

Goldblum didn't wait.  Mere hours after their conversation, she texted Marshall that she intended "to send in the letter to the editor," that she would accept "any repercussions" for her actions, and that she just wanted "to be done and go home."  R. 64-1, Pg. ID 2302.  In response, Marshall texted: "I'm on a call regarding the matter.  Please do not send."  *Id.*  Goldblum sent the letter to the newspaper anyway.

Once Marshall ended her call, she called Goldblum and asked whether she had sent the letter.  Goldblum said, "Yeah, I sent it, and I don't regret what I did."  R. 55, Pg. ID 1251.  As her direct supervisor, Marshall reiterated: "You can't get ahead of our colleagues.  There was already a process in place.  We can't insert ourselves into the system or into a process."  *Id.*

No. 22-3289          *Goldblum v. Univ. of Cincinnati*          Page 4

In fact, a few minutes later, Dean Petren emailed Goldblum the College's statement addressing the controversy and its plan to remove the student from the College's article recognizing each cord recipient.

Early the next morning, Goldblum asked the student newspaper to replace her initial letter with an updated draft. The newer draft was nearly identical to the earlier one, except it expressly mentioned the University's Title IX office. Goldblum didn't tell Marshall about the revised letter, much less obtain permission to send it. For reasons not evident in the record, Goldblum's letter was never published.

Following these incidents, Marshall reported Goldblum's insubordination to UC's human-resources department. During the internal investigation that followed, the University discovered additional infractions, namely that Goldblum repeatedly ignored Title IX complaints, justified her insubordination to her staff, repeatedly criticized her colleagues in front of her staff, routinely interrupted her staff's work, and missed many of her own reporting deadlines.

At the conclusion of its investigation, UC allowed Goldblum to resign in lieu of termination for her insubordination and unacceptable work behavior in violation of UC's Conduct Policy. *See* R. 66-1, Pg. ID 2428, 2430 (establishing UC's right to "immediately terminat[e]" Goldblum for "insubordination," Policy No. 15.02 §§ 2, 3(c), or for deviating from "standard and acceptable behavior," *id.* § 3(ff)). After Goldblum resigned on March 15, 2019, UC discovered that she hadn't followed up on a February 9 email accusing the sex offender of assaulting other persons on UC's campus. Nor had she performed any further investigations into UC's admissions practices.

Though Goldblum had said that she'd accept "any repercussions" for her actions, Goldblum sued UC for unlawful termination under Title VII and Title IX. The district court dismissed Goldblum's Title VII claim and subsequently granted UC summary judgment on Goldblum's Title IX claim. Goldblum now appeals the ruling on her Title IX claim, as well as the district court's orders denying her motions for additional discovery. Addressing Goldblum's Title IX claim and discovery motions in turn, we affirm.

No. 22-3289 *Goldblum v. Univ. of Cincinnati* Page 5

II.

We review the district court's grant of summary judgment de novo, construing the facts in the light most favorable to Goldblum. *Bose v. Bea*, 947 F.3d 983, 988 (6th Cir. 2020).

Title IX provides: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). While this statute doesn't expressly provide a cause of action, the Supreme Court has told us that Title IX is enforceable through an implied right of action. *Cannon v. Univ. of Chi.*, 441 U.S. 677, 688–89 (1979). And particularly relevant here, the Court has held that "when a funding recipient retaliates against a person *because* he complains of sex discrimination, this constitutes intentional discrimination on the basis of sex, in violation of Title IX." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005) (cleaned up).

Under our precedent, we review Goldblum's Title IX claim under the analogous test for Title VII retaliation claims. *Bose*, 947 F.3d at 988–89. Because Goldblum relies on only indirect evidence, she may bring a prima facie retaliation claim under Title IX by showing that: "(1) she engaged in protected activity, (2) the funding recipient knew of the protected activity, (3) she suffered an adverse [employment]-related action, and (4) a causal connection exists between the protected activity and the adverse action." *Id.* (cleaned up).

If Goldblum establishes a prima facie case, UC must articulate a legitimate, nonretaliatory reason for her termination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Should UC meet its burden, Goldblum may then refute UC's proffered reason by showing that it's really a pretext for unlawful retaliation. *Flowers v. WestRock Servs., Inc.*, 979 F.3d 1127, 1132–33 (6th Cir. 2020).

Because UC presented legitimate reasons for seeking Goldblum's resignation, we proceed to pretext without deciding whether Goldblum established a prima facie case.

A.

UC claims two nonretaliatory reasons for asking Goldblum to resign. First, she was insubordinate: she "violated a direct order" from Marshall when she sent the letter. R. 64-1, Pg. ID 2307. Second, she failed to abide by UC's standard of acceptable behavior: she justified her insubordination to her staff, criticized her colleagues in front of her staff, interrupted her staff's work, routinely ignored Title IX complaints, and missed many of her own reporting deadlines. And UC's Conduct Policy permits "immediate termination" for both "[i]nsubordination" and "[a]ny other deviation from standard and acceptable behavior." R. 66-1, Pg. ID 2428, 2430. Thus, UC has identified at least two ways in which Goldblum violated its policies, either of which provides for immediate termination.

Our precedent also supports that conclusion. We have previously held that an employee's insubordination and her failure to follow company policies constitute legitimate, nonretaliatory reasons to terminate employment. *See Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 651 (6th Cir. 2015); *see also Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 260 (4th Cir. 1998) (Congress didn't "intend[] to immunize insubordinate, disruptive, or nonproductive behavior at work." (quotation omitted)). So what logic compels, precedent confirms: UC had legitimate nonretaliatory reasons to fire Goldblum.

B.

Because UC has proffered two legitimate reasons for seeking her resignation, Goldblum must accordingly demonstrate pretext to succeed on her retaliation claim.

Plaintiffs typically show pretext by establishing one of three things: "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that [the proffered reasons] were insufficient to motivate the employer's action." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009). These are not the only ways that a plaintiff can establish pretext. Rather, these three categories are simply a "convenient way of marshaling evidence and focusing it on the ultimate inquiry: 'did the employer fire the employee for the stated reason or not?'" *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012) (quoting *Chen*, 580 F.3d at 400 n.4). As a result, a plaintiff may also

proffer some other "cognizable explanation of how the evidence she has put forth establishes pretext." *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020).  But here, Goldblum has not produced "sufficient evidence from which a jury could reasonably reject" UC's proffered reasons for firing her.  *Id.*

1.

First, Goldblum argues that UC had no factual basis for seeking her resignation because: (i) she wasn't insubordinate, and (ii) she didn't violate the University's standard of acceptable behavior.  But neither argument stands up to scrutiny.

i.

Goldblum argues she wasn't insubordinate for two reasons:  (1) her letter was protected activity under Title IX, so it couldn't have constituted insubordination, and (2) "a Title IX Coordinator cannot be insubordinate."  Appellant's Br. 26 (cleaned up).  We reject each in turn.

First, Goldblum's letter wasn't protected activity because it didn't complain of sex discrimination.  *See Jackson*, 544 U.S. at 174.  To be protected by Title IX, a complaint must specifically accuse a recipient of engaging in intentional sex discrimination—a "vague charge of discrimination" isn't enough.  *Yazdian*, 793 F.3d at 645 (cleaned up).  And it must provide notice to an official authorized to address the complaint and "institute corrective measures on the recipient's behalf."  *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998); *Jackson*, 544 U.S. at 181.

Goldblum's letter fails to satisfy either requirement.

For one thing, the letter didn't specifically accuse UC of intentionally discriminating based on sex.  Instead, it merely promised to make unspecified policy changes, expressed sympathy to UC students, provided telephone numbers for various counseling services, and defended UC's efforts to "make the environment safe and equitable."  R. 66-1, Pg. ID 2534.  So at most, the letter hints at UC's possible failure to provide the appropriate resources required by Title IX's implementing regulations.  But that vague suggestion doesn't amount to a specific allegation of intentional discrimination.

For another, Goldblum didn't send her letter to an official authorized to both address the controversy and "institute corrective measures on the [University's] behalf." *Gebser*, 524 U.S. at 290. Instead, she sent it to the editor of the student newspaper. So her letter failed to notify the proper UC officials.

Thus, Goldblum's letter isn't protected by Title IX because it neither complained of sex discrimination nor was sent to an official authorized to do something about it.

Second, Goldblum's argument that "a Title IX Coordinator cannot be insubordinate" fails because she cites no authority for such a consequential assertion, *see* Appellant's Br. 26–29, nor can we find one. To be sure, Goldblum accurately states that being a Title IX Coordinator involves "coordinating the recipient's responses" to sex discrimination complaints, "monitoring outcomes, identifying and addressing any patterns, and assessing effects on the campus climate." R. 69-6, Pg. ID 2934. But it doesn't follow that anything done in that role is exempt from all University oversight or discipline.

ii.

Goldblum next argues that UC's second proffered reason had no basis in fact because UC contrived evidence of her poor work performance after asking her to resign. Because UC had another legitimate reason—insubordination—for firing Goldblum, this argument is ultimately inconsequential. But even taking the argument straight on, it fails.

Specifically, Goldblum claims UC couldn't have truly fired her for her poor work performance because its only contemporary source supporting that conclusion came from a flawed and self-interested report from one of Goldblum's employees, Morgan Shaw. And Goldblum alleges Shaw's report was unreliable for two reasons. First, she argues that Shaw had limited work experience. Second, she contends that Shaw had a conflict of interest because Goldblum intended to investigate her father, Assistant Dean of Students Daniel Cummins, for his role in admitting the sex offender.

But even assuming Goldblum's allegations about Shaw were true, they wouldn't matter for two independent reasons. First, Shaw's report wasn't UC's only evidence of Goldblum's

No. 22-3289            *Goldblum v. Univ. of Cincinnati*            Page 9

poor work performance. Rather, two other employees also complained of her "unprofessional" and even "disrespectful" behavior towards her colleagues. R. 55, Pg. ID 1189, 1193–94.

Second, even if these complaints failed to establish Goldblum's poor work performance before she resigned, reliable corroborating evidence was discovered shortly thereafter. Indeed, Goldblum's own files and correspondence confirm that she failed to meet many of her reporting deadlines. Instead of disputing whether she failed to meet these deadlines, however, Goldblum claims that the "suspicious timing" of the discovery suggests pretext. Reply Br. 1. Specifically, she alleges that UC's "shifting" and "post-hoc justifications" demonstrate it had no legitimate reason to fire her for unprofessional conduct until after she resigned. *Id.* at 1–2. But this argument fails for two reasons.

For starters, UC may rely on newly discovered evidence so long as it fits within one of the reasons it gave for terminating Goldblum "at the time of discharge" and during litigation. *Miles*, 946 F.3d at 891; *Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 592 (6th Cir. 2002). Here, Marshall referenced Goldblum's poor work performance in the termination letter she prepared in case Goldblum refused to resign. And both below and on appeal, UC has consistently maintained that it terminated Goldblum for unacceptable behavior. Therefore, we won't infer pretext merely because UC elaborated on its justifications for terminating Goldblum after she resigned.

Moreover, because Goldblum's own files and correspondence confirmed that she failed to meet many of her reporting deadlines, UC had a factual basis to terminate her for poor work performance.

Therefore, even if Shaw's report were unreliable, no reasonable juror could conclude that UC's work-performance rationale wasn't based in fact.[2]

---

[2]Regardless, UC's reliance on any false information would've been excused under the "honest belief" rule. *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998). To overcome UC's honest-belief defense, Goldblum must do more than merely allege that the investigation was less than "optimal." *Id.* at 807. Rather, she must put forth evidence showing that UC's reliance on false information was "too obvious to be unintentional." *Id.* (citation omitted). Here, Marshall found evidence confirming Goldblum's disrespectful behavior and missed reporting deadlines. Employers relying on less thorough investigations have prevailed on the honest-belief defense. *Seeger v.*

2.

Next, Goldblum argues that UC's proffered reasons didn't actually motivate it to seek her resignation. Instead, Goldblum argues that UC asked her to resign to prevent her from discovering systemic issues with its admissions process. But no reasonable juror could find that this argument establishes pretext.

First, UC never opposed Goldblum's independent investigation. Instead, the University largely shared and addressed Goldblum's concerns. For example, beyond issuing its own response to the controversy, UC deleted the article's mention of the sex offender, met with student leadership, and held a town hall to address students' concerns. To the extent UC disagreed with Goldblum, such disagreement was about minor details, such as who should issue a response and when it should be issued. And even then, UC tried to accommodate Goldblum's concerns. Indeed, despite her numerous objections to Goldblum's letter, Marshall continued to run Goldblum's letter by her colleagues—which she was in the process of doing when Goldblum sent it out.

Second, Goldblum merely created an investigation file—she made no findings, took no notes, and logged no investigative work during the remainder of her employment at UC, which ended more than a month after opening her investigation. So it's unclear whether UC actually prevented Goldblum from conducting any investigations.

Thus, no reasonable juror could conclude that UC was motivated by reasons other than the ones it proffered.

3.

Goldblum also contends that even if she was insubordinate and unprofessional, such misconduct didn't sufficiently warrant termination. Specifically, she claims that because these were her first infractions, UC should've given her a less severe reprimand under its "progressive discipline" policy. Appellant's Br. 42. We disagree.

---

*Cincinnati Bell Tel. Co.*, 681 F.3d 274, 286–87 (6th Cir. 2012). And nothing supports Goldblum's claim that UC's decision to terminate her employment was clearly "unworthy of credence." *Smith*, 155 F.3d at 807–08.

No. 22-3289   *Goldblum v. Univ. of Cincinnati*   Page 11

To begin, UC's policies permit "immediate termination" for "conduct and rule violations." R. 66-1, Pg. ID 2428. And though these policies also subscribe to the principle of progressive corrective discipline for first-time infractions, Goldblum wasn't entitled to the most lenient reprimand possible. To the contrary, UC's policies expressly "reserve[] the right to impose an appropriate level of corrective action, including termination, depending upon the severity of the violation." R. 55-1, Pg. ID 1354. And while she ultimately disagreed with the termination, Goldblum's own expert acknowledges that Goldblum's "behavior may have been deemed 'severe' because she 'defied a direct order.'" R. 69-2, Pg. ID 2864.

Moreover, though the failure to *uniformly* apply a progressive discipline policy can be evidence of pretext, Goldblum has identified no similarly situated employee who received a more lenient reprimand despite engaging in "substantially identical conduct." *Miles*, 946 F.3d at 893.

To constitute similarly situated employees, the individuals with whom Goldblum seeks to compare her treatment "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them." *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 364 (6th Cir. 2010) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)). Though Goldblum needn't show an exact correlation between herself and the proposed comparators, she must show similarities in "all relevant respects." *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 751 (6th Cir. 2012), *abrogated on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013).

Here, Goldblum identifies two director-level employees who were reprimanded—rather than terminated—for their insubordination. But for two independent reasons, these employees fail as comparators. First, neither reported to Marshall. *See Younis*, 610 F.3d at 364.[3] Second, these potential comparators were reprimanded for different conduct: in one case, taking

---

[3] Whether the "same supervisor" criterion "is relevant depends upon the facts and circumstances of each individual case." *McMillan v. Castro*, 405 F.3d 405, 414 (6th Cir. 2005). Indeed, we have observed that requiring comparators to have the "same supervisor" may be better understood as requiring comparators to have "dealt with the same ultimate decision-maker." *Id.* In this case, we consider the "same supervisor" criterion relevant because UC President Neville Pinto delegated to Marshall all decision-making authority concerning Goldblum's discipline.

University equipment off campus; and in the other, sharing confidential information with a co-worker. Thus, since they aren't similarly situated comparators, Goldblum fails to show that UC didn't uniformly apply its progressive discipline policy.

Therefore, no reasonable juror could find that Goldblum's insubordination and unprofessional behavior was insufficient to warrant termination.

4.

Finally, Goldblum raises two general allegations she claims establish pretext: (1) the "suspicious timing" between her protected activity and discharge, and (2) Marshall's "outright lies." Appellant's Br. 39 (cleaned up). Neither stands up to scrutiny.

Start with timing. Goldblum resigned on March 15, 2019, just over one month after she began complaining that UC "could be considered deliberately indifferent under Title IX" for "siding with the sex offenders" instead of victims of sex discrimination. R. 54, Pg. ID 794, 801. In conjunction with other evidence, such "temporal proximity can be used a[s] 'indirect evidence' to support an employee's claim of pretext." *Asmo v. Keane, Inc.*, 471 F.3d 588, 598 (6th Cir. 2006). But since Goldblum fails to provide such additional evidence, the mere timing of her resignation "cannot alone prove pretext." *Id.*

Goldblum also points to two instances in which Marshall told students that Goldblum's resignation was voluntary instead of coerced. But these statements don't establish pretext for two reasons. First, as a factual matter, Goldblum did resign. And she did so voluntarily to avoid termination. Second, Marshall's obfuscation is justified by her belief that it would've been inappropriate to "discuss employment matters" with students. R. 55, Pg. ID 1305–06. And we won't second-guess this judgment, especially given that its "falsity or incorrectness" isn't enough to "impeach the credibility of [UC's] remaining articulated reason(s)" for requesting Goldblum's resignation. *Sims v. Cleland*, 813 F.2d 790, 793 (6th Cir. 1987). So the alleged lies don't prove pretext either.

For all these reasons, Goldblum fails to establish that UC's two proffered reasons for seeking her resignation were mere pretexts for retaliation.

No. 22-3289 *Goldblum v. Univ. of Cincinnati* Page 13

III.

Goldblum also appeals three of the district court's discovery orders: (1) the order denying her motion to depose UC President Neville Pinto; (2) the order denying her request for the records of approximately 15,000 UC employees; and (3) the order denying her Rule 56(d) motion. We review each for an abuse of discretion. *Doe v. City of Memphis*, 928 F.3d 481, 486 (6th Cir. 2019). Indeed, district courts have significant discretion "to limit the scope of discovery where the information sought is overly broad or would prove unduly burdensome to produce." *Info-Hold, Inc. v. Sound Merch., Inc.*, 538 F.3d 448, 457 (6th Cir. 2008) (cleaned up); *In re Ohio Execution Protocol Litig.*, 845 F.3d 231, 236 (6th Cir. 2016) ("Th[e] desire to allow broad discovery is not without limits and the trial court is given wide discretion in balancing the needs and rights of both plaintiff and defendant." (quoting *Scales v. J.C. Bradford & Co.*, 925 F.2d 901, 906 (6th Cir. 1991))).

A.

Start with Goldblum's request to depose President Pinto after exceeding the deposition limit. The magistrate judge granted UC's motion for a protective order, finding that President Pinto only had limited knowledge of Goldblum's resignation. The district court overruled Goldblum's objection to the magistrate judge's order, finding that President Pinto expressly disclaimed any role in the matter by delegating all decision-making authority to Marshall. That was not an abuse of the wide discretion afforded by Federal Rule of Civil Procedure 26.

Indeed, Rule 26(c)(1)(A) provides that a district "court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense" by barring the deposition of that individual. Given the unlikely chance of President Pinto's deposition proving beneficial, the district court properly found that even a "slight inconvenience" imposed by a deposition would "amount to unreasonable harassment" under Rule 26. R. 45, Pg. ID 610 (quoting *Serrano v. Cintas Corp.*, 699 F.3d 884, 901 (6th Cir. 2012)).

To be sure, the record indicates that Marshall was involved in a UC-wide response to the triumph-cord controversy and that Marshall informed President Pinto of her decision to let

No. 22-3289            *Goldblum v. Univ. of Cincinnati*            Page 14

Goldblum go. But President Pinto appears to have had very little knowledge of Goldblum's letter or Marshall's reasons for asking Goldblum to resign. Absent a "definite and firm conviction that the trial court committed a clear error of judgment," we affirm. *FTC v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 623 (6th Cir. 2014) (quoting *United States v. Hunt*, 521 F.3d 636, 648 (6th Cir. 2008)).

B.

The district court also denied Goldblum's request to obtain the records of as many as 15,000 UC employees. Both below and on appeal, Goldblum argues that she needed these records to identify possible comparators. True, Goldblum may establish pretext by showing that UC treated similarly situated employees who didn't complain of sex discrimination more favorably. But Goldblum can't pick out UC employees at random. Rather, her comparators must have the same supervisors, must be subject to the same standards, and must have engaged in similar conduct. *Johnson v. Kroger Co.*, 319 F.3d 858, 867 (6th Cir. 2003).

Because Goldblum held a director-level position at UC, the magistrate judge limited Goldblum's request to the approximately thirty "director level" UC employees who had also been disciplined for insubordination and unacceptable behavior. R. 41, Pg. ID 533. In overruling Goldblum's objection to this order, the district court found that this limitation honored our court's precedent on potential comparators. We agree, finding no abuse of discretion.[4]

C.

Finally, the district court denied Goldblum's motion to defer consideration of UC's summary-judgment motion and allow for further discovery under Rule 56(d). Specifically, Goldblum sought permission to depose President Pinto and obtain the records of thousands of UC employees, the same requests that the district court denied at earlier stages of the proceedings.

---

[4]Goldblum's reliance on *Bobo* is unavailing. In *Bobo*, we reversed a district court's denial of a motion to compel discovery regarding seven persons who violated the same policy and reported to the same high-level managers as the plaintiff. 665 F.3d at 753. But Goldblum seeks discovery covering a large swath of UC employees who almost certainly didn't report to Marshall, so *Bobo* is inapposite.

No. 22-3289            *Goldblum v. Univ. of Cincinnati*            Page 15

Our review largely "depends on whether further discovery would have changed the legal and factual deficiencies in [Goldblum's] case." *Fifth Third Mortg. Co. v. Chi. Title Ins. Co.*, 692 F.3d 507, 510 (6th Cir. 2012) (cleaned up). But we also consider Goldblum's diligence, her prior opportunities to obtain discovery, the length of the discovery period, and UC's responsiveness during discovery. *CenTra, Inc. v. Estrin*, 538 F.3d 402, 420 (6th Cir. 2008).

Here, the record shows that Goldblum had ample opportunity to take discovery and that UC was responsive to her requests. Indeed, discovery lasted 6 months, in which time Goldblum took 10 depositions, served 21 interrogatories, served 20 requests for admissions, and received more than 4,500 pages of documents from UC. Moreover, for reasons already discussed, deposing Dr. Pinto and obtaining the records of potentially thousands of dissimilarly situated UC employees likely wouldn't cure any of Goldblum's deficiencies. Specifically, there is little reason to think that Dr. Pinto knew additional information relevant to this suit, and Goldblum hasn't established whether any of the potentially thousands of UC employees were relevant comparators.

Goldblum thus had ample discovery, and her further discovery requests would likely have been futile. For these reasons, the district court didn't abuse its discretion.

\*            \*            \*

Because the district court properly managed discovery and entered summary judgment for UC, we affirm.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 22-3289

ANDREA GOLDBLUM,

    Plaintiff - Appellant,

v.

UNIVERSITY OF CINCINNATI,

    Defendant - Appellee.

**FILED**
Mar 10, 2023
DEBORAH S. HUNT, Clerk

Before: GRIFFIN, WHITE, and THAPAR, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is AFFIRMED.

**ENTERED BY ORDER OF THE COURT**

Deborah S. Hunt, Clerk